**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

TOWN OF BEDFORD                :

            Plaintiff            :            CASE NO. 05-10214JCT

v.                                        :

ENERGY EAST SOLUTIONS, INC.    :

            Defendant         :

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rules 56(c) and (f) of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant Energy East Solutions, Inc. ("Defendant" or "Energy East") respectfully submits this Memorandum of Law in opposition to the Motion for Partial Summary Judgment ("Motion") filed by Plaintiff Town of Bedford ("Plaintiff" or "Bedford").  Plaintiff filed its Motion for Summary Judgment at the outset of the case before the completion of discovery.  The Court has limited discovery to the deposition of one witness of the Plaintiff, Ms. Marcia Pyles.[1]  As set forth in Defendant's separate Concise Statement of Material Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment, (hereinafter, "Material Facts in Opp."), the Court must deny the Motion because genuine issues of material fact exist.  Moreover, as detailed below, the Pyles deposition simply raises more questions requiring that the Court permit the parties to complete discovery and deny the Motion.

---

[1] Plaintiff served written discovery with its state court Complaint, and Defendant responded to such discovery because this Court's local rules require that a party respond to discovery pending prior to removal from state court to this Court.  Prior to the filing of the Motion for Summary Judgment, no discovery/scheduling order had been set in this case.  See Commonwealth Aluminum Corp. v. Markowitz, 164 F.R.D. 117 (D. Mass. 1995)("Fed. R. Civ. P. 56(f) is the vehicle by which the party opposing summary judgment may defer judgment by demonstrating an authentic need for, and an entitlement to, an additional interval in which to marshal facts essential to mount an opposition.  A court should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter").

I.    FACTS

In 2001, Plaintiff Town of Bedford entered into a three-year contract with North East Energy Partners, L.L.C. for the purchase and sale of natural gas services (the "Contract"). North East Energy subsequently assigned the Contract to Energy East. See Letter of June 10, 2002 from John Hardy, North East Energy Partners, L.L.C. to R. Reed, Town of Bedford, attached hereto as Exhibit 1.

The Term

The Contract provides under the section headed "TERM", that it would run "From Buyer's August 2001 meter read date through Buyer's August 2004 meter read date." See Contract p. 2, a copy of which is appended hereto as Exhibit 2. Although the Contract stated that it would begin with "Buyer's August 2001 meter read date," the contract was not executed until September 20, 2001. See Exhibit 2 at p. 3; see also Affidavit of Jerry Hawkins ("Hawkins Aff.") at ¶ 14, a copy of which is appended hereto as Exhibit 3. Therefore, Bedford actually received gas from North East Energy Partners pursuant to the Contract after September 20, 2001. See Hawkins Aff. at ¶ 14, Exhibit 3. See Deposition Transcript of Town of Bedford's Marcia Pyles ("Pyles Tr.") at 31-32, a copy of which is appended hereto as Exhibit 4. While Bedford has attached a few invoices to its Motion showing that "Select Energy" was the gas supplier prior to the Contract being signed, Pyles has admitted that "they were the current supplier for the term before this contract." See Pyles Tr. at 32, Exhibit 4 (emphasis added). To extend for the full three-year term, the Contract would actually run from September 20, 2001 to September 20, 2004. Indeed, as verified in the Affidavit of Teresa Bradford, Energy East supplied gas through September 22, 2004 (a copy of the Bradford Affidavit is appended hereto as Exhibit 5).

In addition, although the Contract refers to a single "meter read date," the fact is that Bedford had twelve (12) different properties being served, each with its own meter read date:

> Q.    Did the 12 buildings have different meter reading dates?
>
> A.    Yes.

Pyles Tr. at 6, Exhibit 4.  Therefore, contrary to the language of the Contract, there was no single, specified date on which the Contract would begin and end.

### The Price

Separately, under the section headed "PRICE", the Contract provided two price options: one for a "Fixed Price" and one for an "Indexed Price."  Back in 2001, Bedford and North East Energy Partners had agreed to the "Fixed Price" option for the 2001-2004 Term.  See Contract, Exhibit 2.  In 2001, the price was 5.65¢ /DKT.  Pyles Tr. at 17, 35, Exhibit 4.  That price stayed in effect for three years even though the market price of gas had increased dramatically over those three years.  By 2004, the price of gas in the market was almost double the 2001 contract price.  See Pyles Tr. at 63-64, Exhibit 4.[2]  The current price is 17¢ /DKT.  Pyles Tr. at 54, Exhibit 4

In April of 2004, at the instruction of her supervisor at the Town of Bedford, Marcia Pyles contacted Energy East to find out Energy East's pricing going forward.  See id. at 55.  She then spoke with Jerry Hawkins, an independent energy consultant acting on behalf of Energy East, regarding the upcoming Contract termination.  See Hawkins Aff. at ¶ 4, Exhibit 3; see also Pyles Tr. at 9-10, Exhibit 4.  Hawkins told Pyles that the Contract would terminate but that Energy East would be willing to renew with a new Indexed Price quote.  Hawkins Aff. at ¶ 8, Exhibit 3.  On April 28, 2004, Ms. Pyles sent Hawkins a facsimile stating, "Can you please give

---

[2] In her deposition testimony, Marcia Pyles testified that Jerry Hawkins had provided her in 2004 with quotes of 92¢ and 96¢ per dekatherm.  Pyles Tr. 63-64, Exhibit 4.  We assume that the actual quotes were 9.2¢ and 9.6¢ per dekatherm.

us a price for one year with the option of an annual extension for a max of 3 years total?" Pyles

Tr., Exhibit 4, attached as Exhibit 4 thereto.  Hawkins later responded, "Please verify which

accts that you want on the new contract. . . ."  Pyles Tr, Exhibit 4, attached as Exhibit 5 thereto.

While Pyles denies ever having seen an Indexed Price and does not recall discussing an

Indexed Price, Pyles did recall having had extended discussions with Hawkins about trying to get

a better price.  See, Pyles Tr. at 14-15, 27, 43, 50, Exhibit 4.  Pyles rejected the Energy East price

quote as too high and asked Hawkins to look into other suppliers on behalf of Bedford.  See id.

After months of discussions with Hawkins wherein Pyles was having Hawkins look for better

prices than those offered by Energy East, Bedford suddenly told Energy East on August 16, 2004

that Energy East now had to renew for three more years at the 2001 price because Energy East

had not sent formal written notice of non-renewal.  See Pyles Tr. at 69-70. Exhibit 4.  After that

conversation, by a letter dated August 20, 2004, Energy East gave formal written notice of non-

renewal.  See Letter from S. Humes to R. Reed dated August 20, 2004, attached hereto as Exhibit

6.

The Renewal Provision

Appended to the Contract there was a separate, boilerplate form of Terms and Conditions

which provided that, "[u]nless either party otherwise notifies the other in writing at least thirty

(30) days prior to the expiration of the original term or any subsequently agreed upon term, then

this Agreement shall be automatically renewed for a like term."  See Terms and Conditions at

§ 7, a copy of which is attached hereto as Exhibit 7 (emphasis added).  As stated in the

accompanying affidavit of Jerry Hawkins and the deposition testimony of Marcia Pyles, as early

as April 2004, Energy East had communicated that the Contract would be terminating but that

Energy East would agree to renew at a new price.  Hawkin's Aff. at ¶ 6-7, Exhibit 3; Pyles Tr. 9-

4

10, Exhibit 4. Bedford rejected Energy East's price and sought other suppliers. Hawkin's Aff. at ¶ 7-9, Exhibit 3.

Although the automatic renewal provision speaks in terms of the Contract's expiration, actual Contract performance lagged one month behind dates specified in the Contract since deliveries pursuant to the Contract did not begin until after September 20, 2001. Written notice of non-renewal was provided on August 20, 2004 – thirty (30) days before September 20, 2004. Exhibit 6. Based on industry custom and practice, automatic renewal provisions are intended to be for 30 days. See Hawkins Aff. at ¶ 13, Exhibit 3.

II.    ARGUMENT

Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c) (2005). When deciding upon a motion for summary judgment, all facts are to be viewed, and all inferences drawn, in the light most favorable to the nonmoving party. Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002). The party moving for summary judgment bears the burden of establishing the absence of a genuine issue of material fact. See Bransford & Petz, P.C. v. Bank of Am. Commer. Fin. Corp., 2005 U.S. Dist. LEXIS 14243, 10-11 (D. Mass. 2005).[3] A material fact is one that has the "potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

Here, there are genuine issues of material fact in dispute. First, Energy East has come forward with evidence that Bedford received actual notice of non-renewal, was engaged in price negotiations, and had rejected Energy East's offered price. In addition, Bedford was informed as early as April of 2004 that the Contract would terminate in 2004. See Hawkins Aff. at ¶ 4,

---

[3] All non-reported cases are appended hereto as Exhibit 8.

Exhibit 3; see also Pyles Tr. at p. 9, Exhibit 4. Second, the parties disagree on the meaning of the automatic renewal provision which is ambiguous. Bedford has averred that the Contract was renewed for three more years at the old 2001 fixed price. Energy East submits that, at most, the contract "Term" may have renewed, but the "Price" did not automatically renew at the initially-selected "Fixed Price" option or at the old price, particularly where both parties knew that price was a subject of disagreement. Third, the Contract is ambiguous as to the "meter read date" where there is no single meter read date. Further, since the Contract was signed in September 2001 and since Bedford only started receiving Energy East gas pursuant to the Contract after that date, the Contract did not terminate until September 2004. Therefore, even if a formal written notice of non-renewal was required beyond Bedford's actual notice, Bedford timely received such formal written notice. Fifth, the Contract talks about thirty (30) days' notice. While the automatic renewal provision could be read to refer to the initial three-year term, it could also refer to an automatic renewal for a 30 day term. This reading is supported by custom and usage. See Hawkins Aff. at ¶ 13, Exhibit 3; see Nadherny v. Roseland Prop. Co., 390 F.3d 44, 52 (1st Cir. 2004) ("When evidence of custom and usage of the trade is used to interpret a contract and the issue is disputed, summary judgment is inappropriate"). The communication between Hawkins and Pyles make it clear that Energy East had not agreed to a renewal at the old fixed price.

      1.    Actual Notice was Given

Bedford was informed as early as April of 2004 that the Contract would terminate. Moreover, Bedford was advised that Energy East would only agree to a renewal under the Indexed Price option at a higher price. Even assuming, arguendo, that written notice was not timely given, Bedford had actual notice of Energy East's termination of the old contract at the old

price. Courts have held that "[e]ven where a contract requires a particular method of giving notice, notice given by a different method is effective if it is actually received unless the method by which notice is given is an essential element of the transaction." Univ. Emergency Med. Found. v. Rapier Inv., Ltd., 1998 U.S. Dist. LEXIS 22722 (D.R.I. 1998) aff'd Univ. Emergency Med. Found. v. Rapier Inv., Ltd., 197 F.3d 18 (1st Cir. 1999) (finding that notice of termination was effectively given where notice was mailed to an incorrect address and noting that ". . . the critical question is whether the parties intended the use of the mailing address specified in the contract to be a condition precedent to valid termination …[w]e conclude that they did not. . .[r]ather we find that the parties identified specific addresses for the mailing of notice merely as a convenient means of ensuring timely delivery")[4], see also Desfosses v. Wallace Energy, Inc., 836 F.2d 22, 26 (1st Cir. 1987) (finding that actual notice of termination of a franchise agreement governed by the Petroleum Marketing Practices Act would "suffice if failure of written notice would elevate form over substance").

---

[4] Courts in other jurisdictions have similarly held. See, e.g., Little Beaver Enter. v. The Humphreys Rys., Inc., 719 F.2d 75, 79 (4th Cir. (Va.) 1983) (despite provision in contract requiring 30-days written notice of termination, plaintiff's timely, verbal notice of termination "gave [defendant] every substantive protection strict compliance with the contract would have provided."); IBP, Inc. v. City of Dubuque, 1996 U.S. Dist. LEXIS 22318, at *10 (N.D.Iowa Apr. 1, 1996) (party's statement during telephone conversation that the agreement was "off the table" provided notice of termination even though agreement required "written notice of termination."); Fort Walton Beach Lincoln-Mercury, Inc. v. Pearson, 731 So.2d 859 (Fla. Dist. Ct. App. 1999) (oral notice of termination sufficient despite written notice provision); Writzmann v. Baust, 1998 Tenn. App. LEXIS 671, at *8 (1988) ("[t]he object of requiring notice is accomplished when the party entitled to receive notice has *actual knowledge* of the matter that would have been covered by the notice.") (emphasis added); Berry v. Carnaco Transport, 1994 U.S. App. LEXIS 35228, at **5-6 (9th Cir. 1994) (notice of termination of contract sufficient where plaintiff received actual, unequivocal oral notice followed by written notice of termination and where plaintiffs "clearly understood they were terminated . . . where there is actual notice, courts *will not be hypertechnical* in their interpretation of notice provisions.") (emphasis added); Minneapolis Elec. Lamp Co. v. Federal Holding Co., 175 Minn. 421, 425-26 (1928) (oral notice of termination sufficient despite 30-days written notice requirement in contract where lessor was given "ample oral notice, 15 months before the end of the term, that the lessee intended to vacate and surrender the premises, terminate the lease and not continue it beyond the lease"); McCain v. Nat'l Broad. Co., 1983 U.S. Dist. LEXIS 14491, at **4-5 (D.D.C. 1983) (affirming arbitrator's award finding oral notice of termination sufficient despite written notice requirement because, "[t]he arbitrator quite actually concluded that the written notice provision was intended to ensure that the parties would be appraised of termination of the contract. Since this purpose was served through unequivocal oral notice of termination, the arbitrator concluded that written notice was . . . superfluous. The arbitrator could discern no prejudice to the claimant by reason of not having been given a written notice of termination. The court finds that the arbitrator's . . . conclusion is supported by established principles of contract law.").

2.    <u>Term Not Renewed at Old Price</u>

In its Complaint, Bedford asserts that the Renewal Provision extended not just the TERM but also the PRICE.  <u>See</u> Complaint at ¶ 12.  In other words, Bedford is attempting to argue that Energy East should be locked in for three more years at a gas price that was already three years old.  The Renewal Provision, however, deals only with the <u>length</u> of the renewal, not with the <u>price</u> for the renewal term.  In its entirety, the Renewal Section states: "Unless either party otherwise notifies the other in writing at least thirty (30) days prior to the expiration of the original term or any subsequently agreed upon <u>term</u>, then this Agreement shall be automatically renewed for a like term."  <u>See</u> Exhibit 7 at § 7 (emphasis added).  It does not say "for a like term at the same price."  While such a statement might be unnecessary in a contract that had only one price term, this Contract provided two price options.  The renewal of the term did not eliminate the Contract's price options.  To the contrary, Hawkins told Bedford that Energy East had selected the Indexed Price Option for any renewal term.

The discussions between Pyles and Hawkins for the months leading up to Bedford's "gotcha" letter clearly show that the parties understood that any renewal for a "like term" would be at a different price.  <u>See</u> <u>Trent Partners & Assocs. v. Digital Equip. Corp.</u>, 120 F. Supp. 2d 84, 98 (D. Mass. 1999) ("In Massachusetts the issue of ambiguity must be closely examined, such that if the contract "is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms").

Given the meteoric rise of gas prices from 2001 to 2004 it is obvious that the parties could not have agreed upon another three years locked in to the 2001 prices.  Bedford's assertion that the parties agreed to the renewal of the Contract at the same price after the initial three year

term is not based in reality.  See Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass.

App. Ct. 162, 170 (Mass. App. Ct. 1997) (a contract should be interpreted in a way which will

make it a rational business instrument that will effectuate the apparent intention of the parties).

Determination of this issue is therefore not appropriate for summary judgment.  See Nadherny v.

Roseland Prop. Co., 390 F.3d 44, 52 (1st Cir. 2004) ("When evidence of custom and usage of the

trade is used to interpret a contract and the issue is disputed, summary judgment is

inappropriate").  The communication between Hawkins and Pyles make it clear that Energy East

had not agreed to a renewal at the fixed rate.  Likewise, Bedford understood that Energy East's

renewal price was substantially higher than the 2001 price.  Pyles Tr. at 18, Exhibit 4.  There can

be no meeting of the minds where parties disagree on an essential element of the contract.  Here,

there was an express disagreement on the issue of price.  See Malek v. Verizon Comm'ns., Inc.,

2004 U.S. Dist. LEXIS 976, 12-13 (D. Mass. 2004) ("It is axiomatic that to create an enforceable

contract, there must be agreement between the parties on the material terms of that contract…and

[a] failure of the parties to agree on material terms ... may prevent any rights or obligations from

arising on either side for lack of a completed contract") (Internal citations omitted).  Bedford's

argument of automatic renewal might have more traction if there had been no discussions at all.

But here, Bedford knew that Energy East wanted a higher price and had communicated its

refusal to agree to that term.

     3.    Meter Read Date is Ambiguous

There also exists an ambiguity or issue of material fact regarding the exact date of the

termination of the Contract.  According to the Contract, the initial term was to be measured from

"Buyer's August 2001 meter read date through Buyer's August 2004 meter read date".  See

Exhibit 2 at p. 2.  While this language implies that a single date is certain, there are, in fact, a

9

series of unspecified dates. As Bedford, itself, recognizes, there is no one meter read date; rather, there are several different meter read dates because the dates "varied from municipal building to municipal building." Complaint, ¶ 11; see also Pyles Tr. at 16, Exhibit 4, ("Q: Did the 12 buildings have different meter reading dates? A: Yes."). On its face, it is unclear whether that provision refers to some date in August when a meter is read, or to some date in September when Buyer's consumption for the month of August would be known. Whatever the "meter read" date is, it is not stated in the Contract, and the reality is that Bedford had multiple meter read dates. See Pyles Tr. at 30, Exhibit 4, ("So I guess you could say that they would renew on their individual dates").

Bedford's argument that any ambiguity should be construed against the drafter is also off the point since Energy East did not draft the contract. See Exhibit 2. Further, where both parties to a contract are sophisticated business people, the rule of interpreting ambiguities against the drafter does not control. See, e.g., Falmouth Nat'l Bank v. Ticor Title Ins. Co., 920 F.2d 1058, 1062 (1st Cir. 1990) (Recognizing that when a contract has been negotiated between two parties of equal sophistication and equal bargaining power, the rule of interpreting ambiguities against the drafter does not apply with the same force).

4.   Contract Actually Ran Through September 20, 2004

Bedford did not sign the Contract until September 20, 2001. See Exhibit 2. North East Energy Partners – Energy East's predecessor – did not start supplying gas to Bedford pursuant to this Contract until after the Contract was signed on September 20, 2001. See Hawkins Aff. at ¶ 14, Exhibit 3. Thus, the Contract's initial three year term did not begin until September 20, 2001. To have a full three years of gas service, the Contract would have a termination date of September 20, 2004. Id. Bedford's evidence of a few monthly invoices showing "Select Energy"

as the gas supplier proves nothing since Pyles has admitted that "[t]hey were the current supplier for the Town <u>before</u> this Contract. Pyles Tr. at 32, Exhibit 4. In addition to making Bedford aware that it would not be renewing the Contract, Energy East provided formal written notice on August 20, 2004. <u>See</u> Exhibit 4. This formal written notice complied with the Contract's 30 day notice requirement.

> 5.     <u>Automatic Renewal was Only for 30 Days</u>

Automatic Renewal Provisions such as the one found in the Terms and Conditions are common in the energy industry. <u>See</u> Hawkins Aff. at ¶ 13, Exhibit 3. By custom and usage, these provisions are intended to ensure that the customer will continue to receive gas on a month-to-month basis following the termination of a Contract so that a customer will not unexpectedly be without heat. <u>Id.</u> Thus, the Terms and Conditions provided that, "[u]nless either party otherwise notifies the other in writing at least thirty (30) days prior to the expiration of the original term or any subsequently agreed upon term, then this Agreement shall be automatically renewed for a like term." <u>See</u> Exhibit 7 at § 7. According to the custom in the industry, the language "a like term" likely refers to the "thirty (30) days" mentioned in this sentence and not to another three years at an old price.

Where there is disagreement regarding a contract's terms, that ambiguity precludes deciphering by summary judgment. <u>See</u> <u>e.g.</u>, <u>Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.</u>, 768 F.2d 5 (1st Cir. 1985) (reversing the District Court's grant of summary judgment concerning the interpretation of a contract); <u>see also</u>, <u>InterPay, Inc. v. Bigham</u>, 2002 U.S. Dist. LEXIS 16202 (D. Mass. 2002) (denying both plaintiff's and defendant's motions for summary judgment and finding that "the reasonable inferences that can be drawn about the parties' intentions from the contract language itself is sufficient to raise a material issue of

genuine fact as to the meaning of the Agreement"), a copy of which is appended hereto as

Exhibit 7.

> 6    Because Ms. Pyles Testified that She Did not Know Why Her Supervisor,
> Richard Jones, Asked Her to Contact Energy East Regarding Pricing,
> <u>Additional Discovery is Necessary</u>

Energy East asked Ms. Pyles in deposition about Bedford's purpose in looking at gas

pricing in the Spring of 2004 and Ms. Pyles stated she did not know why she was discussing

such pricing with Energy East.

> Q.    What prompted you to start looking to talk about pricing and renewals in the
> spring of 2004?
>
> A.    My boss [Richard Jones] requested me to go and find some pricing, see what the
> current market was doing, kind of a fact finding mission.
>         * * *
>
> Q.    Did he tell you that, "We have contracts that are going to expire in 2004.  You
> need to start getting some pricing information."?
>
> A.    No.
>
> Q.    He just told you to go look for prices, and you have no idea why?
>
> A.    Correct.

While Energy East believes that Ms. Pyles deposition testimony itself (and the other issues

identified herein) raises genuine issues of material fact that require the denial of the Motion,

based upon Ms. Pyles deposition, the depositions of her supervisor, Richard Jones[5] also is

necessary for Energy East to meaningfully and fully respond to the Amended Complaint and the

Motion.[6]

---

[5] The deposition of Richard Reed, the Town Manager, also may be required given the references in the Pyles
deposition to conversations with Mr. Reed about this matter.

[6] In addition, Ms. Pyles' production of documents from her file at deposition suggest that other documents may exist
in the possession of Bedford employees relevant to Bedford's claims and Energy East's defenses such that the Court
should permit the parties to complete discovery.  Energy East complied with Plaintiff's document requests and
interrogatories, which had been served prior to removal of this action.  Energy East then filed a Motion to Dismiss,

III.    CONCLUSION

For all the reasons set forth above, Defendant Energy East respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment, permit the parties to complete discovery, and grant Energy East such other and further relief as this Court deems just and proper.

Dated at Hartford, Connecticut this 17th day of January 2006.

RESPECTFULLY SUBMITTED,

ENERGY EAST SOLUTIONS, INC.

By: _____
Thomas G. Rohback, admitted pro hac vice
James J. Reardon, Jr. (BBO #566161)
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
Goodwin Square
225 Asylum St.; 13th Floor
Hartford, CT 06103
(860)293-3500
(860)293-3555 (facsimile)

---

and, after the Court ruled upon the Motion to Dismiss, the Court stayed any additional discovery until after the Court's initial Scheduling Conference. The Court then limited discovery to the Pyles deposition.

## **CERTIFICATION**

This is to certify that a copy of the foregoing Response to Plaintiff's Motion for

Partial Summary Judgment was sent by First Class Mail on this 17th day of January, 2006 to all

counsel of record and pro se parties as follows:


Michael F.X. Dolan, Jr., Esq.
Murphy, Hesse, Toomey & LeHane, L.L.P.
300 Crown Colony Drive
Quincy, MA 02269

James J. Reardon, Jr.

# EXHIBIT 1



One Heritage Place
945 Main Street Suite 201
Manchester, CT 06040
Phone:    860.647.1841
Fax:     860.647.1847
www.neenergypartners.com

June 10, 2002



**VIA FACSIMILE** and
**FIRST CLASS MAIL**

**Town of Bedford**
**10 Mudge Way**
**Bedford, MA 01730**

Dear Mr. Reed:

This letter is in reference to that certain Natural Gas Sales Agreement between Northeast Energy Partners, L.L.C. ("NEP") and Town of Bedford ("Customer"), dated as of 9/20/01 (the "Contract").

Pursuant to Paragraph 9 of the Terms and Conditions incorporated into and made part of the Contract, NEP requests your consent to the assignment of the Contract to Energy East Solutions, Inc. By consenting to the assignment, you will continue to receive your natural gas services under the same terms and conditions as is set forth in the Contract however your supplier will be Energy East Solutions, Inc instead of NEP.

Please acknowledge your agreement to the foregoing by signing the facsimile version and returning it to NEP at the following facsimile number: 860-647-1847 no later than June 13, 2000. Additionally, please sign the enclosed copy of the mailed version of this letter when you receive it and return it to us at the following address: One Heritage Place, Manchester CT 06040. An additional signed copy of this letter is enclosed for your records. Upon receiving your consent via facsimile, the assignment will become effective on your next meter read date available for enrollment.

It has been a pleasure working with you. Should you have any questions, please do not hesitate to contact Tom Lockwood at 860-647-1841x10.

Sincerely,

By: 
Name: John Hardy
Title: Managing Partner, North East Energy Partners, L.L.C.

Acknowledged and Agreed to:

**Town of Bedford**

By: 
Name: **Richard T. Reed**
Title: **Town Administrator**

Bedford NEP-EES assignment letter 060602.doc

# EXHIBIT 2

ALL-STATE LEGAL

1

## NATURAL GAS SALES AGREEMENT (MMA)

| | | | | |
|---|---|---|---|---|
| **SELLER:** | NORTHEAST ENERGY PARTNERS | | **BUYER:** | Town of Bedford |
| | One Heritage Place | | | 10 Mudge Way |
| | Manchester, CT 06040 | | | Bedford, MA 01730 |
| **PHONE:** | 860-647-1841 | | **ATTN:** | Richard Reed |
| **FAX:** | 860-647-1847 | | **PHONE:** | 781-275-1111 |
| | | | **FAX:** | 781-275-6310 |

**LOCATION(S):**

See Attached

**LDC ACCOUNT NUMBER(S):**

See Attached

**TERM:** From Buyer's August, 2001 meter read date through Buyer's August 2004 meter read date.

(Circle Choice)

1 Year        2 Year        (3 Year)

**SERVICE:** The sale and purchase of natural gas hereunder shall be on a guaranteed, firm delivery basis. Buyer agrees to continue using natural gas as its energy source for all the uses and processes reflected in the historical usage information provided to Seller, and to purchase its full gas requirements from Seller pursuant to this Natural Gas Sales Agreement and the attached Terms and Conditions (together the "Agreement"). This shall not prohibit Buyer from implementing measures, including maintenance practices and equipment upgrades, designed to improve the efficiency with which it consumes natural gas, so long as Buyer provides Seller with reasonable notice of the implementation date and likely effect of such measures on Buyer's consumption. Seller agrees to supply Buyer's full requirements for natural gas pursuant to the terms and conditions of this Agreement.

**DELIVERY POINT(S):** The point(s) where the Local Distribution Company (LDC) receives gas from the applicable pipeline.

**PRICE:** Initial the appropriate pricing option below.

A.        _____ Fixed Price
           (Initials)

           Under the Fixed Price option Buyer will pay Seller a fixed price of $5.65 per Dth (one million British Thermal Units) for natural gas delivered to the Delivery Point and charges related thereto including, but not limited to, mandatory capacity assignment and telemetering.

B.        _____ Indexed Price
           (Initials)

           Under the Indexed Price option for all natural gas for the Term delivered by Seller to the Delivery Point and sold to Buyer, Buyer will pay Seller $ _____ per dth above the Monthly NYMEX Average. Monthly NYMEX Average shall be the last NYMEX settlement price for such month as published in the Wall Street Journal during the immediately preceding month.

**SPECIAL TERMS AND CONDITIONS:** Seller will indemnify Buyer for any charges, penalty costs, or standby cost related to the nominating, balancing, scheduling, and delivery of natural gas to the delivery point, including the cost of providing gas to the Buyer in the event that Seller cannot provide delivery to the Buyer except in the case of Force Majeure.

During the Term, Seller may not, at any time, unless it has Buyer's express written consent to do so, switch Buyer's accounts onto the LDC's service.

**BUYER:**
AGREED TO AND ACCEPTED

**SELLER:**
AGREED TO AND ACCEPTED

2

BY: _Arthur R. Reed_ DATE: 9/20/01
Its: Town Administrator

BY: _[signature]_ DATE: 12/20/01
Its: M.G. Partner

2

3

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

TOWN OF BEDFORD                          :

        Plaintiff                        :          CASE NO. 05-10214JCT

v.                                       :

ENERGY EAST SOLUTIONS, INC.              :

        Defendant                        :

### AFFIDAVIT OF JERRY HAWKINS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Jerry Hawkins, submit this affidavit in support of Defendant Energy East Solutions, Inc.'s ("Energy East") Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment. Under the pains and penalties of perjury, I state as follows:

1.   I am over the age of 21. I reside in Kingston, New Hampshire.

2.   I am employed by The Energy Authority and have been so employed since September 5, 2002. As part of my employment, I act as an independent agent for the purchase and sale of natural gas services.

3.   In this capacity, I was engaged by Energy East to handle the renewal of a contract for natural gas services ("Contract") between Energy East and the Town of Bedford ("Bedford").

4.   On April 21, 2004, I had a telephone conversation with Marcia Pyles, who was employed as the Facilities Information and Procurement Analyst for Bedford, and discussed with her the upcoming Energy East-Bedford Contract termination.

5.    In May of 2004, I had another conversation with Marcia Pyles in which we discussed market conditions and the renewal. She expressed concern that market rates had gotten very high.

6.    On July 20, 2004, I received a Contract price from Energy East for the renewal of the Bedford Contract pursuant to the "Indexed Price" option contained in the Contract.

7.    That same day, I contacted Marcia Pyles and informed her of the Indexed Price being offered by Energy East for renewal. During the course of this conversation, Ms. Pyles indicated that Energy East's price was too high and asked me to see if I could find better prices with other suppliers in the marketplace. Specifically, at her request, I agreed that, among other potential sources, I would contact Select to see if I could find better prices for Bedford.

8.    On August 4, 2004, I called Marcia Pyles to let her know that Bedford needed to accept or reject Energy East's renewal proposal based on the quoted Index Price Option. Again, she told me that Energy East's price was too high and asked me to find better prices from other suppliers.

9.    On August 11, 2004, I called Marcia Pyles to check whether Bedford had decided to renew the contract. At this time, I also sent her an e-mail of a blank Select contract. In addition, I sent her a separate e-mail talking about Keyspan Terms and Conditions.

10. On approximately, August 13, 2004, I received call from Marcia Pyle's boss, Richard Reed. I reiterated the price at which Energy East was prepared to renew the Contract. I explained that market conditions were causing the market to be higher than the last time they signed the Contract three years ago. He asked me to explain my role, which I did.

11. On August 16, 2004, Ms. Pyle's boss, Richard Reed, called me to tell me that Bedford demanded a renewal at the old fixed price. I explained that that proposal was not feasible and that Energy East would not agree to renew at that price. He indicated that it was his view that Energy East now had no choice but to renew at the old fixed price.

12. I reported this conversation to Energy East and had no further involvement with this Contract.

13. Automatic Renewal Provisions such as those found in the Terms and Conditions form are common in the energy industry. By custom and usage, these provisions are intended to ensure that the customer will continue to receive gas on a month-to-month basis following the termination of a Contract so that a customer will not be without a supplier.

14. Bedford did not sign this Contract until September 20, 2001. North East Energy Partners – Energy East's predecessor – did not start supplying gas to Bedford until the Contract was signed in September 2001. To have a full three years of gas service, the Contract would have a termination date or termination dates on or after September 20, 2004.

Signed under the pains and penalties of perjury, this _12_ day of January, 2006.

_____
Jerry Hawkins

# EXHIBIT 4

1

Volume I
Pages 1 to 75
Exhibits 1 to 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
TOWN OF BEDFORD,                 :
          Plaintiff,             :
                                 :
     vs.                         :   Civil Action
                                 :   No. 05-10214-JCT
ENERGY EAST SOLUTIONS, INC.,     :
          Defendant.             :
                                 :
- - - - - - - - - - - - - - - - -x

          DEPOSITION OF MARCIA LYN PYLES, a witness
called on behalf of the Defendant, taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of LeBoeuf, Lamb, Greene & MacRae
L.L.P., 260 Franklin Street, Boston, Massachusetts,
on Tuesday, December 20, 2005, commencing at 10:26
a.m.

PRESENT:

     Murphy, Hesse, Toomey & Lehane, LLP
          (By Michael F.X. Dolan, Esq.)
          300 Crown Colony Drive, Suite 410, Quincy,
          MA  02169, for the Plaintiff.

     LeBoeuf, Lamb, Greene & MacRae L.L.P.
          (By Thomas G. Rohback, Esq.,
          and James J. Reardon, Jr., Esq.)
          Goodwin Square, 225 Asylum Street,
          Hartford, CT  06103, for the Defendant.

                    *  *  *  *  *

2

I N D E X

WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

MARCIA LYN PYLES

 BY MR. ROHBACK            4


                     *  *  *  *

                 E X H I B I T S

NO.                    DESCRIPTION                    PAGE

  1     Document entitled "Natural Gas Sales          30
        Agreement (MMA)" Bate stamped
        EES0017 to EES0021

  2     Affidavit of Marcia Pyles                     41

  3     Handwritten notes, one page                   55

  4     Fax dated 4/28/04 from Marcia Pyles           55
        with attachment

  5     email dated 6/30/04 from Jerry                55
        Hawkins to Marcia Pyles with
        attachment

  6     Fax dated 8/17/04 to Jan Geist from           55
        Marcia Pyles

  7     email from Marcia Pyles to Richard            55
        Jones dated 8/5/04

  8     email from Jerry Hawkins to Marcia            55
        Pyles dated 8/11/04 with attachment

  9     email from Jerry Hawkins to Marcia            55
        Pyles dated 8/11/04 with attachment

3

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 10 | Handwritten notes, one page, with "Jan Geist" written at top | 55 |

* * * *

4

1              P R O C E E D I N G S

2              MARCIA LYN PYLES

3   a witness called for examination by counsel for the

4   Defendant, having been satisfactorily identified by

5   the production of her driver's license and being

6   first duly sworn by the Notary Public, was examined

7   and testified as follows:

8              DIRECT EXAMINATION

9      BY MR. ROHBACK:

10     Q.    Ms. Pyles, my name is Tom Rohback.  We met

11  briefly, and I represent Energy East in this

12  lawsuit.  I'm going to ask you some questions.  If

13  you don't understand a question, just let me know,

14  and I'll try to rephrase it.  Okay?

15     A.    Okay.

16     Q.    By whom are you currently employed?

17     A.    The Town of Bedford.

18     Q.    And for how long have you been employed by

19  the Town of Bedford?

20     A.    Three years this December.

21     Q.    So when did you start working for the Town

22  of Bedford?

23     A.    December 16, 2002.

24     Q.    And before starting work for the Town of

5

1    Bedford, were you employed by anyone?

2        A.    Yes, I was.  I was employed by -- it was

3    bought out several times.  It was first FutureTense,

4    then Open Market, then IConverse, so I guess you'd

5    call them "IConverse."

6        Q.    How long were you employed by that company

7    or collection of companies?

8        A.    I would say over three years,

9    approximately.

10       Q.    Somewhere in the late '90s; '98, '99 to

11    2002?

12       A.    It was '99 to 2002.

13       Q.    And before that, were you employed by

14    anyone?

15       A.    Yes, I was, by WSI Corporation.  And that

16    was -- it stands for Weather Services International.

17       Q.    And how long were you employed by them?

18       A.    Approximately 11 years.

19       Q.    So that's sometime in the '80s?

20       A.    That was from 1988 to 1999.

21       Q.    And before that, were you employed by

22    anyone?

23       A.    Yes, I was.

24       Q.    Okay.

6

1    A.    BayBanks from 1986.

2    Q.    Any employment before that?

3    A.    Dunkin' Donuts, when I was in high school.

4    Q.    And what's your educational background?

5    A.    High school diploma, and I have a few

6    credits towards college.

7    Q.    And when did you take those credits?

8    A.    That would have been probably in 1986 and

9    '87, I would say.

10   Q.    Very briefly, what were your

11   responsibilities at each of your employers?  And I

12   assume they changed over time somewhat.

13   A.    Uh-hum.  At BayBank I was a corporate

14   credit clerk, and it was processing corporate loans,

15   managing what their balances were.  At WSI, I

16   started off as an accounts receivable clerk.  And

17   that turned into a contract administrator, to a

18   customer -- accounting customer supervisor.

19   Q.    And what are we going to call the next

20   employer?

21   A.    It started off as FutureTense, bought out

22   by Open Market, and then it was IConverse.  And the

23   positions I held in all three were very similar.

24   They were the accounts receivable side of the

7

1    business.  It was collections, commissions and a

2    little bit of the contract administration.

3        Q.    And after IConverse, you went to work for

4    the Town of Bedford?

5        A.    Correct.

6        Q.    And what position did you --

7        A.    I was initially -- the title was the

8    administrative assistant, and now it's the

9    facilities information and procurement analyst.

10       Q.    Your initial title for Bedford was

11   administrative assistant.  Were you the assistant to

12   someone?

13       A.    To Richard Jones.

14       Q.    And what was his position?

15       A.    Director of facilities.

16       Q.    And what were your job responsibilities as

17   the administrative assistant to Richard Jones?

18       A.    They're the same as they are right now.

19   It's handling all the procurement for the

20   department, managing the utility bills for the

21   schools and the towns, doing, you know, everything

22   related to the budget for the department.  You know,

23   from preparing the budget to reviewing it throughout

24   the year to see if there were any inefficiencies or

8

1    problems that could arise by the end of the year.

2    Handling all the procurements, whether it's for

3    buying supplies, procuring contracts for

4    construction projects we have in town.

5        Q.    And is it for a particular department that

6    you work for?

7        A.    I work for the facilities department.

8        Q.    And what does the facilities department do?

9        A.    The facilities department oversees the

10   maintenance of the school buildings and town

11   buildings for the Town of Bedford.  That goes from

12   custodial services to maintenance services.

13       Q.    How many buildings are there that you

14   supervise or oversee?

15       A.    There are four school buildings.  Town

16   buildings?  Give me one second, and I'll count them.

17   It was eight buildings.

18       Q.    Eight town buildings and four school

19   buildings?

20       A.    Correct.

21       Q.    And during your entire tenure, has it been

22   about the same, about 12 buildings?

23       A.    Yes.

24       Q.    And you had no involvement, then, in the

9

1   initial negotiation or entering into the contract

2   between the Town of Bedford and Energy East,

3   correct?

4       A.   Correct.

5       Q.   When did you first become aware of that

6   contract's existence?

7       A.   It would have been April of 2004.

8       Q.   How did you become aware of that contract's

9   existence?

10      A.   When I was contacted by Jerry Hawkins.

11      Q.   And was that contact by telephone?

12      A.   Yes.

13      Q.   And as best as you can recall, what did he

14  say to you and what did you say to him in that

15  conversation?

16      A.   As best as I recall, he talked about the

17  current conditions of the gas market.  That's as

18  best as I can recall about that.

19      Q.   Had you spoken with him before that?

20      A.   No.

21      Q.   So did he introduce himself to you in that

22  conversation?

23      A.   Yes.

24      Q.   Did he explain that he was -- what did he

10

1  tell you he was?  What was his role?

2      A.    He said that he was an agent with -- I

3  don't recall the name of his company -- Northeast

4  Energy Partners, I think, or something like that,

5  and that he was a broker for gas supply.

6      Q.    And in that conversation, did he tell you

7  that the contract that Bedford had with Energy East

8  was going to expire that year?

9      A.    He said that the term was due to end at the

10  end of the year, yes.

11      Q.    And did he ask you what you wanted to do

12  then or to start thinking about what you wanted to

13  do in terms of finding gas supply beyond the end of

14  the term?

15      A.    No.

16      Q.    He did not ask you that?

17      A.    No.

18      Q.    Did you discuss that?

19      A.    Not that I recollect.

20      Q.    How did the subject come up, then, as to

21  what the current conditions were in the gas market?

22      A.    He brought them up.

23      Q.    What did he say to you about that?

24      A.    I don't recall.  I don't recall exactly.

11

1      Q.   Do you recall generally?

2      A.   That the gas market had increased.  The

3  specific rate, I don't recall.

4      Q.   Prior to the call from Jerry Hawkins, had

5  you seen the contract between Energy East and

6  Bedford?

7      A.   No.

8      Q.   When was the first time that you did see

9  that contract between Energy East and Bedford?

10     A.   The middle of August.

11     Q.   Going back to the April telephone

12 conversation with Mr. Hawkins, he talked with you a

13 little bit about the current gas market conditions

14 and that the price had increased of gas, right?

15     A.   Uh-hum.

16     Q.   And did your conversation end with any

17 agreement to get back in touch with one another at

18 some point?

19     A.   I don't recall.

20     Q.   Did you ask him to do anything for you in

21 that conversation?

22     A.   No.

23     Q.   Did you have subsequent conversations with

24 Mr. Hawkins?

12

1    A.    Yes.

2    Q.    When was your next conversation?

3    A.    I want to say the May time frame.

4    Q.    And did he call you on the phone or did you

5    call him?

6    A.    I don't recall, but I want to say he called

7    me.

8    Q.    And what was the subject discussed in that

9    conversation?

10    A.    The market rates.

11    Q.    And what did he say this time about the

12    market rates?

13    A.    That they were still not favorable.

14    Q.    Now, when you say, "still not favorable,"

15    were you looking to lock in at some point when you

16    had favorable rates?

17         MR. DOLAN:  Objection.

18    A.    (No response)

19    Q.    Do you understand the question?  The way

20    this works is he can object --

21         MR. DOLAN:  I'm just going to make an

22    objection.  You can always answer the question.  As

23    Mr. Rohback said to you, if you don't understand it,

24    you can just ask him to rephrase it or tell him

13

1  that.

2       THE WITNESS:  Can you reask that question?

3       MR. ROHBACK:  Sure.

4  Q.  When you said that the market rates were

5  still not favorable, I wanted to just get a sense of

6  "not favorable" with regard to what.  Were you

7  considering trying to lock in on a rate when it was

8  favorable?  Sometimes if we're looking at getting a

9  mortgage, we'll keep checking, you know, when are

10 the rates favorable.  And when they're favorable, we

11 then say, "Okay, lock in, and I'll get that

12 mortgage."

13       So I wanted to know from your prospective,

14 when you're talking about rates not being favorable,

15 what, if anything, were you looking to do in term of

16 rates being favorable?

17       MR. DOLAN:  Objection.

18 A.  Nothing.

19 Q.  You were just sort of curious as to whether

20 rates were favorable?

21 A.  Just checking the current conditions of the

22 market, yeah.

23 Q.  What, if anything, else was said in that

24 conversation in May?

14

1      A.    I don't recall.

2      Q.    Did you ask him to continue to look into

3   rates for you?

4          MR. DOLAN:   Objection.

5      A.    No.  I want to say it was June that I asked

6   him to look into it.

7      Q.    Is June the next conversation you had with

8   him or did you have multiple conversations in May?

9      A.    I don't recall.

10     Q.    You might have had an additional

11  conversation or two, but you just can't remember?

12     A.    Correct.

13     Q.    Do you recall any additional topics that

14  you discussed with Mr. Hawkins in the month of May?

15     A.    No.

16     Q.    In June, did you ask Mr. Hawkins to look

17  into getting better rate quotes for you?

18     A.    Yes.

19     Q.    And was that in a telephone conversation?

20     A.    Yes.

21     Q.    Did you call him or did he call you?

22     A.    I believe I called him.

23     Q.    And as best as you can recall, what was

24  said in that conversation?

15

1    A.   I asked him to explore pricing contracts

2  with multiple gas suppliers.

3    Q.   And that's all they had for the Town of

4  Bedford?

5    A.   Yes.

6    Q.   And that would be to find a replacement at

7  the end of the Energy East contract, correct?

8        MR. DOLAN:   Objection.

9    A.   No.

10    Q.   What was it for?

11    A.   To see what the market conditions were.

12    Q.   Did you have any time frame as to when you

13  wanted to find out what the energy price was?

14    A.   No.

15    Q.   Why were you curious as to what energy

16  prices were?

17    A.   Because the market is so volatile, it

18  changes all the time.

19    Q.   So this was just for your own curiosity to

20  find out what was happening with the market; you

21  weren't looking to find a replacement for your gas

22  supply?

23    A.   No.

24    Q.   At this point, though, did you know that

16

1   the contract with Energy East was scheduled to end

2   in August, correct --

3           MR. DOLAN:  Objection.

4       Q.   -- or September of 2004?

5       A.   According to Jerry Hawkins, yes.

6       Q.   He told you that?

7       A.   Yes.

8       Q.   And did you have other contracts with other

9   suppliers for gas or was Energy East the only one?

10      A.   Energy East was the only one.

11      Q.   So they supplied gas for all these 12

12  buildings?

13      A.   Yes.

14      Q.   Did the 12 buildings have different meter

15  reading dates?

16      A.   Yes.

17      Q.   Do you recall what period of time those

18  meter reading dates extended from?

19      A.   I don't recall exactly, but second week of

20  the month to maybe the third week, in that two-week

21  middle period of the month range.

22      Q.   So there would be different dates within a

23  period of a week or two?

24          MR. DOLAN:  Objection.

17

1    Q.   Is that right?

2    A.   Yes.

3         MR. DOLAN:   Objection.

4    Q.   In the June conversation with Mr. Hawkins,

5    did he tell you what the current market rates were?

6    A.   Yes.

7    Q.   And what did he say then?

8    A.   I don't recall the exact rates, but he did

9    quote me prices for Energy East and Select Energy

10   and told me that it wasn't favorable at this time;

11   that you should look at pricing at the end of the

12   summer.

13   Q.   What was the quote he gave you for Energy

14   East, do you recall?

15   A.   I don't recall.

16   Q.   Did you know what rate you were paying

17   Energy East at the time?

18   A.   Yes.

19   Q.   What rate were you paying at the time, do

20   you recall?

21   A.   It was .565 decatherms.

22   Q.   And the price that he was quoting you for

23   Energy East in June of 2004 was approximately what?

24   A.   I don't recall.

18

```
 1      Q.    Was it close to double that price?

 2            MR. DOLAN:  Objection.

 3      A.    I don't recall.

 4      Q.    It was more than that price, though, wasn't

 5  it?

 6      A.    Yes.

 7      Q.    And did you tell him that you were not

 8  interested in entering into a contract at those

 9  higher rates at this point in time?

10      A.    No.

11      Q.    Did you tell him anything about whether you

12  wanted to enter into a contract at that point in

13  time at higher rates?

14      A.    No.

15      Q.    You just told him to keep looking and let

16  you know when he finds a good price?

17            MR. DOLAN:  Objection.

18      A.    Can you rephrase that?

19      Q.    Sure.  Did you tell him, when he told you

20  what the prices were for Energy East and Select

21  Energy, that he should keep looking and come back to

22  you when he finds what he thinks may be an

23  attractive price?

24      A.    No.
```

19

1    Q.   Did you ask him to find other suppliers?

2    A.   No.

3    Q.   What did you ask him to do?

4    MR. DOLAN:  Objection.

5    A.   Nothing.

6    Q.   Maybe I misunderstood you.  I thought

7 initially you asked him to explore the price in

8 other contracts -- or other pricing contracts?

9    A.   Yes.

10    Q.   So you did want him to go out and get

11 pricing for contracts?

12    A.   Pricing for the market.

13    Q.   Pricing for market.

14    A.   Uh-hum.

15    Q.   And what does that mean, "pricing for

16 market"?

17    A.   To see what the market pricing was out

18 there via different vendors.

19    Q.   And in June, you were asking him to do that

20 so that you would know what options you had?

21    A.   Yes.

22    Q.   When was the next time you had a

23 conversation with Mr. Hawkins?

24    A.   It would have had to have been the

20

1    beginning of August.

2        Q.    And was that by telephone also?

3        A.    Yes.

4        Q.    Have you ever met him in person?

5        A.    No.

6        Q.    So all your communications with him were

7    through the telephone?

8        A.    No.

9        Q.    Were they in some other fashion?

10       A.    Email.

11       Q.    Email, okay.

12            And have you produced to your counsel all

13   the email traffic that you had with Mr. Hawkins?

14       A.    Yes.

15       Q.    Have you had any email conversations with

16   anyone from Energy East?

17       A.    No.

18       Q.    Have you had any telephone discussions with

19   anyone from Energy East?

20       A.    Jan Geist.

21       Q.    And when did you have that conversation?

22       A.    That was mid-August.

23       Q.    Is that the first time you had a

24   conversation with someone from Energy East?

21

1     A.   Yes.

2     Q.   Now, in your telephone conversation with

3 Mr. Hawkins in early August, did you call him or did

4 he call you?

5     A.   He called me.

6     Q.   And what was the subject discussed in that

7 conversation?

8     A.   Renewal of the contract.

9     Q.   And what did he say to you and what did you

10 say to him?

11    A.   He told me that I needed to renew the

12 contract before it expired, so that we do not lose

13 the zero capacity assigned accounts prior to the

14 next meter reading.

15    Q.   It was zero capacity, you said?

16    A.   Yes.

17    Q.   For new accounts?

18    A.   It's existing accounts.  There's I believe

19 four accounts that have a zero capacity assignment

20 assigned to them, which grandfathered those accounts

21 for not being charged a capacity rate.

22    Q.   So for four of these 12 buildings, you were

23 charged no capacity; is that what you're saying?

24    A.   Correct.

22

1    Q.    And what response, if any, did you have to

2   Mr. Hawkins when he said that?

3    A.    I wanted to know what the deadline was for

4   renewing the contract, so we do not lose the zero

5   capacity.

6    Q.    And what did he say to you?

7    A.    He was vague in his answer.  He was not

8   sure himself.  I wasn't even sure at that point what

9   a zero capacity assignment was.  So he forwarded me

10  some emails from Keyspan, trying to show me what a

11  zero capacity assignment was, but nowhere could he

12  show me where a deadline was that I needed to renew

13  a contract before we lose that zero capacity.

14   Q.    And what, if anything, did you say to him

15  then?

16   A.    That I'd have to get back to him.

17   Q.    And what did you do then at the end of that

18  conversation?

19   A.    I called Rick Reed to request a copy of the

20  contract to see if there was any kind of lead time

21  that I needed to provide the supplier with a renewal

22  or termination, so that we don't lose the zero

23  capacity account.

24   Q.    And is that, then, the first time that you

23

1   saw the contract?

2       A.    Correct.

3       Q.    And did Mr. Read supply you with a copy of

4   the contract?

5       A.    Yes.

6       Q.    Had you been keeping Mr. Reed apprised of

7   your conversations with Mr. Hawkins over these few

8   months?

9       A.    No.

10      Q.    Had you told anyone about your

11  conversations with Mr. Hawkins over these past few

12  months?

13      A.    Richard Jones.

14      Q.    And that's the person you reported to?

15      A.    Correct.

16      Q.    And what did you tell Mr. Jones about those

17  conversations as they were unfolding?

18      A.    I was telling him the market condition

19  prices or comments that Jerry Hawkins was relaying

20  to me.

21      Q.    So you were telling Mr. Jones that the

22  price of gas was higher than it used to be?

23      A.    Yes.

24      Q.    And what, if anything, did he say to you in

24

1  response to that?

2      A.   He would just kind of grunt at me; just

3  "Oh, hum."  Really nothing was said.

4      Q.   Did he give you any guidance or any

5  direction?

6      A.   Yes.

7      Q.   What did he say?

8      A.   He would tell me to put it in queue to

9  follow up, you know, in a couple of weeks with Jerry

10  to see if that condition has changed throughout the

11  whole process, except for the end when I told him,

12  you know, "We're going to lose zero capacity."  And

13  that's when he instructed me to look into it further

14  to see what I can find out about deadlines of

15  notifying the supplier, so we don't lose our zero

16  capacity.

17      Q.   So until that point in time, you were

18  basically just looking for a good price?

19      A.   Yes.

20      Q.   And then sometime in August of 2004, Mr.

21  Reed supplied you with a copy of the contract?

22      A.   Correct.

23      Q.   Had he reviewed the contract prior to that,

24  do you know?

25

1          MR. DOLAN:   Objection.

2      A.   I don't know.

3      Q.   Did he tell you he had reviewed the

4  contract?

5      A.   No.

6      Q.   Did he tell you anything about the

7  contract?

8      A.   No.

9      Q.   How long was the time between the time you

10  asked him for the contract and the time he supplied

11  it to you?

12     A.   I don't recall.

13     Q.   And by that, I don't really mean, did you

14  have your stopwatch out, but was it something where

15  he said, "I can't find it; it's going to take me a

16  long time," or was it something that was produced in

17  a reasonably short time frame?

18     A.   It was the same day.

19     Q.   Okay.  And did you then review the

20  contract?

21     A.   Yes.

22     Q.   And what did you see in terms of renewal?

23     A.   That the contract automatically renewed,

24  unless either party gave 30 days' notice for like

26

1    term.

2        Q.    What did you do then when you found that

3    out?

4        A.    I went to my supervisor, Richard Jones, and

5    told him of that.

6        Q.    And what did he say to you?

7        A.    He took the paperwork and made a phone call

8    to Jerry Hawkins.

9        Q.    And what did he say to Mr. Hawkins?

10       A.    I don't know.

11       Q.    Did he tell you what he said to Mr.

12   Hawkins?

13       A.    No.

14       Q.    Do you recall what date that was?

15       A.    No.

16       Q.    Did you have any further discussions with

17   Mr. Hawkins?

18       A.    No.

19       Q.    So that was the last time you had a

20   conversation with Mr. Hawkins?

21       A.    Yes.

22       Q.    You never, then, told Mr. Hawkins that it

23   was your view that it was Energy East's obligation

24   to signal an intention not to renew, did you?

27

1       A.    I did not, no.

2       Q.    And you don't know whether Mr. Jones did

3    that?

4       A.    I don't know what was specifically said.  I

5    know they had a conversation about it.

6       Q.    When you spoke with Mr. Jones, did you talk

7    with -- I'm sorry, Mr. Hawkins -- did you talk with

8    him about a difference between fixed price and index

9    price?

10      A.    Not that I recall.

11      Q.    You don't recall ever discussing that with

12   Mr. Hawkins?

13      A.    No.

14      Q.    Are you familiar with contracts that have

15   index prices?

16      A.    Not really, no.

17      Q.    When you reviewed the Energy East contract,

18   did you notice that there was an option; one for a

19   fixed price and one for an index price?

20      A.    Yes.

21      Q.    Did you discuss that with anyone?

22      A.    No.

23      Q.    Did you have any understanding of what that

24   index price option was?

28

1    A.   No.

2    Q.   Had you ever seen a contract with an index

3 price option before?

4    A.   No.

5    Q.   So you basically didn't pay too much

6 attention to that?

7    A.   Yes.

8    Q.   What is your understanding as to when the

9 contract with Energy East terminated?

10    A.   Never.

11    Q.   And that's because, in your view, it

12 renewed automatically?

13    A.   Yes.

14    Q.   The first part of the contract was for a

15 three-year term?

16         MR. DOLAN:  Objection.

17    Q.   Was the contract for a three-year term

18 initially?

19    A.   Yes.

20    Q.   And when did the first three-year term end?

21    A.   With the August 2004 meter read dates.

22    Q.   And when we talk about an August meter read

23 date, does that mean that someone comes in and reads

24 the meters in September for August consumption, or

29

1  does that mean that they're reading the meters in

2  August for July consumption, or do you know?

3      A.   They would be reading the meters in August

4  for the July to August consumption.

5      Q.   And is that the August meter read date

6  that's referred to in the contract, then?

7      A.   Yes.

8      Q.   And how did you come to that understanding?

9      A.   Via the bills, I would say.

10     Q.   When you say "via the bills..."

11     A.   The bills bill you for a period of time.

12 What's considered a meter read date is the end date

13 that the meter is read.  So that would be my

14 interpretation of that.

15     Q.   If a meter read date is August 2 and

16 captures the period from July 2 to August 2, is that

17 the July read or is that the August meter read?

18     A.   The August meter read.

19     Q.   Even though the consumption is almost

20 exclusively for July, right?

21     A.   Right.

22     Q.   Did you confirm that understanding with

23 anyone?

24     A.   No.

30

1    Q.    And were there different dates, then --
2  since there were different meter read dates, were
3  there different dates on which the contract was to
4  renew or expire?
5    A.    I would say they were all coterminous for
6  the August meter read dates, depending on the
7  individual.  So I guess you could say that they
8  would renew on their individual dates.
9    Q.    So it could be 12 different dates?
10   A.    Uh-hum.
11   Q.    Is that right?
12       MR. DOLAN:  Objection.
13   A.    Yes.
14       MR. ROHBACK:  Would you mark this please,
15  as Pyles Exhibit 1.
16              (Document marked as Pyles
17              Exhibit 1 for identification)
18       MR. DOLAN:  I don't think we put this on
19  the record.  We're doing standard stipulations?
20       MR. ROHBACK:  Sure.
21       MR. DOLAN:  Reserving all objections,
22  except as to form?  Reserving motions to strike
23  until time of trial?
24       MR. ROHBACK:  That sounds fine to me.

31

1          MR. DOLAN:  And we can read and sign within

2    30 days?  Waive the notary?

3          MR. ROHBACK:  Yes.

4          MR. DOLAN:  Okay.

5      BY MR. ROHBACK:

6      Q.    Ms. Pyles, I hand you a document which has

7    been marked as Pyles Exhibit 1, which appears to be

8    the natural gas sales agreement that we've been

9    dealing with in this case.  And I just wanted to

10   check with you; is this, in fact, the contract that

11   you're referring to?

12     A.    Yes.

13     Q.    And what was Richard Reed's position in the

14   Town of Bedford?

15     A.    His employment position?

16     Q.    Yes.

17     A.    Town administrator.

18     Q.    And this contract, it appears that Mr. Reed

19   signed it on September 20, '01.  And someone on the

20   other side signed it on December 20 of '01.  Do you

21   see those two dates?

22     A.    Yes.

23     Q.    And did you see those when you reviewed the

24   contract?

32

1    A.    Yes.

2    Q.    And did that have any bearing on the way

3 you looked at this contract or understood it?

4        MR. DOLAN:  Objection.

5    A.    No.

6    Q.    Was it your understanding, then, that gas

7 would have been supplied to the Town of Bedford

8 prior to anyone signing an agreement to pay for that

9 gas?

10        MR. DOLAN:  Objection.

11   A.    Based on the history, yes.  They were the

12 current supplier for the Town before this contract.

13   Q.    So whoever was supplying gas had been

14 supplying it before this contract was signed; is

15 that what you're saying?

16   A.    Can you restate that?

17   Q.    Yes.  Whoever was supplying gas in 2001

18 prior to signing this contract was the same party

19 that was supplying the gas after this contract was

20 signed?

21   A.    Yes.

22   Q.    And who was that?

23   A.    It was Northeast Utilities.

24   Q.    So the gas actually comes from Northeast

33

1    Utilities; is that right?

2            MR. DOLAN:  Objection.

3        A.    I don't know.

4        Q.    Do you know who actually supplied the gas

5    to Northeast Utilities that the Town of Bedford got

6    during the month of August 2001?

7        A.    Can I ask a question back?

8        Q.    Sure.

9        A.    Are you asking where it actually came from?

10       Q.    Yes.  Who was the supplier.   Northeast

11   Utilities provided it to you, but who was the

12   supplier of the gas?

13       A.    It was Northeast Utilities and Keyspan did

14   the delivery and supply.

15       Q.    And was Northeast Utilities the deliverer

16   after this contract was signed?

17       A.    Yes.

18       Q.    Did you have any separate contract or

19   relationship with Northeast Utilities beyond this

20   contract?

21       A.    Not to my knowledge.

22       Q.    Did you ever discuss with anyone as to

23   whether or not the agreement with Energy East ran

24   from the time that the contract was signed, as

34

1    opposed from the initial date of an August meter

2    read?

3        A.    Are you asking if the dates are

4    different --

5        Q.    Yes.

6        A.    -- if I asked anyone?

7        Q.    Yes.

8        A.    No, I did not.

9        Q.    Did you ever discuss that with anyone,

10   whether you asked the question or they told you or

11   they asked the question?

12       A.    No.

13       Q.    And so we're clear, I'm looking at this,

14   and it's a contract that wasn't signed by anyone

15   until September 20.  And while it talks about an

16   August meter read date, there might be some

17   confusion as to when the contract actually started

18   and when you would actually start getting bills to

19   or from the supplier.  And I'm just asking if you've

20   ever discussed that with anyone.

21            MR. DOLAN:  Objection.

22       A.    No.

23       Q.    Have you ever heard anyone discussing that?

24       A.    No.

35

1    Q.   Have you ever heard that mentioned?

2    A.   No.

3    Q.   And on the first page of this contract, do

4  you see that there is a -- it provides two options;

5  one for a fixed price and one for an index price,

6  right?

7    A.   Yes.

8    Q.   And you understood that the 5.65 decatherm

9  price was set back in 2001, right?

10   A.   Yes.

11   Q.   And that that had been fixed for three

12 years, from 2001 to 2004, right?

13   A.   Yes.

14   Q.   And you understood that Energy East did not

15 want to renew at that price, right?  They wanted a

16 higher price.

17        MR. DOLAN:  Objection.

18   A.   I don't know.

19   Q.   You don't know?

20   A.   Can you rephrase that again?

21   Q.   Sure.  Did Mr. Hawkins tell you that Energy

22 East would renew at a higher price, but not at the

23 5.65 decatherm price that was set back in 2001?

24        MR. DOLAN:  Objection.

36

1       A.    In August?

2       Q.    Did he tell you that in June or May?

3       A.    No.

4       Q.    When was the first time he told you that?

5             MR. DOLAN:  Objection.

6       A.    He didn't.

7       Q.    He never told you that; is that your

8   testimony?

9             MR. DOLAN:  You have to answer orally.

10      A.    I'm thinking.  I'm sorry.  (Pause)  Yes.

11      Q.    Was it your understanding, then, in August

12  of 2004, that Energy East wanted to agree to lock

13  into another three years at a fixed price that was

14  set in 2001?

15            MR. DOLAN:  Objection.

16      A.    Can you say that again?

17      Q.    Yes.  Was it your understanding -- a lot of

18  times lawyers talk about parties entering into a

19  contract having a meeting of the minds, that they

20  agree on something.

21      A.    Uh-hum.

22      Q.    Was it your understanding in 2004 that

23  Energy East wanted to lock into a three-year term at

24  a fixed price that was set in 2001?

37

1          MR. DOLAN:  Objection.

2     A.   I don't know.

3     Q.   Did you consider that?

4          MR. DOLAN:  Objection.

5     A.   No.

6     Q.   Do you know if anyone called them up and

7     said, "Is this what you want to do"?

8     A.   Can you rephrase that?

9     Q.   Sure.  Did anyone from the Town of Bedford,

10    to your knowledge, call up Energy East and say, "Are

11    you willing" -- "Do you want to lock in for another

12    three-year term at a fixed price that was set in

13    2001"?

14         MR. DOLAN:  Objection.

15    A.   Yes.

16    Q.   Somebody did do that?  Who?

17    A.   Are you asking me if we asked them if we

18    wanted to renew the contract at the current contract

19    price?  Is that what you're asking me?

20    Q.   That someone from Bedford wanted to make

21    sure and call Energy East and say, in words or

22    substance, "Is this your intention, too, to extend

23    this contract for three years at the 2001 price"?

24         MR. DOLAN:  Objection.

38

1     A.   We didn't ask them if it was their

2   intention.  We told them we thought that it renewed

3   at that price.

4     Q.   You told them at a point in time after it

5   was too late?

6          MR. DOLAN:  Objection.

7     Q.   I mean, basically, did you tell them after

8   they were supposed to have told you, in your view,

9   that they didn't want to renew, did you tell them at

10   that point in time, "It's too late; that you're

11   stuck with it"?

12          MR. DOLAN:  Objection.

13     Q.   In words or substance.

14          MR. DOLAN:  Objection.

15     A.   No, I never said, "You're stuck with it."

16     Q.   Did somebody from Bedford say that?

17     A.   Not to my knowledge.

18     Q.   So you were perfectly willing to negotiate

19   a price with Energy East?

20          MR. DOLAN:  Objection.

21     A.   No.

22     Q.   You didn't tell them, then, that they were

23   stuck with it?  You just didn't say anything; is

24   that what you're saying?

39

1          MR. DOLAN:  Objection.

2      A.    No.  I called them and said, "The contract

3    renewed.  You didn't give notice when I found out --

4    when I got the contract, that there was an auto

5    renew clause; that the contract should roll.  What

6    do you think of that?"  And she was unaware of it

7    and said, you know, "Can you fax it to me."  I faxed

8    the contract.  She looked at it, called me back and

9    said, "That's a huge mistake.  All of our contracts

10   are at headquarters.  I'm going to have to find out

11   what other liabilities are out there.  I'm going to

12   have to show this to our lawyers and get back to

13   you."

14     Q.    And who was that?  Jan Geist?

15     A.    Jan Geist.

16     Q.    And did you call her or did she call you?

17     A.    I called her.

18     Q.    And why did you call her?

19          MR. DOLAN:   Objection.

20     A.    I called her upon my request of Richard

21   Jones.

22     Q.    So Mr. Jones asked you to call her?

23     A.    Yes.

24     Q.    Why did he ask you to call her?

40

1    A.    He had a conversation with Jerry Hawkins.

2  I guess he asked Jerry about the auto renew clause,

3  and "What do you think of that?"  And Jerry said

4  that he couldn't speak on that.  You would have to

5  talk to Energy East and to call Jan Geist.

6    Q.    And at that point, then, rather than Mr.

7  Jones calling Jan Geist, he asked you to call her?

8    A.    Correct.

9    Q.    And did you and Mr. Jones talk about the

10  renewal or nonrenewal prior to your call with Jan

11  Geist?

12    A.    Yes.

13    Q.    And what did you say in that conversation?

14    A.    How we interpreted the language.

15    Q.    And in your conversation with Mr. Jones,

16  who said what about the interpretation of the

17  language?

18    A.    That he believed that the contract itself,

19  in its entirety, would renew for another three

20  years.

21    Q.    And what did you say?

22    A.    I concurred.

23    Q.    And did you discuss whether it renewed at

24  the fixed price or the index price?

41

1     A.   No, there was no option for that.

2     Q.   In that conversation, had you told Mr.

3  Jones that Energy East had quoted you a higher

4  price?

5     A.   Can you restate that.

6     Q.   In your conversations with Mr. Jones, had

7  you told him that Energy East had quoted you a

8  higher price?

9         MR. DOLAN:  Objection.

10    A.   Prior to August, yes.

11        THE WITNESS:  Can we take a break, so I can

12  go to the ladies' room?

13        MR. ROHBACK:  Sure.  Absolutely.

14     (Recess)

15          (Document marked as Pyles

16          Exhibit 2 for identification)

17  BY MR. ROHBACK:

18     Q.   Ms. Pyles, I hand you a document which has

19  been marked as Pyles Exhibit 2 -- and it appears to

20  be a copy of your affidavit in this case with an

21  exhibit -- and ask you if you can identify this.

22     A.   (Witness reviews document)  It's my

23  affidavit, as well as the copies of invoices from

24  Keyspan for the meter read dates of August 2001

42

1  through August 2004.

2      Q.    And is the information in your affidavit

3  true and correct?

4      A.    Yes.

5      Q.    Is there anything in your affidavit you

6  want to change?

7      A.    No.

8      Q.    In Paragraph 5 of your affidavit, you state

9  that "...neither the Town of Bedford nor Energy East

10 indicated its intent not to renew their August 2001

11 through August 2004 Natural Gas Sales Agreement

12 within the time frame and in the manner contemplated

13 by the automatic renewal provision of the

14 Agreement."  Do you see that reference?

15     A.    Yes.

16     Q.    Is that accurate?

17     A.    Yes.

18     Q.    And when you say "Energy East," you're

19 referring there to the company, as opposed to Jerry

20 Hawkins?

21          MR. DOLAN:  Objection.

22     A.    Yes.

23     Q.    And when you say, "in the time frame and in

24 the manner contemplated by the automatic renewal

43

1    provision," there you're referring to a written

2    notice, as opposed to a telephone notice?

3        A.    Yes.

4        Q.    And if you look on the next page, Paragraph

5    7, you state -- and you're referring now to

6    Paragraph 6 -- it was not until that August 16, 2004

7    time that you had a discussion with Energy East

8    regarding the renewal.  Do you see those paragraphs?

9        A.    Yes.

10       Q.    And that, again, refers to someone at

11   Energy East, like a Jan Geist, as opposed to Jerry

12   Hawkins, correct?

13       A.    Correct.

14       Q.    When Jerry Hawkins was getting you prices,

15   he was getting prices from competitors of Energy

16   East, correct?

17       A.    Yes.

18       Q.    And did you understand at that point in

19   time that Mr. Hawkins was trying to help you find

20   the best price for gas on the market?

21       A.    Yes.

22       Q.    And at that point in time Mr. Hawkins was

23   not necessarily trying to help Energy East, was he?

24            MR. DOLAN:   Objection.

44

1      A.    I don't know.

2      Q.    Well, let me put it to you this way.  He

3   wasn't trying to tell you that you should go with

4   Energy East because they're the nicest people on the

5   block.  He was trying to help you find the best

6   price that he could for Bedford, right?

7           MR. DOLAN:  Objection.

8      A.    To my knowledge, yes.

9      Q.    And the conversation, going back to your

10  affidavit on August 16, 2004, that was with Jan

11  Geist, correct?

12     A.    Yes.

13     Q.    Did you have any notes of that

14  conversation?

15     A.    Yes.

16     Q.    Did you produce those notes?

17     A.    Yes.

18     Q.    Did counsel produce those to us?

19          MR. DOLAN:  I can talk to you afterwards

20  about documents.  She's not going to know anything

21  about what we produced or didn't produce.

22          MR. ROHBACK:  Okay.

23     Q.    Did you write a memorandum about your

24  conversation with Jan Geist?

45

1     A.    No.

2     Q.    How long were your notes regarding your

3  conversation with Jan Geist?

4     A.    "How long" in a matter of what form?

5     Q.    You tell me.  Were they an email?  Were

6  they handwritten?

7     A.    Handwritten note.

8     Q.    Was it a page of notes?

9     A.    No.  Just bullet form, two lines.

10    Q.    And in that conversation, Ms. Geist said

11 that there's been a huge mistake; is that correct?

12    A.    Correct.

13    Q.    Did she indicate that Energy East did not

14 want to renew for a three-year term at the 2001

15 fixed price?

16    A.    No, she didn't commit either way.  She

17 wanted to talk to a counselor.

18    Q.    But she did tell you that that was a huge

19 mistake?

20    A.    Yes.

21    Q.    Did she confirm that the contract renewed

22 according to its terms?

23        MR. DOLAN:  Objection.

24    A.    By her admittance, that it was a huge

46

1    mistake, I would say yes.

2        Q.    Did she say that, "Yes, the contract did

3    renew according to its terms"?

4        A.    No.

5        Q.    So you were inferring that from her having

6    said that there's been a huge mistake; is that

7    correct?

8        A.    Correct.

9        Q.    So your statement in Paragraph 8 of your

10   affidavit, which states, quote, "During that

11   discussion, Energy East Solutions, Inc., confirmed

12   to me that the Natural Gas Sales Agreement had

13   renewed according to its terms," that statement,

14   then, is based on the inference that you drew; is

15   that correct?

16       A.    Yes.

17       Q.    Were there any discussions among people at

18   the Town of Bedford after this conversation that you

19   had with Jan Geist talking about it?

20            MR. DOLAN:    Objection.

21       A.    Yes.

22       Q.    With whom did you have discussions?

23       A.    I discussed it with Richard Jones.

24       Q.    And what was said in your discussions with

47

1  him?

2      A.    I told him what was said in the

3  conversation; that she saw the auto renew clause and

4  said it was a huge mistake; that they were not aware

5  of an auto renew clause; that the contracts resided

6  in headquarters, and that she was going to have to

7  pull all the contracts, because they had bought the

8  company out, I guess.  And that they didn't have the

9  contracts there, so she wanted to see whether other

10  liability was there, and that they were going to

11  contact their counsel and that we would hear

12  something back from them.  That is what I told him.

13      Q.    As you're sitting here today, do you

14  specifically recall her saying that she was not

15  aware of the auto renew clause?

16      A.    Yes.

17      Q.    And what words do you recall her saying?

18      A.    That she's not aware of such clause.  "Can

19  you please fax me the contract."

20      Q.    She did not have a copy of the contract?

21      A.    Correct.

22      Q.    Did you fax her the contract?

23      A.    Yes, I did.

24      Q.    Did you have any conversations with her

48

1    after that?

2        A.    Yes.    That's when she made the -- implied

3    that it's a huge mistake.    "I need to pass this on

4    to our counsel, and I'll get back to you."

5        Q.    And what discussions did you have with

6    people at Bedford about the huge mistake?

7            MR. DOLAN:    Objection.

8        A.    It was just with Richard Jones.

9        Q.    And what was said to him about the huge

10   mistake?

11           MR. DOLAN:    Objection.

12       A.    Exactly what I just said a few minutes ago.

13   I reiterated the whole conversation with him, and

14   that she thought it was a huge mistake and thought

15   they had other liabilities out there and wanted to

16   check that to protect their --

17       Q.    Were there any discussions with people at

18   Bedford about calling Energy East and saying, in

19   words or substance, "Okay, what price would you want

20   to renew at"?

21           MR. DOLAN:    Objection.

22       A.    Not to my knowledge.

23       Q.    Were there any discussions within the Town

24   of Bedford that you had gotten a big advantage over

49

1    Energy East?

2            MR. DOLAN:  Objection.

3        Q.    That you had gotten them to be locked in by

4    accident to a provision that required them to

5    provide you with three years more of power -- or

6    gas, rather, at a 2001 price?

7            MR. DOLAN:  Objection.

8        A.    Can you say that again?

9        Q.    Were people pretty happy at Bedford that

10   you got three years of gas for 2001 pricing in 2004?

11           MR. DOLAN:  Objection.

12       A.    I wouldn't say "happy."

13       Q.    They were unhappy?

14           MR. DOLAN:  Objection.

15       A.    I don't know what their emotions were.

16       Q.    What were your emotions?

17       A.    I wasn't too emotional about it.  I mean,

18   it's business.

19       Q.    Did people at Bedford feel that Energy East

20   had goofed up?

21           MR. DOLAN:  Objection.

22       Q.    Or made a mistake?

23       A.    Made a mistake, yes.

24       Q.    And was it the intention, then, of the Town

50

1   of Bedford to take advantage of the mistake that

2   Energy East made?

3          MR. DOLAN:  Objection.

4     A.    I don't know if I'd say "take advantage,"

5   but hold the contract to the word of the contract.

6     Q.    And in your mind, that meant requiring

7   Energy East to continue to supply three more years

8   of gas at 2001 fixed price?

9          MR. DOLAN:  Objection.

10    A.    Correct.

11    Q.    Was there any discussion at this point in

12  time about the index price?

13    A.    Not to my knowledge.  Do you mean with

14  Energy East?

15    Q.    Within the Town of Bedford.

16    A.    As the market in general?

17    Q.    Yeah.  Was there any discussion among

18  people in the Town of Bedford as to index pricing as

19  opposed to the fixed price?

20         MR. DOLAN:  Objection.

21    A.    I know there was discussion after we

22  received some letters from lawyers going back and

23  forth.  We needed to get a contract, because you

24  guys weren't going to -- Energy East was not going

51

1    to cover or continue the service.  They were

2    terminating it.

3            So at that point we were looking at

4    different vendors to lock in.  And yes, we were

5    looking at the index pricing, as well as fixed

6    pricing.  We were looking at both.

7        Q.    And were companies willing to offer you

8    fixed prices?

9        A.    Yes.

10       Q.    For what period of time?

11       A.    I think it was just for a one-year period.

12       Q.    Was anyone willing to offer you a fixed

13   price for a three-year period?

14       A.    The person I was checking with at Select

15   Energy, it was through the -- I think it was MMA or

16   HEFA contracts.  They only went through the next

17   year.  So for us to procure it under the procurement

18   clause, we had to procure it under that guidelines.

19   And it would only go through the one-year period.

20   So I'd say no.

21       Q.    Were companies quoting you index pricing?

22       A.    Yes.

23       Q.    Were any of the index prices for more than

24   one year?

52

1    A.   I don't recall.

2    Q.   And did you enter into a contract with

3  anyone?

4    A.   Yes, Select Energy.

5    Q.   Is Select Energy one of the companies that

6  Jerry Hawkins had provided you with quotes from?

7    A.   Yes.

8    Q.   And did Select Energy offer you the best

9  price?

10    A.   Yes.

11    Q.   The price that you entered into a contract

12  with Select Energy at, was that higher or lower than

13  the price that Jerry Hawkins had quoted you?

14    A.   It was lower.

15    Q.   Did he handle those negotiations for you or

16  did you negotiate that yourself?

17    A.   We negotiated that ourselves.

18    Q.   Did he introduce you to Select Energy?

19    A.   No.

20    Q.   Did you know them before this?

21    A.   No.

22    Q.   How did you find them?

23    A.   When he provided the price, he gave me the

24  company name.

53

1     Q.    So to that extent, he introduced you to the

2   company?

3     A.    Yes.

4     Q.    Do you currently have a contract with

5   someone?

6     A.    Yes.

7     Q.    And with whom?

8     A.    Select Energy.

9     Q.    And when does that expire?

10     A.    It's currently going month to month.

11     Q.    Did you have a contract with Select Energy

12   for a full year or has it always been a

13   month-to-month contract?

14     A.    It wasn't for a full year.  We initially

15   locked in for month-to-month.  And then for I think

16   eight months we locked it in, and then we're going

17   month-to-month again.

18     Q.    Why are you going month-to-month, instead

19   of a full year or three years?

20     A.    To my knowledge, it's because of the

21   hurricane, Katrina, jacked the prices, so we didn't

22   want to lock in at that rate.  So we're hoping that

23   the gas prices will go down.

24     Q.    So because of the great volatility in the

54

1    gas market, you wanted to keep your options open and

2    go month-to-month?

3        A.    Yes.

4        Q.    So when you say that the price Select

5    Energy provided you was lower than what Jerry

6    Hawkins had quoted you, was that a month-to-month

7    price or a yearly price?

8        A.    I believe they were both yearly prices.

9        Q.    But you're not actually paying on a yearly

10   price basis for Select Energy?  Your price changes

11   every month; is that right?

12       A.    Currently, yes.

13       Q.    And you're currently paying something like

14   17 cents per decatherm?

15       A.    Yes.  That was as of October, November.

16   I'm not sure what December is.

17           MR. ROHBACK:  Why don't we just go off the

18   record.

19           (Discussion off the record)

20           MR. ROHBACK:  Would you mark this -- why

21   don't you just mark these sequentially, and then

22   we'll introduce them one at a time, so we can

23   identify them.

24

55

1          (Documents marked as Pyles

2          Exhibits 3 through 10 for

3          identification)

4     BY MR. ROHBACK:

5     Q.    Ms. Pyles, before you we have a number of

6     exhibits; but first, what your counsel has just

7     produced to us, the first has been marked Exhibit 3

8     and appears to be some handwritten notes.  Can you

9     identify that, please?

10    A.    Yes.

11    Q.    What is that?

12    A.    Those are my notes of conversations.

13    Q.    Your notes of conversation with whom -- or

14    conversations with whom?

15    A.    The first one is with Janet Demattio.  She

16    was at Energy East when I called asking for pricing

17    and I was in fact finding.  She said that I needed

18    to call the energy authority and speak with John

19    Kerny or Jerry Hawkins and gave me the number.

20    Q.    And when was it that you called Janet

21    Demattio for that information?

22    A.    I don't recall the exact date, but it was

23    definitely in 2004.

24    Q.    Was it April of 2004?

56

1    A.    I don't want to guess; but if I had to, I

2    would say yes.

3    Q.    But this was -- if we're looking at your

4    involvement in this contract situation, it would

5    have begun sometime in April or March of 2004?

6    A.    Correct.

7    Q.    What prompted you to start looking to talk

8    about pricing and renewals in the spring of 2004?

9    A.    My boss requested me to go and find some

10   pricing, see what the current market was doing, kind

11   of a fact finding mission.

12   Q.    Was he aware that the contract was

13   scheduled to expire in 2004?

14   MR. DOLAN:  Objection.

15   A.    I don't know.

16   Q.    Did he tell you that, "We have contracts

17   that are going to expire in 2004.  You need to start

18   getting some pricing information"?

19   A.    No.

20   Q.    He just told you to go look for prices, and

21   you have no idea why?

22   A.    Correct.

23   Q.    The writing on the right-hand side of this,

24   what is that?

57

 1        A.    That was a sticky.  Typically when I'm

 2   calling someone, I'll have a sticky, and I'll write

 3   it, and then I'll write it on a piece of paper.  And

 4   I usually attach the sticky to it, just as the

 5   original.

 6        Q.    So those are both your handwriting?

 7        A.    Yes.

 8        Q.    And then down below, what is that a

 9   reference to?

10        A.    That's a reference to a conversation that I

11   had with Jerry Hawkins, where I asked him about the

12   pricing.  And he informed me that -- I had asked

13   him, you know, who he was.  I really didn't know who

14   he was.  He informed me that, you know, he used to

15   be an employee of Energy East.  He's no longer an

16   employee.  He's now with -- he had his own business,

17   if I recall -- the best way I can say it is he's a

18   broker that sells energy contracts and that he had

19   his own business.  Based on the current market, it

20   forced him to do that.

21        Q.    And this also, then, would have reflected a

22   conversation sometime in April or maybe March of

23   2004; is that correct?

24        A.    Correct.

58

1    Q.    And in this conversation in that April or

2    March time frame of 2004, Jerry Hawkins indicated to

3    you that he would get you quotes from several

4    different vendors, correct?

5    A.    Yes.

6    Q.    And you had written in there "broker" with

7    a question mark.  Do you see that?

8    A.    Yes, I see that.

9    Q.    And you had the question mark because --

10   A.    Because that was my terminology.  And I

11   didn't know if that was the right terminology to use

12   for him.  That was my understanding of how I

13   interpreted what his role was.

14   Q.    Because it looked like he was going out to

15   get you quotes from different gas suppliers?

16   A.    Correct.

17   Q.    The next document we've marked as Exhibit 4

18   appears to be a facsimile transmission from you to

19   Jerry Hawkins, and this is dated April 28, 2004.

20   Can you identify what this is?

21   A.    Yes.    That is a facsimile transmission to

22   Jerry Hawkins.  In order for him to get prices, he

23   needed copies of the current contract to see

24   whatever he needs to see to give a quote.

59

1      Q.    And in this you state, quote, "Can you

2   please give us a price for one year with the option

3   of an annual extension for a max of three years

4   total."  Do you see that reference?

5      A.    Yes.

6      Q.    And were you asking him, then, to get you

7   price quotes for the various buildings in the Town

8   of Bedford that were being served by the Energy East

9   contract?

10     A.    Yes.

11     Q.    And were you asking him to get price quotes

12  from just Energy East or from whatever suppliers he

13  could come up with?

14     A.    Whatever suppliers he could come up with.

15     Q.    At this point in time did you understand

16  that the contract was terminating at the end -- at

17  some time in 2004, in August or September of 2004?

18          MR. DOLAN:  Objection.

19     A.    No, not terminating.  The contract term was

20  up for the end, according to Jerry Hawkins at the

21  time.

22     Q.    And the next document we've marked is

23  Exhibit 5.  And this is an email from Jerry Hawkins

24  to you; is that correct?

60

1     A.    Correct.

2     Q.    And this is June 30, 2004?

3     A.    Correct.

4     Q.    And he says, quote, "Hi, Marcia.  Here is

5     the account list that I have.  Please verify which

6     accounts that you want on the new contract and let

7     me know if there are others to add."  Do you see

8     that reference?

9     A.    Yes.

10    Q.    The list that he has, are those the schools

11    and the buildings in the Town of Bedford?

12    A.    Yes.

13    Q.    And those are the ones that were being

14    served by Energy East at the time?

15    A.    With the exception of the three on the

16    bottom that are new accounts, yes.

17    Q.    And in this, Mr. Hawkins was asking you to

18    determine or verify which accounts you wanted to be

19    on whatever the new contract was going to be; is

20    that right?

21    A.    Can you repeat that?

22    Q.    Yes.  He says, "Please verify which

23    accounts you want on the new contract."

24    A.    Yes.

61

1    Q.    So I take it, then, that you and he were

2    discussing a new contract for the supply of gas to

3    these various buildings, correct?

4         MR. DOLAN:  Objection.

5    A.    Pricing for contract, yes.

6    Q.    And the next document I have is dated

7    August 17, 2004.  This is marked as Exhibit 6.  And

8    is this a letter that you sent to Jan Geist on or

9    about August 17, 2004?

10   A.    Which one are you on?

11        MR. DOLAN:  You're taking it in the

12   chronological order they've been marked, but out of

13   date order, right?

14        THE WITNESS:  Yes.  Can you repeat that

15   question.

16   Q.    Exhibit 6, can you identify that?

17   A.    Yes.

18   Q.    What is that?

19   A.    That is a facsimile transmission to Jan

20   Geist, where I faxed her a copy of the contract and

21   itemizing the clause for the renewal.

22   Q.    And so you were sending her a copy of the

23   contract that you had discussed with her; is that

24   correct?

62

1     A.    Yes.

2     Q.    And this says, "Per your discussion with

3     Richard Jones yesterday," it starts out that way.

4     So she had a conversation with Richard Jones the day

5     before you sent this?

6     A.    Yes.

7     Q.    And you finished by saying, "Richard will

8     be contacting you this morning to discuss this

9     further," correct?

10    A.    Correct.

11    Q.    Did he do that?

12    A.    I don't know.

13    Q.    Did he report to you that he did that?

14    A.    I don't recall.  I don't know.

15    Q.    The next document I have is marked as

16    Exhibit 7.  It's a one-page email dated August 5,

17    2004 from you to Richard Jones.  Do you have that?

18    A.    Yes.

19    Q.    And is this, in fact, an email that you

20    sent to Richard Jones on or about August 5, 2004?

21    A.    I'm sorry, say that again.  I was reading.

22    Q.    Is this an email you sent to Mr. Jones?

23    A.    Yes, it is.

24    Q.    And you are explaining in this email who

63

1    Jerry Hawkins is; is that correct?

2        A.    Yes.

3        Q.    Did Mr. Jones ask you who Jerry Hawkins is?

4        A.    Yes.

5        Q.    And what did you tell him as to who Jerry

6    Hawkins is?

7              MR. DOLAN:   Objection.

8        A.    I didn't say who he is, but I said where he

9    was from.

10       Q.    Did you say what his role was in this

11   whole --

12       A.    In this email?

13       Q.    Not in the email, but in your conversations

14   with Mr. Jones.

15       A.    Yes.

16       Q.    And what did you explain to Mr. Jones was

17   the role of Mr. Hawkins?

18       A.    I explained that he was in a role of being

19   a broker and selling supply services for different

20   vendors.

21       Q.    And you relate here in this August 5, 2004

22   email that Mr. Hawkins had quoted you a price of 92

23   cents -- is that 92 cents?  Is that the way you read

24   that?

64

1      A.    Yes.

2      Q.    92 cents.  And that Energy East had quoted

3   a price of 96 cents, correct?

4      A.    Correct.

5      Q.    What's the next reference there, that "Tech

6   Bid"?

7      A.    Can I just tell you where this email came

8   from?

9      Q.    Sure.

10     A.    Richard called me and said, I want you to

11  email -- because he was going to be out of the

12  office and checking his email from home -- Jerry's

13  contact info, number, what the prices were quoted,

14  as well as what the tech bid, which is the oil, No.

15  2 oil fuel for the schools.  So it's a multiple of

16  different things, not just relating to Energy East.

17     Q.    So were you considering oil instead of gas

18  for some of your heating needs or is it just a

19  different --

20     A.    The only school that's heated by -- at that

21  time by gas was Davis School.  Most of them were

22  primarily heated with No. 2 fuel.  There was gas

23  being used at the schools for cooking and things

24  like that, science labs, small...  all the town

65

1    buildings primarily are gas heated.

2        Q.    So the town buildings are gas heating and

3    the schools are oil heating?

4        A.    Primarily, yeah.  It's changed a little bit

5    since then, but yes.

6        Q.    How has it changed?

7        A.    The middle school went under a renovation,

8    and we do have the capacity to heat the school on

9    gas or oil.  I'm not currently sure what we're doing

10   right now.  Town buildings, the DPW -- I'm not sure

11   how they were heated.  I don't think they were

12   heated with No. 2 at all.  I think they've always

13   been gas.

14       Q.    And at the bottom of this email you say

15   that you called John Roderick from Keyspan.  Was he

16   the contact you had at Keyspan?

17       A.    Yes.  He's our agent.

18       Q.    And he was going to get you pricing of

19   what?  Gas?

20       A.    Yes.

21       Q.    And did you get pricing from him on gas?

22       A.    No.

23       Q.    Why?

24       A.    I was looking for a future pricing from

66

1   him.  And his comment was, If he could predict

2   future pricing, he'd be a millionaire.  So no.

3       Q.   So you wanted to know where gas was going

4   to go in the future?

5       A.   Yeah.

6       Q.   And you wanted to know where gas was going

7   to go in the future to figure out whether you should

8   lock in for a long term or a short term; is that

9   right?

10          MR. DOLAN:  Objection.

11      A.   I'm not sure why I was asking.

12      Q.   Do you have any recollection as to why you

13  were asking?

14      A.   Richard Jones asked me to call Keyspan and

15  find out what the delivery rates were, and I imagine

16  it was for budgeting purposes.

17      Q.   What does that last sentence mean, "She did

18  give me a list of her Energy East contract, but I

19  informed her yet again that it is to be all Keyspan

20  accounts"?

21      A.   I'm not responsible for paying all the

22  Energy East and Keyspan bills.  April Delano in the

23  DPW department is responsible for paying the sewer

24  buildings, the little sewer outhouses.  So there are

67

1    some Keyspan and Energy East bills that belong to

2    those buildings.  And I was trying to compile a list

3    of all gas usage for the Town of Bedford.  So I was

4    asking her, "I want copies of all your Energy

5    East -- at least one bill for each Energy East bill

6    you have and every Keyspan bill, so that we can

7    hopefully incorporate all of these into a new

8    contract."

9        Q.    The next document you have has been marked

10   as Exhibit 8.  And can you identify what this is?

11       A.    This is an email from me to Jerry

12   Hawkins -- no, from Jerry to me.  I'm sorry, with a

13   copy of the Select Energy contract, which I had

14   requested to see what our current energy contract

15   would look like.

16       Q.    And the next document, marked as Exhibit 9,

17   what is that?

18       A.    That's an email from Jerry Hawkins to me,

19   which I requested to find out more information about

20   the zero capacity assignment, you know, what it

21   really is.  That's what he emailed me, to try to

22   help me understand what a zero capacity assignment

23   is.

24       Q.    And he's providing you some information in

68

1    the Keyspan link?

2        A.    Correct.

3        Q.    And Exhibit 10, is that your handwriting?

4        A.    Yes.

5        Q.    And what does this reflect?

6        A.    This reflects the notes that I took with my

7    conversations from Jan.

8        Q.    And those conversations took place in

9    August of '04?

10       A.    Correct.

11       Q.    Do you know what date or dates in August of

12   '04?

13       A.    I don't recall the exact date, no.

14       Q.    Something like the 16th?

15       A.    I don't recall.

16       Q.    Was it around the middle of the month?

17       A.    Yes.

18       Q.    Were these two separate conversations that

19   you had or are these just two notes of the same

20   conversation?

21       A.    Two separate conversations.

22       Q.    So the first one says that you spoke with

23   Jan, correct?

24       A.    Correct.

69

1    Q.   And "received fax."  Does that mean she

2 received the fax you sent her?

3    A.   Correct.

4    Q.   And that was the fax sending her a copy of

5 the contract?

6    A.   Yes.

7    Q.   And that's when she said that there's been

8 a huge mistake?

9    A.   Yes.

10    Q.   And she also said, "Need to look at other

11 liabilities"; is that right?

12    A.   Correct.

13    Q.   And she needs to speak with lawyers and

14 with -- what's that?

15    A.   "Will call back."

16    Q.   The next conversation, was that her calling

17 you back?

18    A.   Yes.

19    Q.   And in this -- could you read your writing?

20    A.   Sure.  It says, "Spoke with Jan.  Heads up.

21 Lawyer states terms only one term to auto renew not

22 price.  Will send us a letter to that fact."  So she

23 was just calling me to give me a heads up of what

24 their position was.

70

1      Q.    And that was that if there was an automatic

2   renewal, it was for one term, but not an automatic

3   renewal of the old price?

4      A.    It was for the term only and not the price,

5   correct.

6      Q.    So you had heard that, then, from her?

7      A.    Yes.

8      Q.    Do you recall how long it was between the

9   time of the first call and the time of the second

10  call that day?

11     A.    No, I don't recall.

12     Q.    Did you discuss that position with anyone;

13  that the renewal would renew just the term, but not

14  the price?

15     A.    Yes, I did tell my supervisor.

16     Q.    And what did you say to him and what did he

17  say to you?

18     A.    I just informed him that Jan called me to

19  give me a heads up that the lawyers are saying that

20  it's the term and not the price they were renewing,

21  and that they're sending a letter to that fact.  And

22  he said, "Okay, we'll wait for the letter."

23     Q.    What happened then when you got the

24  letter -- did you get the letter?

71

1      A.    I was copied on the letter, and I just read

2    it.  I didn't do anything with it.  It went to Rick

3    Reed, I believe.

4      Q.    Did you have any discussions with anyone

5    concerning that issue?

6      A.    No.

7      Q.    Did anyone ask you for your input?

8      A.    No.

9      Q.    No one asked you what you thought about it?

10     A.    No.

11     Q.    Did you volunteer your feelings or

12   your belief or your reading of the contract to

13   anyone?

14     A.    No.

15     Q.    Did you form an opinion yourself as to

16   whether the contract renewed for another term

17   or at a different price or that the same price

18   renewed?

19          MR. DOLAN:  Objection.

20     A.    In my opinion, the contract reads it

21   renews.  The contract agreement is the whole

22   agreement.  That's how I read it.  That's my

23   opinion.  Not that it matters.

24     Q.    Did you form that opinion at the time?

72

A.    What do you mean by that?

Q.    Well, when Jan Geist told you that the reading from the Energy East people was that if it renewed, it renewed for a term, but not necessarily at the same old price, did you think, when she told you that, "That's impossible"?  "That's wrong?"  "I see what you're saying, but I disagree"?  Or did you think it over and try and figure it out?

MR. DOLAN:  Objection.

A.    When she told me that, I listened to her. My thoughts were I didn't agree, but not that that matters.  At this point it was out of my hands.  It was between Richard and Rick Reed and Energy East.

Q.    And what did Richard and Rick Reed say about that issue?

MR. DOLAN:  Objection.

A.    Nothing.

Q.    They didn't talk to you about it?

A.    No.

MR. ROHBACK:  All right.  I'll take a quick break, and we may be done.

(Recess)

MR. ROHBACK:  I have no further questions.

73

1    Thank you very much, Ms. Pyles.

2              MR. DOLAN:  I have no questions.

3                    (Whereupon, the deposition was

4                    concluded at 12:30 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

75

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                          )

I, Jane M. Williamson, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 20th day of December, 2005, at 10:26 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 22nd day of December, 2005.

*Jane M. Williamson*

Notary Public

My commission expires:  1/19/07

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813



**PARTMENT OF PUBLIC FACILITIES**

cia Pyles, Facilities Information and Procurement Analyst

101 McMahon Road, Rear
Bedford, MA 01730-2160

Tel.: 781-275-5290 x 6402
Fax: 781-275-8429

E-Mail:  Marcia_Pyles@bedford.k12.ma.us

## FACSIMILE TRANSMISSION

DATE: _____ April 28, 2004 _____ (603) 642- 9591

CONTACT: _____ Gene Hawkins to Jerry

COMPANY: _____ Energy East → TEANEW)

FAX NO. _____ (603) 642-6477

FROM: _____ Marcia Pyles

No. Pages: (Incls. Cover Sheet) _____ 14

Comments:

Gene,

So sorry that this has taken so long to get to you.  Following are copies of all 13 Gas accounts.  Can you please give us a price for one year with the option of an annual extension for a max of 3 years total?

Please note the following accounts are under construction and may not be in the Town of Bedford's name or may have a new account #:

Account # 49326-15970 should be in J &J Contractors

Account # 49320-10540 could be in Travi Construction

Account # 49318-16600 could be in CTA Construction

If you have any questions please feel free to contact me.

Sincerely,

*Marcia Pyles*

6/29

Price in 1002  6/30 am



EXHIBIT

Pyles
4
12/20/05  Jmw

# KEYSPAN
## Energy Delivery

2003361

0154932010540400129877

**AUTO
TOWN OF BEDFORD  DPW
JANICE BIRCH
11 MUDGE WAY
BEDFORD, MA.

**C.009

01730-2127

**Please Pay
Upon Receipt**
129.87  H

49320-10540

⌐ Account Number ¬

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.
Write your account number on check.

Detach Here
▼

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| TOWN OF BEDFORD  DPW  BLDG  16 SOUTH RD  BEDFORD,MA  01730 | 49320-10540 | | Dec 26 '03 |
| | Rate  G-52T  Comm'l Non-Hea | For Customer Assistance  Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 21 days you used 452 therms:**

Dec 12 2003 reading FINAL        34840
Nov 21 2003 reading ACTUAL       34402
CCF Used for METER# 008611972      438

Thermal Factor                 x1.0324
Total therms used                  452

**Your Cost is determined as follows:**

Minimum Charge                   $31.56
$1.5028 per day for 21 days
First 452.0 therms @ $.2001       90.45
Distribution Adjustment:           7.86
452 therms x 0.01740 per therm

**GAS DELIVERY CHARGE.**         $129.87

**TOTAL CURRENT CHARGES**        $129.87

## SUMMARY OF CHARGES

Total Current Charges            $129.87
Amount Due Last Bill               47.36
Your Total Payments Since
  Last Bill. Thank You!           -47.36

**Please Pay Upon Receipt**      $129.87

### GAS USE HISTORY

| | Days | | Therms | | Days | | Therms |
|---|---|---|---|---|---|---|---|
| Dec 03 | 21 | Est | 452 | May 03 | 29 | Act | 259 |
| Nov 03 | 27 | Act | 34 | Apr 03 | 31 | Act | 417 |
| Oct 03 | 31 | Act | 34 | Mar 03 | 29 | Act | 512 |
| Sep 03 | 30 | Act | 56 | Feb 03 | 28 | Act | 648 |
| Aug 03 | 33 | Act | 18 | Jan 03 | 35 | Act | 705 |
| Jul 03 | 33 | Act | 17 | Dec 02 | 29 | Act | 625 |
| Jun 03 | 30 | Act | 105 | Nov 02 | 30 | Act | 381 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

This is your final bill for gas service at the above address. Thank you in
advance for prompt payment.

We sincerely appreciate the prompt way you pay your bills.

*Canceled
Bill on
12/29*



**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**

www.keyspanenergy.com

SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

2004086

015493183166004010577902

```
**AUTO                          **C 009
TOWN CENTER
%ATTN FAY RUSSO
21 MUDGE WAY
BEDFORD MA              01730-2127
```

**Please Pay
Upon Receipt**
1,057.90  H

49318-16500

⎿ Account Number ⏌

Please mail this part of bill with your payment.    Detach Here
Make checks payable to KeySpan Energy Delivery.
Write your account number on check.

KeySpan address on the back must show in return envelope window

| Service To | | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|---|
| TOWN CENTER<br>0 MUDGE WAY<br>BEDFORD,MA<br>01730 | BLDG | 49318-16500 | Apr 21 '04 | Mar 25 '04 |
| | | Rate   G-43T<br>Commercial Hea | For Customer Assistance<br>Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 29 days you used 4329 therms:**

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 69009 |
| Feb 24 2004 reading ACTUAL | 65890 |
| Difference for Meter # 007846911 | 3119 |
| Fixed Factor Multiplier | x1.3394 |
| | 4178 |
| Thermal Factor | x1.0361 |
| Total therms used | 4329 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge<br>$4.2355 per day for 29 days | $122.83 |
| First 4329.0 therms @ $.1916 | 829.44 |
| Distribution Adjustment<br>4329 therms x 0.02440 per therm | 105.63 |
| **GAS DELIVERY CHARGE** | **$1,057.90** |
| **TOTAL CURRENT CHARGES** | **$1,057.90** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $1,057.90 |
| Amount Due Last Bill | 1,309.78 |
| Your Total Payments Since<br>Last Bill. Thank You! | -1,309.78 |
| **Please Pay Upon Receipt** | **$1,057.90** |

If payment received after 05/19/2004
a late payment charge of $9.73
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Mar 04 | 29 Act | 4329 | Aug 03 | 33 Act | 29 |
| Feb 04 | 29 Act | 5531 | Jul 03 | 33 Act | 38 |
| Jan 04 | 31 Act | 6596 | Jun 03 | 30 Act | 521 |
| Dec 03 | 34 Act | 5000 | May 03 | 29 Act | 1489 |
| Nov 03 | 29 Act | 2444 | Apr 03 | 28 Act | 3093 |
| Oct 03 | 30 Act | 1499 | Mar 03 | 28 Act | 4461 |
| Sep 03 | 30 Act | 32 | Feb 03 | 29 Act | 5995 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: B80658C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

We sincerely appreciate the prompt way you pay your bills.

VENDOR NO: _2233 Linu-3_
AMOUNT: _$1057.90_
INVOICE DATE: _3/25/04_
INVOICE NO: _7_
P.O. DATE: _____  P.O. NO. _____
ACCOUNT NO: 001-2360 _3211_    _0006_

Page 1 of 1

# KEYSPAN

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**

www.keyspanenergy.com    SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

04/28/2004  18:04

**KEYSPAN**
Energy Delivery

2004086

015493183663070002925B

\*\*AUTO
TOWN CENTER                    \*\*C 009
% TOWN OF BEDFORD
12 MUDGE WAY # M2-1
BEDFORD MA                      01730-2147

**Please Pay
Upon Receipt**
                                    29.25   H

49318-16630

Account Number

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.  Detach Here
Write your account number on check.

KeySpan address on the back must show in return envelope window.

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| **TOWN CENTER**<br>0 MUDGE WAY<br>BEDFORD, MA<br>01730 | **49318-16630** | **Apr 21 '04** | **Mar 25 '04** |
| | Rate<br>**G-51T**<br>**Comm'l Non-Hea** | colspan | **For Customer Assistance**<br>**Please call (800) 231-5325** |

## CURRENT BILL ITEMIZED

**In 29 days you used 18 therms:**

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 9851 |
| Feb 24 2004 reading ACTUAL | 9834 |
| CCF Used for METER# 00314B724 | 17 |
| Thermal Factor | x1.0361 |
| Total therms used | 18 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge<br>$.8355 per day for 29 days | $24.23 |
| First 18.0 therms @ $.2542 | 4.58 |
| Distribution Adjustment:<br>18 therms x 0.02440 per therm | .44 |
| **GAS DELIVERY CHARGE** | **$29.25** |
| **TOTAL CURRENT CHARGES** | **$29.25** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $29.25 |
| Amount Due Last Bill | 30.06 |
| Your Total Payments Since<br>Last Bill. Thank You! | -30.06 |
| **Please Pay Upon Receipt** | **$29.25** |

If payment received after 05/19/2004
a late payment charge of $.27
(0.92% of outstanding charges) may be added.

**GAS USE HISTORY**

| | Days | | Therms | | Days | | Therms |
|---|---|---|---|---|---|---|---|
| Mar 04 | 29 Act | | 18 | Aug 03 | 33 Act | | 17 |
| Feb 04 | 29 Act | | 21 | Jul 03 | 35 Act | | 19 |
| Jan 04 | 31 Act | | 19 | Jun 03 | 30 Act | | 24 |
| Dec 03 | 34 Act | | 22 | May 03 | 29 Act | | 22 |
| Nov 03 | 29 Act | | 26 | Apr 03 | 31 Act | | 18 |
| Oct 03 | 29 Act | | 23 | Mar 03 | 29 Act | | 15 |
| Sep 03 | 38 Act | | 16 | Feb 03 | 28 Act | | 15 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: B95B58C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access.  Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

We sincerely appreciate the prompt way you pay your bills.

VENDOR NO. *29.33 Line 3 (signature)*
AMOUNT: *$29.25*
INVOICE DATE: *3/25/04*
INVOICE NO.:
P.O. DATE _____ P.O. NO. _____
ACCOUNT NO: 001-2360-*5211.0000*

Page 1 of 1

**KEYSPAN**
Energy Delivery

TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE NUMBER ABOVE
www.keyspanenergy.com    SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

2004086

015493182011050043b03b

**AUTO
BEDFORD POLICE STATION          **C 009
JANICE BIRCH
11 MUDGE WAY
BEDFORD, MA          01730-2127

**Please Pay
Upon Receipt**
436.03   H

49318-20110

⌐ Account Number ¬

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.   Detach Here ▼
Write your account number on check.

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| BEDFORD POLICE STATION<br>0 MUDGE WAY<br>BEDFORD, MA<br>01730 | 49318-20110 | Apr 21 '04 | Mar 25 '04 |
| | Rate  G-43T<br>Commercial Hea | For Customer Assistance<br>Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

### In 29 days you used 1450 therms:

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 42089 |
| Feb 24 2004 reading ACTUAL | 40727 |
| Difference for Meter # 005523688 | 1362 |
| Fixed Factor Multiplier | x1.0270 |
| | 1399 |
| Thermal Factor | x1.0361 |
| Total therms used | 1450 |

### Your Cost is determined as follows:

| | |
|---|---|
| Minimum Charge | $122.83 |
| $4.2355 per day for 29 days | |
| First 1450.0 therms @ $.1916 | 277.82 |
| Distribution Adjustment: | |
| 1450 therms x 0.02440 per therm | 35.38 |
| **GAS DELIVERY CHARGE** | **$436.03** |
| **TOTAL CURRENT CHARGES** | **$436.03** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $436.03 |
| Amount Due Last Bill | 1,267.73 |
| Your Total Payments Since<br>Last Bill. Thank You! | -1,267.73 |
| **Please Pay Upon Receipt** | **$436.03** |

If payment received after 05/19/2004
a late payment charge of $4.01
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | | Therms | | Days | | Therms |
|---|---|---|---|---|---|---|---|
| Mar 04 | 29 | Act | 1450 | Aug 03 | 33 | Act | 199 |
| Feb 04 | 29 | Act | 2081 | Jul 03 | 33 | Act | 236 |
| Jan 04 | 31 | Act | 2709 | Jun 03 | 30 | Act | 457 |
| Dec 03 | 34 | Act | 1680 | May 03 | 29 | Act | 519 |
| Nov 03 | 28 | Act | 873 | Apr 03 | 31 | Act | 1176 |
| Oct 03 | 31 | Act | 876 | Mar 03 | 29 | Act | 1778 |
| Sep 03 | 30 | Act | 389 | Feb 03 | 28 | Act | 2325 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: 45D458C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

√ #641027

# KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**

www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

2004086

0154932022540700224020

**AUTO
TOWN OF BEDFORD
JANICE BIRCH
11 MUDGE WAY
BEDFORD MA          01730-2127

**C 009

**Please Pay
Upon Receipt**

224.02    H

49320-22540

⌐ Account Number ⌐

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.    **Detach Here**
Write your account number on check.

| Account Number | Next Meter Reading | Bill Date |
|---|---|---|
| **49320-22540** | **Apr 21 '04** | **Mar 25 '04** |

**Service To**
TOWN OF BEDFORD
120 SOUTH RD
BEDFORD,MA
01730

| Rate    G-41 | For Customer Assistance |
|---|---|
| **Commercial Hea** | **Please call (800) 231-5325** |

## CURRENT BILL ITEMIZED

**In 29 days you used 154 therms:**

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 3964 |
| Feb 24 2004 reading ACTUAL | 3815 |
| CCF Used for METER# 0B0002878 | 149 |
| Thermal Factor | x1.0361 |
| Total therms used | 154 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge | $24.23 |
| $.8355 per day for 29 days | |
| First 154.0 therms @ $.3340 | 51.44 |
| Distribution Adjustment: | 3.76 |
| 154 therms x 0.02440 per therm | |
| **GAS DELIVERY CHARGE** | **$79.43** |
| GAS SUPPLY CHARGE | |
| @ $.93890 /therm | 144.59 |
| **TOTAL CURRENT CHARGES** | **$224.02** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $224.02 |
| Amount Due Last Bill | 788.63 |
| Your Total Payments Since Last Bill. Thank You! | -788.63 |
| **Please Pay Upon Receipt** | **$224.02** |

If payment received after 05/19/2004
a late payment charge of $2.06
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Mar 04 | 29 Act | 154 | Aug 03 | 33 Act | 9 |
| Feb 04 | 29 Act | 262 | Jul 03 | 33 Act | 9 |
| Jan 04 | 31 Act | 310 | Jun 03 | 30 Act | 16 |
| Dec 03 | 35 Act | 174 | May 03 | 29 Act | 20 |
| Nov 03 | 28 Act | 81 | Apr 03 | 31 Act | 84 |
| Oct 03 | 30 Act | 41 | Mar 03 | 29 Act | 181 |
| Sep 03 | 30 Act | 10 | Feb 03 | 28 Act | 262 |

## IMPORTANT MESSAGES

**Your unique online Access Code is: 62CB58C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

We sincerely appreciate the prompt way you pay your bills.

**Page   1 of   1**

# KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE NUMBER ABOVE**
www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
Energy Delivery

2004085

015493182044010017507O

**C 009
A

BEDFORD FIRE DEPT
JANICE BIRCH
11 MUDGE WAY          01730-2127
BEDFORD MA

IIIIII...II.III.I.III.I.II.IIII...III.III.III

**Please Pay
Upon Receipt**      175.07   H

49318-20440

Account Number

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.   Detach Her
Write your account number on check.

KeySpan address on the back must show in return envelope window                    ▼

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| BEDFORD FIRE DEPT 55 GREAT RD BEDFORD,MA 01730 | 49318-20440 | Apr 21 '04 | Mar 24 '04 |
| | Rate    G-43T Commercial Hea | For Customer Assistance Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 14 days you used 536 therms:**

| | |
|---|---|
| Mar 09 2004 reading REMOVE | 69682 |
| Feb 24 2004 reading ACTUAL | 69181 |
| Difference for Meter # 009713657 | 501 |
| Fixed Factor Multiplier | x1.0306 |
| | 516 |
| Thermal Factor | x1.0385 |
| Total therms used | 536 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge $4.2350 per day for 14 days | $59.29 |
| First 536.0 therms @ $.1916 | 102.70 |
| Distribution Adjustment: 536 therms x 0.02440 per therm | 13.08 |
| GAS DELIVERY CHARGE | $175.07 |
| **TOTAL CURRENT CHARGES** | $175.07 |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $175.07 |
| Amount Due Last Bill | 1,003.32 |
| Your Total Payments Since Last Bill. Thank You! | -1,003.32 |
| **Please Pay Upon Receipt** | $175.07 |

If payment received after 05/18/2004
a late payment charge of $1.61
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Mar 04 | 14 Act | 536 | Aug 03 | 33 Act | 282 |
| Feb 04 | 29 Act | 1596 | Jul 03 | 33 Act | 289 |
| Jan 04 | 31 Act | 1943 | Jun 03 | 30 Act | 561 |
| Dec 03 | 34 Act | 1581 | May 03 | 29 Act | 579 |
| Nov 03 | 28 Act | 950 | Apr 03 | 31 Act | 1083 |
| Oct 03 | 31 Act | 713 | Mar 03 | 29 Act | 1404 |
| Sep 03 | 30 Act | 352 | Feb 03 | 28 Act | 1750 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code Is: 525258C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."−



**Page    1 of    1**

# KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

2004086

0154931816570000506517          0641027

**AUTO
TOWN OF BEDFORD--DPW
JANICE BIRCH
11 MUDGE WAY
BEDFORD, MA.          01730-2127

**C 009

Please Pay
Upon Receipt
506.51    H

49318-16570

⌐ Account Number ¬

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.
Write your account number on check.    Detach Here ▼

KeySpan address on the back must show in return envelope window

| | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| **Service To** | 49318-16570 | **Apr 21 '04** | **Mar 25 '04** |

**TOWN OF BEDFORD--DPW
10 MUDGE WAY
BEDFORD,MA
01730    BLDG**

| Rate | G-42T | For Customer Assistance |
|---|---|---|
| | Commercial Hea | Please call (800) 231-5325 |

## CURRENT BILL ITEMIZED

**In 27 days you used 1767 therms:**

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 89034 |
| Feb 26 2004 reading ESTIMATED | 87328 |
| CCF Used for METER# 009713920 | 1706 |
| Thermal Factor | x1.0359 |
| Total therms used | 1767 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge $1.5022 per day for 27 days | $40.56 |
| First 1767.0 therms @ $.2393 | 422.84 |
| Distribution Adjustment: 1767 therms x 0.02440 per therm | 43.11 |
| **GAS DELIVERY CHARGE** | **$506.51** |
| **TOTAL CURRENT CHARGES** | **$506.51** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $506.51 |
| Amount Due Last Bill | 1,606.71 |
| Your Total Payments Since Last Bill. Thank You! | -1,606.71 |
| **Please Pay Upon Receipt** | **$506.51** |

If payment received after 05/19/2004
a late payment charge of $4.66
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| Days | Therms | Days | Therms |
|---|---|---|---|
| Mar 04  27 Act | 1767 | Aug 03  31 Est | 85 |
| Feb 04  31 Est | 2693 | Jul 03  33 Act | 192 |
| Jan 04  28 Act | 3162 | Jun 03  30 Est | 671 |
| Dec 03  37 Est | 2576 | May 03  60 Act | 2013 |
| Nov 03  29 Act | 1186 | Mar 03  57 Act | 5166 |
| Oct 03  30 Est | 1035 | Jan 03  64 Act | 6534 |
| Sep 03  32 Act | 219 | Nov 02  56 Act | 2078 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: B6BE58C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

AMT._____3379.36___600 inv

VE_____10610

A_____001-3500-5211

**Page  1 of  1**



## KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com    SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION



# KEYSPAN
Energy Delivery

2004042

015493222069030041381 7

0640888

BEDFORD MIDDLE SCHOOL **C 009
TOWN OF BEDFORD               A
99 MCMAHON RD
BEDFORD,MA                    01730-2109

**Please Pay
Upon Receipt**
413.81    H

49322-20690

└─ Account Number ─┘

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.
Write your account number on check.    Detach He.

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| BEDFORD MIDDLE SCHOOL<br>99 MCMAHON RD<br>BEDFORD,MA<br>01730 | 49322-20690 | Feb 20 '04 | Feb 10 '04 |
| | Rate      G-43<br>Commercial Hea | For Customer Assistance<br>Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 75 days you used 9447 therms:**

Feb 03 2004 reading ACTUAL        015375
Nov 20 2003 reading ACTUAL        014463
Meter multiplier is 10.0 -CCF used    912
CCF Used for METER# 9803782          9120

Thermal Factor                    x1.0359
Total therms used                    9447

### Your Cost is determined as follows:

| | |
|---|---|
| Minimum Charge<br>$4.2358 per day for 75 days | $317.69 |
| First 9447.0 therms @ $.1919 | 1,812.88 |
| Distribution Adjustment:<br>9447 therms x 0.01770 per therm | 167.21 |
| **GAS DELIVERY CHARGE** | **$2,297.78** |
| GAS SUPPLY CHARGE<br>@ $.89400 /therm | 8,445.62 |
| **TOTAL CURRENT CHARGES** | **$10,743.40** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $10,743.40 |
| Amount Due Last Bill | 2,981.37 |
| Your Total Payments Since<br>Last Bill. Thank You! | -2,981.37 |
| Gas Charges from 11/20/2003<br>to 12/29/2003 CANCELLED | -10,329.59 |
| **Please Pay Upon Receipt** | **$413.81** |

If payment received after 03/06/2004
a late payment charge of $3.81
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Feb 04 | 75 Act | 9447 | Mar 03 | 28 Act | 10278 |
| Nov 03 | 29 Act | 4517 | Feb 03 | 29 Est | 7414 |
| Oct 03 | 154 Act | 4844 | Jan 03 | 66 Act | 16895 |
| May 03 | 29 Act | 8942 | Nov 02 | 60 Act | 7003 |
| Apr 03 | 28 Est | 207 | Sep 02 | 32 Act | 208 |

## IMPORTANT MESSAGES

**Your unique online Access Code is: 60EFC4C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

Your previous billing was estimated because we could not gain access to
read your meter /or/ we found the meter reading to be inconsistent with
your normal usage patterns. We have since obtained data and recalculated
the amount as shown.

AMT. _413.81_

VENDOR NO. _2233_

ACCT. NO. _4100·52·23·2_

P.O. NO. _____

**Page   1 of   1**

# KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com        SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

0641063
2004086

015493161396080015292q

**AUTO
JOB LANE SCHOOL
BEDFORD PUBLIC SCH
11 MUDGE WAY
BEDFORD MA

**C 009

01730-2127

**Please Pay
Upon Receipt
152.92 H**

49316-13960

└ Account Number ┘

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.    Detach Here
Write your account number on check.        ▼

| Service To | | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|---|
| JOB LANE SCHOOL<br>0 SWEETWATER AVE<br>BEDFORD,MA<br>01730 | SCH | 49316-13960 | Apr 21 '04 | Mar 25 '04 |
| | | Rate G-52T<br>Comm'l Non-Hea | For Customer Assistance<br>Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 29 days you used 488 therms:**

| | | |
|---|---|---|
| Mar 24 2004 reading ACTUAL | | 76987 |
| Feb 24 2004 reading ACTUAL | | 76516 |
| CCF Used for METER# 006398816 | | 471 |
| | | |
| Thermal Factor | | x1.0361 |
| Total therms used | | 488 |

**Your Cost is determined as follows:**

| | | |
|---|---|---|
| Minimum Charge<br>$1.5020 per day for 29 days | $43.56 | |
| First 488.0 therms @ $.1997 | 97.45 | |
| Distribution Adjustment:<br>488 therms x 0.02440 per therm | 11.91 | |
| | | |
| **GAS DELIVERY CHARGE** | **$152.92** | |
| | | |
| **TOTAL CURRENT CHARGES** | **$152.92** | |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $152.92 |
| Amount Due Last Bill | 299.50 |
| Your Total Payments Since<br>Last Bill. Thank You! | -299.50 |
| **Please Pay Upon Receipt** | **$152.92** |

If payment received after 05/19/2004
a late payment charge of $1.41
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Mar 04 | 29 Act | 488 | Aug 03 | 33 Act | 334 |
| Feb 04 | 29 Act | 465 | Jul 03 | 33 Act | 361 |
| Jan 04 | 33 Act | 472 | Jun 03 | 30 Act | 517 |
| Dec 03 | 32 Act | 482 | May 03 | 29 Act | 424 |
| Nov 03 | 28 Act | 352 | Apr 03 | 31 Act | 500 |
| Oct 03 | 31 Act | 394 | Mar 03 | 29 Act | 458 |
| Sep 03 | 30 Act | 382 | Feb 03 | 28 Act | 439 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: E79558C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

AMT.  152.92

VENDOR  2233

A ___  101- 4100-54.18. ⑤


## KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com    SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION



**0641060**

2004086

0154931816810700050151

··c

BEDFORD HIGH SCHOOL
BEDFORD PUBLIC SCHOOLS
BUSINESS OFFICE 9 MUDGEWY
BEDFORD MA          01730

Illll.....Ill..l.Il..ll.l.l.l

**Please Pay
Upon Receipt**
50.15   H

49318-16810

L Account Number J

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.    **Detach Here**
Write your account number on check.            ▼

KeySpan address on the back must show in return envelope window

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| BEDFORD HIGH SCHOOL<br>0 GREAT RD<br>BEDFORD,MA<br>01730 | **49318-16810** | **Apr 21 '04** | **Mar 25 '04** |
| | Rate **G-42T**<br>**Commercial Hea** | **For Customer Assistance**<br>**Please call** (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 29 days you used 25 therms:**

| | |
|---|---|
| Mar 24 2004 reading ACTUAL | 03208 |
| Feb 24 2004 reading ACTUAL | 03184 |
| CCF Used for METER# 0B9001953 | 24 |

| | |
|---|---|
| Thermal Factor | x1.0361 |
| Total therms used | 25 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge | $43.56 |
| $1.5020 per day for 29 days | |
| First 25.0 therms @ $.2393 | 5.98 |
| Distribution Adjustment: | |
| 25 therms x $.02440 per therm | .61 |
| **GAS DELIVERY CHARGE** | **$50.15** |
| **TOTAL CURRENT CHARGES** | **$50.15** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $50.15 |
| Amount Due Last Bill | 154.86 |
| Your Total Payments Since<br>Last Bill. Thank You! | -154.86 |
| **Please Pay Upon Receipt** | $50.15 |

If payment received after 05/19/2004
a late payment charge of $.46
(0.92% of outstanding charges) may be added.

**GAS USE HISTORY**

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Mar 04 | 29 Act | 25 | Aug 03 | 33 Act | 93 |
| Feb 04 | 29 Act | 76 | Jul 03 | 33 Act | 102 |
| Jan 04 | 28 Act | 192 | Jun 03 | 30 Act | 168 |
| Dec 03 | 37 Est | 222 | May 03 | 29 Act | 136 |
| Nov 03 | 29 Act | 175 | Apr 03 | 31 Act | 154 |
| Oct 03 | 29 Act | 243 | Mar 03 | 29 Act | 156 |
| Sep 03 | 31 Est | 36 | Feb 03 | 28 Act | 169 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: BF9558C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

50.15

VENDOR NO  2233

ACCT. NO. 101-4100·54-18-1

P.O. NO.



TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE

www.keyspanenergy.com        SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION.


**Energy Delivery**

2003302

0154932423350100835242

**\*\*AUTO**
**DAVIS SCHOOL**
**BSNSS OFFC/BED PUBL SCHL**
**11 MUDGE WAY**
**BEDFORD,MA**                     **01730-2127**

**\*\*C 009**                          0640543

COPY

**Please Pay**
**Upon Receipt**
**835.24   H**

49324-23350

⌐ Account Number ¬

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.   **Detach Here**
Write your account number on check.                          ▼

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| **DAVIS SCHOOL**<br>**0 DAVIS RD**<br>**BEDFORD,MA**<br>**01730** | 49324-23350 | **Nov 19 '03** | **Oct 28 '03** |

| Rate   **G-43T** | For Customer Assistance |
|---|---|
| **Commercial Hea** | **Please call (800) 231-5325** |

## CURRENT BILL ITEMIZED

**In 35 days you used 3772 therms:**

| | |
|---|---|
| Oct 28 2003 reading ESTIMATED | 210126 |
| Sep 23 2003 reading ACTUAL | 206592 |
| Difference for Meter # 009906095 | 3534 |
| Fixed Factor Multiplier | x1.0319 |
| | 3647 |
| Thermal Factor | x1.0344 |
| Total therms used | 3772 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge | $136.29 |
| $3.8940 per day for 35 days | |
| First 3772.0 therms @ $.1658 | 625.40 |
| Distribution Adjustment: | |
| 3772 therms x 0.01950 per therm | 73.55 |
| **GAS DELIVERY CHARGE** | **$835.24** |
| **TOTAL CURRENT CHARGES** | **$835.24** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $835.24 |
| Amount Due Last Bill | 175.02 |
| Your Total Payments Since<br>Last Bill. Thank You! | -175.02 |
| **Please Pay Upon Receipt** | **$835.24** |

If payment received after 12/22/2003
a late payment charge of $8.35
(1.00% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Oct 03 | 35 Est | 3772 | Mar 03 | 32 Act | 8513 |
| Sep 03 | 33 Act | 251 | Feb 03 | 25 Est | 9197 |
| Aug 03 | 29 Act | 160 | Jan 03 | 35 Act | 12184 |
| Jul 03 | 33 Act | 205 | Dec 02 | 31 Act | 8338 |
| Jun 03 | 30 Act | 256 | Nov 02 | 31 Act | 5601 |
| May 03 | 29 Est | 2519 | Oct 02 | 29 Act | 1793 |
| Apr 03 | 28 Est | 6259 | Sep 02 | 157 Act | 4996 |

## IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

Your next meter reading date is shown above. If you won't be home
you can always prevent an estimated bill by telephoning us your meter
reading.  Just call the Customer Assistance telephone number above
on the day of your scheduled meter reading.

**Your unique online Access Code is: 323658C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User".

AMT _____ 835.24

VENDOR NO. _____ 2233

ACCT. NO. 101-4100-52-23-4

P.O. NO. _____                 **Page   1 of  1**


**Energy Delivery**

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION



**KEYSPAN**
Energy Delivery

2004057

0154932213270900518778

•• C

TOWN OF BEDFORD
BEDFORD PUBLIC SCH
BUSINESS OFF 9 MUDGE WY
BEDFORD MA          01730

IIIllllllllllllllllllllll
        COPY

**Please Pay
Upon Receipt**
518.77    H

49322-13270

⌐ Account Number ¬

KeySpan address on the back must show in return envelope window

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.   Detach Here
Write your account number on check.                      ▼

| Service To | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|
| TOWN OF BEDFORD<br>0 MCMAHON AVE          SCH<br>BEDFORD,MA<br>01730 | 49322-13270 | Mar 22 '04 | Feb 25 '04 |
| | Rate   G-41T<br>Commercial Hea | For Customer Assistance<br>Please call (800) 231-5325 | |

### CURRENT BILL ITEMIZED

In 29 days you used 345 therms:

| | |
|---|---|
| Feb 24 2004 reading ESTIMATED | 0455 |
| Jan 26 2004 reading ESTIMATED | 0122 |
| CCF Used for METER# 00R346132 | 333 |
| Thermal Factor | x1.0358 |
| Total therms used | 345 |

Your Cost is determined as follows:

| | |
|---|---|
| Minimum Charge | $24.23 |
| $.8355 per day for 29 days | |
| First 345.0 therms @ $.3354 | 115.71 |
| Distribution Adjustment: | 7.90 |
| 345 therms x 0.02290 per therm | |
| **GAS DELIVERY CHARGE** | **$147.84** |
| **TOTAL CURRENT CHARGES** | **$147.84** |

### SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $147.84 |
| Amount Due Last Bill | 399.36 |
| Your Total Payments Since<br>Last Bill. Thank You! | -28.43 |
| **Please Pay Upon Receipt** | **$518.77** |

#### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Feb 04 | 29 Est | 345 | May 03 | 29 Act | 0 |
| Jan 04 | 94 Est | 909 | Apr 03 | 31 Act | 0 |
| Oct 03 | 30 Act | 0 | Mar 03 | 29 Act | 0 |
| Sep 03 | 30 Act | 0 | Feb 03 | 63 Act | 0 |
| Aug 03 | 33 Act | 0 | Dec 02 | 87 Act | 0 |
| Jul 03 | 33 Act | 0 | Sep 02 | 33 Act | 0 |
| Jun 03 | 30 Act | 0 | Aug 02 | 29 Act | 0 |

### IMPORTANT MESSAGES

You have chosen Energy East to be your gas supply provider.
KeySpan Energy Delivery will continue to deliver gas to your premises.
If you have any questions about your gas supply charges, please contact
Energy East at (800) 485-4549. Thank you.

**Your unique online Access Code is: EE3E58C**
We're online, anytime!  View and pay your bill, check your balance, submit
meter readings.  The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

AMT.  ___547·20 (2 cmv)___

VENDOR NO  ___2233___

ACCT. NO.  ___4100-54·18·2___

P.O. NO.  _____

**KEYSPAN**
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE NUMBER ABOVE**

www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

# KEYSPAN
## Energy Delivery

2004035

015493261597020273288Ø

**C 009
F

TOWN OF BEDFORD--DPW
JANICE BIRCH
11 MUDGE WAY                    01730-2127
BEDFORD MA

49326-15970

___ Account Number ___

KeySpan address on the back must show in return envelope window

**Please Pay
Upon Receipt**

2,732.88    H

Please mail this part of bill with your payment.
Make checks payable to KeySpan Energy Delivery.     Detach Here
Write your account number on check.                      ▼

| Service To | | Account Number | Next Meter Reading | Bill Date |
|---|---|---|---|---|
| TOWN OF BEDFORD--DPW | BLDG | 49326-15970 | Feb 20 '04 | Feb 03 '04 |
| 314 GREAT RD | | Rate   G-41 | For Customer Assistance | |
| BEDFORD MA 01730 | | Commercial Hea | Please call (800) 231-5325 | |

## CURRENT BILL ITEMIZED

**In 20 days you used 2095 therms:**

| | |
|---|---|
| Jan 29 2004 reading ACTUAL | 00477 |
| Jan 09 2004 reading UNLOCK | 00017 |
| Difference for Meter # 000305716 | 460 |
| Fixed Factor Multiplier | x4.3944 |
| | 2021 |
| Thermal Factor | x1.0367 |
| Total therms used | 2095 |

**Your Cost is determined as follows:**

| | |
|---|---|
| Minimum Charge | $16.71 |
| $.8355 per day for 20 days | |
| First 2095.0 therms @ $.3402 | 712.72 |
| Distribution Adjustment: | |
| 2095 therms x 0.01740 per therm | 36.45 |
| **GAS DELIVERY CHARGE** | **$765.88** |
| GAS SUPPLY CHARGE | |
| @ $.93890 /therm | 1,967.00 |
| **TOTAL CURRENT CHARGES** | **$2,732.88** |

## SUMMARY OF CHARGES

| | |
|---|---|
| Total Current Charges | $2,732.88 |
| Amount Due Last Bill | 410.92 |
| Gas Charges from 01/09/2004 | -410.92 |
| to 01/26/2004 CANCELLED | |
| **Please Pay Upon Receipt** | **$2,732.88** |

If payment received after 03/29/2004
a late payment charge of $25.14
(0.92% of outstanding charges) may be added.

### GAS USE HISTORY

| | Days | Therms | | Days | Therms |
|---|---|---|---|---|---|
| Jan 04 | 20 Act | 2095 | Dec 02 | 29 Act | 770 |
| Jun 03 | 26 Act | 83 | Nov 02 | 30 Act | 198 |
| May 03 | 29 Act | 261 | Oct 02 | 28 Act | 115 |
| Apr 03 | 31 Act | 634 | Sep 02 | 33 Act | 8 |
| Mar 03 | 29 Act | 507 | Aug 02 | 29 Act | 4 |
| Feb 03 | 28 Act | 665 | Jul 02 | 35 Act | 6 |
| Jan 03 | 35 Act | 742 | Jun 02 | 30 Act | 53 |

## IMPORTANT MESSAGES

**Your unique online Access Code is: F14858C**
We're online, anytime! View and pay your bill, check your balance, submit
meter readings. The code above provides free, instant access. Go to
www.keyspanenergy.com, click "My Account" then "I'm a New User."

Based on a review of your account, a prior bill(s) has been cancelled.
Please see details in the Summary of Charges section. The corrected
charges are detailed in the Current Bill Itemized section.

*Spoke w/ C.S. reissuing to
J.J.*

**Page  1 of  1**

## KEYSPAN
Energy Delivery

**TO REPORT A GAS ODOR CALL THE CUSTOMER ASSISTANCE  NUMBER ABOVE**
www.keyspanenergy.com          SEE REVERSE FOR ADDITIONAL CUSTOMER INFORMATION

Printed by: Marcia Pyles
Title: Bedford Acct List 06-30.xls : BPS

---

Wednesday, June 30, 2004 1:38:53 PM

Message

**From:**    👤 "Jerry Hawkins" <jhawkins@teanew.com>

**Subject:**   Bedford Acct List 06-30.xls

**To:**     👤 **Marcia Pyles**

**EXHIBIT**
Pyles
5
12/20/05 JMW

---

**Attachments:**   📄 Bedford Acct List 06-30.xls

---

Hi Marcia,
Here is the acct list that I have.  Please verify which accts that you want
on the new contract and let me know if there are others to add.
Thank you.
Jerry

| Company Name | LDC Account Number | Address | |
|---|---|---|---|
| Town of Bedford-DPW2 | 4932210990 | Norma Rd | |
| Town of Bedford-High School | 4931816810 | Great Rd | |
| Town of Bedford-Hartwell | 4938910690 | Hartwell Rd | |
| Town of Bedford-Fire Dept | 4931820440 | 55 Great Rd | |
| Town of Bedford-DPW6 | 4932410420 | Davis Rd | |
| Town of Bedford-DPW5 | 4932213150 | Parker Rd | |
| Town of Bedford-Lane School | 4931613980 | Sweetwater Ave | |
| Town of Bedford-DPW3 | 4938910390 | Middlesex Tpk | |
| Town of Bedford-Library | 4931820260 | Mudge Way | |
| Town of Bedford-DPW1 | 4932610000 | 341 Great Rd | |
| Town of Bedford-Davis School | 4932423350 | Davis Rd | |
| Town of Bedford-16 South Rd | 4932010540 | 16 South Rd | |
| Town of Bedford-DPW4 | 4932416870 | 150 Carlisle Rd | |
| Town of Bedford-John Glenn Middle School | 4932213270 | McMahon Ave | |
| Town of Bedford-Town Hall | 4931816570 | 10 Mudge Way | |
| Town of Bedford-Town Center 2 | 4931816630 | Mudge Way | |
| Town of Bedford-Town Center 1 | 4931816600 | Mudge Way | |
| Town of Bedford-Police Dept | 4931820110 | Mudge Way | |
| | | | |
| Town of Bedford-DPW | 4932615970 | 314 Great Rd | New |
| Town of Bedford-Middle School | 4932220690 | 99 McMahon Rd | New |
| Town of Bedford-DPW | 4932022540 | 120 South Rd | New |

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

TOWN OF BEDFORD                          :

       Plaintiff                   :          CASE NO. 05-10214JCT

v.                                       :

ENERGY EAST SOLUTIONS, INC.              :

       Defendant                   :

## AFFIDAVIT OF TERESA BRADFORD IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Teresa Bradford, submit this affidavit in support of Defendant Energy East Solutions, Inc.'s ("Energy East") Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment. Under the pains and penalties of perjury, I state as follows:

1.     I am over the age of 21. I reside in Corpus Christi, Texas.

2.     I am employed by The Energy Network, Inc. as vice president and controller.

3.     In this capacity, I have access to Energy East's invoices for the supply of natural gas to the Town of Bedford.

4.     Attached hereto as Exhibits A-1 through A-14, are true and accurate copies of invoices issued by Energy East to the Town of Bedford reflecting service to the Town of Bedford in September, 2004. Based upon these invoices, Energy East supplied natural gas to the Town of Bedford through September 22, 2004.

Signed under the pains and penalties of perjury, this 17th day of January, 2006.

_Teresa Bradford_
Teresa Bradford

**EXHIBIT A-1**



# EnergyEast Solutions

An **Energy East** Company

**Account Number:** 4004284

**This Amount Due Upon Receipt:** $161.87

**Invoice Number:** 39132
**Invoice Date:** 9/27/2004
**LDC Account #:** 0004931820260
**Meter Number:** 05473595        **LDC Rate:** 42

**Late Charges Added After:** 10/27/2004

**Remit To:**    Energy East Solutions
PO Box 8000
Department No 488
Buffalo, NY 14267

**Attn:**    Richard Reed

Town of Bedford-Library
7 Mudge Way
Bedford        MA        01730

---

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

**Account Number:** 4004284

**Service Address**
Town of Bedford
Town of Bedford-Library
11 Mudge Way
Bedford        MA        01730

| | |
|---|---|
| Previous Balance: | 9.72 |
| Payments Received: | $0.00 |
| Other Adjustments: | $0.00 |
| Other Adjustment Note: | |
| Finance Charge: | $0.00 |
| Balance Forward: | 9.72 |

**Service Period**    8/26/2004 **To** 9/22/2004

**Energy Charge:**    266 th    0.572 $ per th    $152.15

**Sales Tax**    $0.00

**Charges This Period**    $152.15

**Total DUE to EnergyEast Solutions**    **$161.87**

---

**Detail Information**

**Payments:**    Received Date    Check #        **Amount**

$0.00

$0.00

**Payments Received:**    $0.00

State GRT Included in the above calculations    $0.00

**Customer Class:**

Late charges of 1.5% per month will be added to any overdue amounts

**If you have any questions please call EnergyEast Solutions at 1-800-260-0300**

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-2**

01/17/2006 11:15 FAX 6077211719          NYSEG SOLUTIONS                    ☑003



## EnergyEast Solutions

An **Energy East** Company

Account Number: **4004278**                    **This Amount Due Upon Receipt:**  **$62.91**

Invoice Number: 39127

Invoice Date:   9/27/2004
LDC Account #: 0004932410420                   Late Charges Added After:    **10/27/2004**
Meter Number:  06216749          LDC Rate: 52              Remit To:    Energy East Solutions
        Attn:    Accounts Payable                                       PO Box 8000
                                                                        Department No 488
        **Town of Bedford-DPW6**                                       Buffalo, NY  14267
        314 Great Rd
        Bedford              MA        01730

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| Account Number:  4004278 | Previous Balance: | $58.91 | |
|---|---|---|---|
| **Service Address** | Payments Received: | $0.00 | |
| Town of Bedford | Other Adjustments: | $0.00 | |
| Town of Bedford-DPW6 | Other Adjustment Note: | | |
| 314 Great Rd. | Finance Charge: | | $0.00 |
| Bedford          MA       01730 | Balance Forward: | | $58.91 |

| Service Period | 8/25/2004  **To**  9/22/2004 | | | |
|---|---|---|---|---|
| Energy Charge: | 7 **th** | 0.572 **$ per th** | $4.00 | |
| Sales Tax | | | $0.00 | |
| **Charges This Period** | | | | $4.00 |
| **Total DUE to EnergyEast Solutions** | | | | **$62.91** |

### Detail Information

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | | $0.00 |

State GRT Included in the above calculations          $0.00

Customer Class: 1600

Late charges of 1.5% per month will be added to any overdue amounts

**If you have any questions please call EnergyEast Solutions at 1-800-260-0300**

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-3**

01/17/2006 11:16 FAX 6077211719          NYSEG SOLUTIONS                    ☑004



**EnergyEast Solutions**

An **Energy East** Company

Account Number:   **4004276**           This Amount Due Upon Receipt:    **$34.90**

Invoice Number: 39125
Invoice Date:    9/27/2004                Late Charges Added After:      **10/27/2004**
LDC Account #: 0004932416870 .
Meter Number: 08864711       LDC Rate: 51      Remit To:    Energy East Solutions
      Attn:    Dept of Public Works                          PO Box 8000
                                                             Department No 488
                                                             Buffalo, NY  14267
      **Town of Bedford-DPW4**
      314 Great Rd
      Bedford          MA        01730


                    Please return this portion with payment

            *Please write your EnergyEast Solutions Account Number on your check*

  Account Number:    4004276          Previous Balance:          $33.76
                                      Payments Received:          $0.00
  Service Address                     Other Adjustments:          $0.00
  Town of Bedford
  Town of Bedford-DPW4                Other Adjustment Note:
  11 Mudge Way                        Finance Charge:                        $0.00
  Bedford       MA      01730         Balance Forward:                       $33.76

    Service Period       8/26/2004  To   9/22/2004

    Energy Charge:                  2  th     0.572  $ per th      $1.14


                                                                  $0.00
                 Sales Tax
                                                                          $1.14
              Charges This Period

          **Total DUE to EnergyEast Solutions**                    **$34.90**


  Detail Information

  Payments:     Received Date      Check #              Amount
                                                         $0.00
                                                         $0.00

                                              Payments Received:   $0.00
                 State GRT Included in the above calculations   $0.00

  Customer Class: 185


            Late charges of 1.5% per month will be added to any overdue amounts


      **If you have any questions please call EnergyEast Solutions at 1-800-260-0300**

                 Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-4**

01/17/2006 11:16 FAX 6077211719                NYSEG SOLUTIONS                    ☑005



## EnergyEast Solutions

### An **Energy East** Company

**Account Number:** | 4004277 |                    **This Amount Due Upon Receipt:**    | **$28.61** |
**Invoice Number:** 39126
**Invoice Date:**    9/27/2004
**LDC Account #:** 0004932213150                     **Late Charges Added After:**    | **10/27/2004** |
**Meter Number:** 06319072        **LDC Rate:** 42            **Remit To:**    Energy East Solutions
          Attn:    Dept of Public Works                                        PO Box 8000
                                                                               Department No 488
**Town of Bedford-DPW5**                                                       Buffalo, NY 14267
314 Great Rd
Bedford                      MA            01730

---

Please return this portion with payment
*Please write your EnergyEast Solutions Account Number on your check*

**Account Number:**    4004277                 **Previous Balance:**         $26.32

**Service Address**                            **Payments Received:**        $0.00
Town of Bedford                                **Other Adjustments:**        $0.00
Town of Bedford-DPW5
10 Mudge Way                                   **Other Adjustment Note:**
Bedford          MA      01730                 **Finance Charge:**                      $0.00
                                               **Balance Forward:**                     $26.32

| **Service Period** | 8/25/2004 To 9/22/2004 | | | | |

| **Energy Charge:** | | 4 th | 0.572 $ per th | $2.29 |

|                    **Sales Tax** |                              $0.00 |
|               **Charges This Period** |                           $2.29 |
| **Total DUE to EnergyEast Solutions** |                       **$28.61** |

---

**Detail Information**

---

**Payments:**    **Received Date**    **Check #**              **Amount**
                                                                $0.00
                                                                $0.00
                                         **Payments Received:**        $0.00
            **State GRT Included in the above calculations**   $0.00
**Customer Class:** 185

---

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-5**

01/17/2006 11:17 FAX 6077211719          NYSEG SOLUTIONS                    ☑006



## EnergyEast Solutions

An **Energy East** Company

| Account Number: | 4004286 | This Amount Due Upon Receipt: | $195.62 |
|---|---|---|---|

Invoice Number: 39134
Invoice Date: 9/27/2004
LDC Account #: 0004931816600          Late Charges Added After: **10/27/2004**
Meter Number: 07646911          LDC Rate: 43          Remit To: Energy East Solutions
          Attn:    Fay Russo                                                     PO Box 8000
                                                                                          Department No 488
**Town of Bedford -Town Center 1**                                  Buffalo, NY 14267
12 Mudge Way
Bedford                    MA          01730

### Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| Account Number: 4004286 | | |
|---|---|---|
| | Previous Balance: | $9.72 |
| Service Address | Payments Received: | $0.00 |
| Town of Bedford | Other Adjustments: | $0.00 |
| Town of Bedford-Town Center 1 | Other Adjustment Note: | |
| 12 Mudge Way | Finance Charge: | $0.00 |
| Bedford        MA        01730 | Balance Forward: | $9.72 |

| Service Period | 8/25/2004 **To** 9/22/2004 | | | |
|---|---|---|---|---|
| Energy Charge: | 325 **th** | 0.572 **$ per th** | $185.90 | |
| Sales Tax | | | $0.00 | |
| Charges This Period | | | | $185.90 |
| **Total DUE to EnergyEast Solutions** | | | | **$195.62** |

**Detail Information**

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | | $0.00 |

State GRT Included in the above calculations          $0.00

Customer Class: 186

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-6**

01/17/2006 11:17 FAX 6077211719          NYSEG SOLUTIONS                                    ☒007



## EnergyEast Solutions

An **Energy East** Company

| | | |
|---|---|---|
| **Account Number:** | 4004288 | **This Amount Due Upon Receipt:** ($57.78) |

**Invoice Number:** 39136
**Invoice Date:** 9/27/2004
**LDC Account #:** 0004931816570          **Late Charges Added After:**    10/27/2004
**Meter Number:** 09713920    **LDC Rate:** 42          **Remit To:**    Energy East Solutions
**Attn:**    Janice Birch                                                  PO Box 8000
                                                                          Department No 488
**Town of Bedford-Town Hall**                                             Buffalo, NY 14267
101 McMahon Rd
Bedford                    MA          01730

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| **Account Number:** 4004288 | | |
|---|---|---|
| **Service Address** | **Previous Balance:** | ($181.33) |
| Town of Bedford | **Payments Received:** | $0.00 |
| Town of Bedford-Town Hall | **Other Adjustments:** | $0.00 |
| 11 Mudge Way | **Other Adjustment Note:** | |
| Bedford        MA      01730 | **Finance Charge:** | $0.00 |
| | **Balance Forward:** | ($181.33) |

| **Service Period** | 8/26/2004 **To** 9/22/2004 | | | |
|---|---|---|---|---|
| **Energy Charge:** | 216 **th** | 0.572 **$ per th** | $123.55 | |
| | | | | |
| **Sales Tax** | | | $0.00 | |
| **Charges This Period** | | | | $123.55 |
| **Total DUE to EnergyEast Solutions** | | | | **($57.78)** |

**Detail Information**

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | **Payments Received:** | | $0.00 |
| | State GRT Included in the above calculations | | $0.00 | |

**Customer Class:** 187

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-7**



## EnergyEast Solutions

An **Energy East** Company

| | |
|---|---|
| **Account Number:** 4004285 | **This Amount Due Upon Receipt:** **$170.46** |
| Invoice Number: 39133 | |
| **Invoice Date:** 9/27/2004 | |
| LDC Account #: 0004931820110 | **Late Charges Added After:** **10/27/2004** |
| Meter Number: 05523688    LDC Rate: 43 | **Remit To:** Energy East Solutions |
| Attn: Janice Birch | PO Box 8000 |
| | Department No 488 |
| **Town of Bedford-Police Dept** | Buffalo, NY 14267 |
| 101 McMahon Rd | |
| Bedford          MA          01730 | |

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | | |
|---|---|---|
| **Account Number:** 4004285 | **Previous Balance:** | $62.35 |
| | **Payments Received:** | $0.00 |
| **Service Address** | **Other Adjustments:** | $0.00 |
| Town of Bedford | **Other Adjustment Note:** | |
| Town of Bedford-Police Dept | | |
| 11 Mudge Way | **Finance Charge:** | $0.00 |
| Bedford     MA     01730 | **Balance Forward:** | $62.35 |

| | | |
|---|---|---|
| **Service Period**   8/26/2004 **To** 9/22/2004 | | |
| **Energy Charge:**   189 **th**   0.572 **$ per th**   $108.11 | | |
| **Sales Tax** | $0.00 | |
| **Charges This Period** | | $108.11 |
| **Total DUE to EnergyEast Solutions** | | **$170.46** |

### Detail Information

| Payments: | Received Date | Check # | | Amount |
|---|---|---|---|---|
| | | | | $0.00 |
| | | | | $0.00 |
| | | | **Payments Received:** | $0.00 |
| | | State GRT Included in the above calculations | $0.00 | |

Customer Class: 187

Late charges of 1.5% per month will be added to any overdue amounts

**If you have any questions please call EnergyEast Solutions at 1-800-260-0300**

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-8**

01/17/2006 11:18 FAX 6077211719          NYSEG SOLUTIONS                    009



## EnergyEast Solutions

An **Energy East** Company

| | |
|---|---|
| Account Number: **4004279** | **This Amount Due Upon Receipt:**  **$388.96** |
| Invoice Number: 39128 | |
| Invoice Date: 9/27/2004 | |
| LDC Account #: 0004931820440 | **Late Charges Added After:** **10/27/2004** |
| Meter Number: 09713657     LDC Rate: 43 | **Remit To:** Energy East Solutions |
| Attn: Janice Birch | PO Box 8000 |
| | Department No 488 |
| **Town of Bedford-Fire Dept** | Buffalo, NY 14267 |
| 101 McMahon Rd | |
| Bedford          MA          01730 | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | | |
|---|---|---|
| Account Number:  4004279 | **Previous Balance:** | $235.09 |
| | **Payments Received:** | $0.00 |
| **Service Address** | **Other Adjustments:** | $0.00 |
| Town of Bedford | | |
| Town of Bedford-Fire Dept | **Other Adjustment Note:** | |
| 11 Mudge Way | **Finance Charge:** | $0.00 |
| Bedford     MA     01730 | **Balance Forward:** | $235.09 |

| | | | | |
|---|---|---|---|---|
| **Service Period** | 8/26/2004 **To** 9/22/2004 | | | |
| **Energy Charge:** | 269 th | 0.572 **$ per th** | $153.87 | |
| **Sales Tax** | | | $0.00 | |
| **Charges This Period** | | | | $153.87 |
| **Total DUE to EnergyEast Solutions** | | | | **$388.96** |

### Detail Information

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | **Payments Received:** | | $0.00 |
| | State GRT Included in the above calculations | | $0.00 | |
| Customer Class: 187 | | | | |

Late charges of 1.5% per month will be added to any overdue amounts

## If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-9**

01/17/2006 11:19 FAX  6077211719                    NYSEG SOLUTIONS                    ☑010

## EnergyEast Solutions

An **Energy East** Company

| | |
|---|---|
| Account Number: **4004280** | This Amount Due Upon Receipt: **$1,071.92** |
| Invoice Number: 39129 | |
| Invoice Date: 9/27/2004 | |
| LDC Account #: 0004938910690 | Late Charges Added After: **10/27/2004** |
| Meter Number: 09842072    LDC Rate: 41 | Remit To:  Energy East Solutions |
| Attn:  Dept of Public Works | PO Box 8000 |

**Town of Bedford-Hartwell**
6 Rear Alfred Circle
Bedford              MA        01730

Energy East Solutions
PO Box 8000
Department No 488
Buffalo, NY 14267

---

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | | |
|---|---|---|
| Account Number:  4004280 | Previous Balance: | $1,057.62 |
| | Payments Received: | $0.00 |
| **Service Address** | Other Adjustments: | $0.00 |
| Town of Bedford | Other Adjustment Note: | |
| Town of Bedford-Hartwell | | |
| 11 Mudge Way | Finance Charge: | $0.00 |
| Bedford     MA     01730 | Balance Forward: | $1,057.62 |

| | | | | |
|---|---|---|---|---|
| Service Period | 8/25/2004  To  9/22/2004 | | | |
| Energy Charge: | 25  th | 0.572  $ per th | $14.30 | |
| Sales Tax | | | $0.00 | |
| Charges This Period | | | | $14.30 |
| Total DUE to EnergyEast Solutions | | | | **$1,071.92** |

---

**Detail Information**

---

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | $0.00 | |
| | State GRT Included in the above calculations | | $0.00 | |
| Customer Class: | | | | |

---

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-10**



**EnergyEast Solutions**

An **Energy East** Company

| | | |
|---|---|---|
| **Account Number:** ‎ 4005226 | **This Amount Due Upon Receipt:** | $13.73 |
| Invoice Number: 39163 | | |

Invoice Date:    9/27/2004
LDC Account #: 0004932610010
Meter Number: 0T539991     **LDC Rate:** 51
Attn:    Richard Reed

Late Charges Added After:    10/27/2004
Remit To:    Energy East Solutions
PO Box 8000
Department No 488
Buffalo, NY 14267

**TOWN OF BEDFORD-PUMP-DPW**
11 Mudge Way
Bedford         MA         01730

---

Please return this portion with payment
*Please write your EnergyEast Solutions Account Number on your check*

| | | |
|---|---|---|
| Account Number:    4005226 | Previous Balance: | $0.00 |
| Service Address | Payments Received: | $0.00 |
| | Other Adjustments: | $0.00 |
| TOWN OF BEDFORD-PUMP-DPW | Other Adjustment Note: | |
| 10 Mudge Way | Finance Charge: | $0.00 |
| Bedford      MA      01730 | Balance Forward: | $0.00 |

| | | | | |
|---|---|---|---|---|
| Service Period | 8/25/2004 **To** 9/22/2004 | | | |
| Energy Charge: | 24 th | 0.572 $ per th | $13.73 | |
| Sales Tax | | | $0.00 | |
| Charges This Period | | | | $13.73 |
| **Total DUE to EnergyEast Solutions** | | | | **$13.73** |

---

Detail Information

---

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | | $0.00 |
| | State GRT Included in the above calculations | $0.00 | | |

Customer Class:

---

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-11**

01/17/2006 11:19 FAX 6077211719                NYSEG SOLUTIONS                            ☑012



# EnergyEast Solutions

An **Energy East** Company

Account Number: **4004274**
Invoice Number: 39124                  **This Amount Due Upon Receipt:**    **$6,533.39**
Invoice Date:    9/27/2004
LDC Account #: 0004932210990
Meter Number:  00155968        **LDC Rate: 42**    **Late Charges Added After:**    **10/27/2004**
   Attn:    Accounts Payable                          Remit To:    Energy East Solutions
                                                                   PO Box 8000
**Town of Bedford-DPW2**                                           Department No 488
314 Great Rd                                                       Buffalo, NY 14267
Bedford             MA        01730

---

Please return this portion with payment
*Please write your EnergyEast Solutions Account Number on your check*

Account Number:   4004274              Previous Balance:        $6,507.65

Service Address                        Payments Received:         $0.00
Town of Bedford                        Other Adjustments:         $0.00
Town of Bedford-DPW2
314 Great Rd.                          Other Adjustment Note:
Bedford      MA      01730             Finance Charge:                        $0.00
                                       Balance Forward:                    $6,507.65

---

 Service Period      8/25/2004  To  9/22/2004

 Energy Charge:              45 th        0.572 $ per th      $25.74


            Sales Tax                              $0.00

        Charges This Period                                    $25.74

     Total DUE to EnergyEast Solutions                        **$6,533.39**

---

Detail Information

---

Payments:    Received Date      Check #                 Amount
                                                         $0.00
                                                         $0.00
                                          Payments Received:      $0.00
            State GRT Included in the above calculations  $0.00
Customer Class: 1600

---

      Late charges of 1.5% per month will be added to any overdue amounts


## If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-12**

01/17/2006 11:20 FAX 6077211719                    NYSEG SOLUTIONS                                    ☑013



# EnergyEast Solutions

An **Energy East** Company

**Account Number:** 4004287
**Invoice Number:** 39135
**Invoice Date:** 9/27/2004
**LDC Account #:** 0004931816630
**Meter Number:** 03146724          **LDC Rate:** 51
    **Attn:** Fay Russo

**This Amount Due Upon Receipt:**     $17.73

**Late Charges Added After:**     10/27/2004

**Remit To:**  Energy East Solutions
PO Box 8000
Department No 488
Buffalo, NY 14267

**Town of Bedford -Town Center 2**
12 Mudge Way
Bedford          MA          01730

---

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | |
|---|---|
| **Account Number:** 4004287 | |
| | **Previous Balance:** $9.72 |
| **Service Address** | **Payments Received:** $0.00 |
| Town of Bedford | **Other Adjustments:** $0.00 |
| Town of Bedford-Town Center 2 | **Other Adjustment Note:** |
| 12 Mudge Way | **Finance Charge:** $0.00 |
| Bedford          MA          01730 | **Balance Forward:** $9.72 |

| | | | |
|---|---|---|---|
| **Service Period** | 8/26/2004 To 9/22/2004 | | |
| **Energy Charge:** | 14 th | 0.572 $ per th | $8.01 |
| **Sales Tax** | | | $0.00 |
| **Charges This Period** | | | $8.01 |
| **Total DUE to EnergyEast Solutions** | | | **$17.73** |

---

**Detail Information**

---

| Payments: | Received Date | Check # | Amount |
|---|---|---|---|
| | | | $0.00 |
| | | | $0.00 |
| | | **Payments Received:** | $0.00 |

State GRT Included in the above calculations     $0.00
Customer Class: 186

---

Late charges of 1.5% per month will be added to any overdue amounts

## If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-13**

01/17/2006 11:20 FAX 6077211719    NYSEG SOLUTIONS    ☑014



## EnergyEast Solutions

An **Energy East** Company

| | |
|---|---|
| Account Number: **4004274** | This Amount Due Upon Receipt: **$6,512.80** |
| Invoice Number: 40514 | |
| Invoice Date: 11/12/2004 | |
| LDC Account #: 0004932210990 | Late Charges Added After: **12/12/2004** |
| Meter Number: 00155968    LDC Rate: 42 | Remit To: Energy East Solutions |
| Attn:    Accounts Payable | PO Box 8000 |
| | Department No 488 |
| **Town of Bedford-DPW2** | Buffalo, NY 14267 |
| 314 Great Rd | |
| **Bedford    MA    01730** | |

### Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | | | |
|---|---|---|---|
| Account Number:    4004274 | Previous Balance: | $6,535.11 | |
| **Service Address** | Payments Received: | $0.00 | |
| Town of Bedford | Other Adjustments: | ($25.74) | |
| Town of Bedford-DPW2 | Other Adjustment Note: LDC Cancel | | |
| 314 Great Rd. | Finance Charge: | | $0.00 |
| Bedford    MA    01730 | Balance Forward: | | $6,509.37 |

| Service Period | 8/25/2004 To 9/22/2004 | | | |
|---|---|---|---|---|
| Energy Charge: | 6  th | 0.572 $ per th | $3.43 | |
| Sales Tax | | | $0.00 | |
| Charges This Period | | | | $3.43 |
| **Total DUE to EnergyEast Solutions** | | | | **$6,512.80** |

REBILL

### Detail Information

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | $0.00 | |
| | State GRT Included in the above calculations | $0.00 | | |

Customer Class: 1600

Late charges of 1.5% per month will be added to any overdue amounts

### If you have any questions please call EnergyEast Solutions at 1-800-260-0300

Please make all checks payable to EnergyEast Solutions

**EXHIBIT A-14**

01/17/2006 11:21 FAX 6077211719          NYSEG SOLUTIONS                          015



An **Energy East** Company

| | |
|---|---|
| Account Number: 4005226 | This Amount Due Upon Receipt: **$0.70** |

Invoice Number: 40516
Invoice Date: 11/12/2004
LDC Account #: 0004932610010          Late Charges Added After: **12/12/2004**
Meter Number: 0T539991          LDC Rate: 51          Remit To: Energy East Solutions
Attn: Richard Reed                                                    PO Box 8000
                                                                       Department No 488
**TOWN OF BEDFORD-PUMP-DPW**                                           Buffalo, NY 14267

11 Mudge Way
Bedford          MA          01730

Please return this portion with payment

*Please write your EnergyEast Solutions Account Number on your check*

| | | |
|---|---|---|
| Account Number: 4005226 | Previous Balance: | $46.76 |
| | Payments Received: | $0.00 |
| **Service Address** | Other Adjustments: | ($46.76) |
| TOWN OF BEDFORD-PUMP-DPW | Other Adjustment Note: LDC Cancel | |
| 10 Mudge Way | Finance Charge: | $0.70 |
| Bedford          MA          01730 | Balance Forward: | $0.70 |

| | | | | |
|---|---|---|---|---|
| Service Period | 6/22/2004 To 9/22/2004 | | | |
| Energy Charge: | 0 th | 0.572 $ per th | $0.00 | |
| Sales Tax | REBILL | | $0.00 | |
| Charges This Period | | | | $0.00 |
| **Total DUE to EnergyEast Solutions** | | | | **$0.70** |

**Detail Information**

| Payments: | Received Date | Check # | Amount | |
|---|---|---|---|---|
| | | | $0.00 | |
| | | | $0.00 | |
| | | Payments Received: | | $0.00 |
| | State GRT Included in the above calculations | | $0.00 | |

Customer Class:

Late charges of 1.5% per month will be added to any overdue amounts

**If you have any questions please call EnergyEast Solutions at 1-800-260-0300**

Please make all checks payable to EnergyEast Solutions

# EXHIBIT 6

# LeBoeuf, Lamb, Greene & MacRae
## L.L.P.
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

NEW YORK
WASHINGTON, D.C.
ALBANY
BOSTON
HARRISBURG
HARTFORD
HOUSTON
JACKSONVILLE
LOS ANGELES
NEWARK
PITTSBURGH
SALT LAKE CITY
SAN FRANCISCO

Goodwin Square
225 Asylum Street, 13th Floor
Hartford, CT 06103
(860) 293-3500
FACSIMILE: (860) 293-3555

E-MAIL ADDRESS: STEPHEN.HUMES@LLGM.COM
WRITER'S DIRECT DIAL: (860) 293-3744
WRITER'S DIRECT FACSIMILE: (860) 241-1344

LONDON
(A LONDON-BASED
MULTINATIONAL PARTNERSHIP)
PARIS
BRUSSELS
JOHANNESBURG
(PTY) LTD.
MOSCOW
RIYADH
(AFFILIATED OFFICE)
BISHKEK
ALMATY
BEIJING

August 20, 2004

VIA FACSIMILE AND CERTIFIED MAIL

Town of Bedford
10 Marion Way
Bedford, MA 01730
Attn. Richard Reed, Town Administrator

Re:    Natural Gas Sales Agreement (MMA) with Energy East Solutions, Inc.

Dear Mr. Reed:

Please be advised that this law firm represents Energy East Solutions, Inc. ("EES") in connection with the above-referenced Natural Gas Sales Agreement (MMA) (the "Agreement"). We have been asked to inform the Town of Bedford that the above-referenced contract, which is dated September 20, 2001 and has a term of three years, is about to expire. This letter is the requisite notice that EES is willing to renew the Agreement for another three year term, but that the price for the Agreement has changed.

As your account representative has previously informed the Town of Bedford, the new price EES is offering you in order to renew the Agreement for another three years is $3.11 per DTH above the Monthly NYMEX Average price ("Index Price"). Monthly NYMEX Average shall be the last NYMEX settlement price for each month as published in the Wall Street Journal during the immediately preceding month.

Our client has informed us that the Town of Bedford has elected not to renew the Agreement for the above-described Index Price offering. This letter, therefore, is notice to the Town of Bedford that, unless the Town of Bedford sends a written confirmation by facsimile or regular mail to (203) 368-0045 by September 1, 2004 of its acceptance of a renewed Agreement at the Index Price, then EES will terminate service to the Town of Bedford accounts effective as

Mr. Richard Reed, Town Administrator
August 20, 2004

Page 2

of the September, 2004 meter read date and EES will be so notifying KeySpan, the local
distribution company, that the Town of Bedford meters are being terminated.  Natural gas service
from EES will therefore continue through the September, 2004 meter read date, but will
terminate on the meter read date for each account.

      If you have any further questions or would like to discuss this matter further, please
contact me or have your legal representative contact me directly.  If you prefer, you can contact
Jan Geist at EES directly at (203) 382-9553.

      Sincerely,

Stephen J. Humes

CC:   Jan Geist, Energy East Solutions, Inc.
      Richard Jones, Town of Bedford Department of Public Facilities

# EXHIBIT 7

## TERMS AND CONDITIONS (MMA)

1. **QUALITY:** All natural gas delivered hereunder shall meet the quality and heat content requirements of the applicable transporting pipeline.

2. **TRANSPORTATION:** This Agreement is contingent upon execution of all intrastate and interstate transportation Agreements required to complete this transaction. Seller and/or its gas supplier(s) shall be responsible for arranging the transportation to the Delivery Point(s) and Buyer shall be responsible for arranging the transportation or handling thereafter. Seller shall be responsible for executing an agent authorization letter with Buyer to assist Buyer in arranging transportation to the delivery point if required by the delivering LDC.

3. **MEASUREMENT:** Natural gas sold and delivered hereunder shall be measured at the Delivery Point(s) in accordance with the procedures established by the receiving LDC.

4. **BILLING & PAYMENT:** Buyer shall be billed monthly by Seller for natural gas supplied in accordance with this Agreement at the Price indicated above. Buyer shall pay each invoice within twenty (20) days of the date on which Buyer receives such invoice unless Buyer is a Municipality in which case Buyer shall pay each invoice within fifty-five (55) days of the date on which Buyer receives such invoice. Municipality shall mean any city, town, school district, regional school district, water district or fire district that is organized under the laws of the Commonwealth of Massachusetts. Buyer may withhold any disputed amounts until such dispute is resolved. Interest on unpaid invoices will accrue from the due date and must be paid at a rate of 1.5% per month; provided however no such late payment charge shall be due on disputed amounts if Buyer disputes all or a portion of the amounts in a written statement received by Seller within twenty (15) business days of Buyer's receipt of the subject invoice. In the case of any such dispute, Buyer shall pay the undisputed portion in a timely fashion and shall at the same time pay the disputed portion into an interest-bearing escrow account. Within fifteen (15) business days of receiving written notice of the disputed amount, Seller shall respond to such notice by either rectifying the amount in dispute or clarifying such invoice to Buyer. If Buyer is not satisfied with Seller's resolution, Buyer and Seller agree to submit the dispute to expedited arbitration in accordance with the Commercial Rules of the American Arbitration Association. Interest on the escrowed funds shall be distributed to Seller or to Buyer in proportion to the allocation of the disputed funds upon the ultimate resolution of such dispute. If the dispute is submitted to arbitration, the prevailing party shall be entitled to its costs. If the arbitrator's decision does not result in a final award, the parties shall divide the costs equally. Under no circumstances shall Seller bill Buyer for any unbilled consumption which consumption occurred more than ninety (90) days earlier than the date of the invoice. If Buyer does not make payments on undisputed portions of its bill within the time period provided for in this paragraph, Seller may assign its rights to collect payment under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement, no actuation or state of affairs, including any action or inaction by either Party, arising from or relating to any failure of the LDC to provide accurate information to either Party may constitute or give rise to a default by Buyer.

4. **TAXES AND ROYALTIES:** Seller shall pay or cause to be paid all royalties and other sums relating to the production and transportation of natural gas to the Delivery Point(s); provided however, that any increase in applicable taxes or transportation fees relating to the production and transportation of natural gas to the Delivery Point(s) occurring after the commencement of service hereunder shall be paid by Buyer and reflected in the Price which shall be adjusted accordingly. Buyer shall be responsible for any costs, fees, and taxes of any kind which are levied upon or attributable to the gas purchased and sold hereunder after title has passed from Seller to Buyer, including but not limited to the utility shrinkage, franchise fees, loss and unaccounted for charges, utility users' tax, tariffed intrastate transportation charges and surcharges of every kind and nature. Any increase in applicable taxes will be paid by Buyer and reflected in the delivered price as adjusted. Buyer shall be responsible for sales, usage, and any other related taxes.

5. **TITLE:** Seller hereby warrants good title exists for the gas delivered to the Delivery Point(s) hereunder. The title to such gas shall pass to Buyer at the Delivery Point(s).

6. **FORCE MAJEURE:** In the event that either Party is rendered unable, wholly or in part, to perform its obligations (other than payment or financial obligations) under the Natural Gas Sales Agreement and the incorporated Terms and Conditions due to events not reasonably anticipated or within the control of either Party, such as, but not limited to, acts of God, government regulations, changes in law or LDC actions, both Parties agree that such non-performance shall be excused. In the event Seller is unable to deliver gas at any time during the term of this Agreement for reasons of Force Majeure Buyer shall be temporarily released to purchase such deficient quantities from Buyer's Local Distribution Company ("LDC").

7. **RENEWALS:** Unless either party otherwise notifies the other in writing at least thirty (30) days prior to the expiration of the original term or any subsequently agreed upon term, then this Agreement shall be automatically renewed for a like term.

8. **TERMINATION:** A Party may terminate this Agreement under the following conditions: (i) Any assignment for the benefit of the creditors, or any bankruptcy, reorganization, or other proceeding under any bankruptcy or insolvency law is initiated by the other Party; (ii) Failure of the other Party to materially comply with any provisions of Massachusetts laws or regulations regarding the retail marketing of natural gas as amended, or applicable orders and regulations thereunder, regarding retail Natural Gas sales and usage; (iii) A change in the applicable laws and/or regulations which

3

result in an increase in the Buyer's price beyond the price offered by the LDC; (iv) A material breach by the other Party of any of the terms of this Agreement which breach is not remedied within thirty (30) days of the breaching Party's receipt of written notice of such breach.

9. **ASSIGNMENT:** Buyer may assign this Agreement to a third party with Seller's prior written consent. Seller may assign this Agreement to a third party with Buyer's prior written consent or to an affiliate without Buyer's consent, if the affiliate has substantially similar financial and technical capabilities to perform Seller's obligations under this agreement. Any required consents shall not be unreasonably withheld by either party.

10. **GOVERNING LAW:** This Agreement shall be construed according to the laws of the Commonwealth of Massachusetts and any disputes, which arise, shall be submitted to a state or federal court where the Buyer is located except as provided for in Paragraph 4 of these Terms and Conditions to the Agreement.

11. **CONFIDENTIALITY:** Each shall keep the terms and conditions of the Agreement confidential except as may be required in order to effectuate the transportation and delivery of gas to be sold hereunder or to meet the lawful requirement of any regulatory body having jurisdiction, or the provisions of the Massachusetts Public Records Laws M.G.L. ch. 4, §7 and ch. 66, §10, and Laws 1997 ch. 164. Notwithstanding the previous sentence, Buyer authorizes Seller to provide AES NewEnergy with Buyer's natural gas usage data.

4

5