# EXHIBIT 8

*2005 U.S. Dist. LEXIS 14243, **

BRANSFORD & PETZ, P.C., in its own behalf and as Assignee fka BRANSFORD, KALPERIS & PETZ, P.C., fka BRANSFORD, MCGLONE & PETZ, P.C., Plaintiff, v. BANK OF AMERICA COMMERCIAL FINANCE CORPORATION aka BANC OF AMERICA COMMERCIAL CORPORATION, Defendant.

CIVIL ACTION NO. 2003-11466-NG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2005 U.S. Dist. LEXIS 14243

June 13, 2005, Decided

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff law firm, on its own behalf and as assignee of a collection agency, sued defendant factoring company in a Massachusetts state court for breach of contract, quantum meruit, violation of Mass. Gen. Laws ch. 93A, and fraud. The company removed the case to federal district court and moved for summary judgment. The matter was referred to a magistrate judge for a report and recommendation.

**OVERVIEW:** The company retained the collection agency to collect an unpaid loan from a borrower. The company had purchased an insolvency risk insurance policy to cover the loan. The agency hired the law firm to assist in collecting the loan, and the law firm instituted litigation. The borrower defaulted, but the judgment was never collected. However, the law firm claimed that it was entitled to a contingency fee from the proceeds that the company collected from the insurance policy. The magistrate found that portions of an affidavit submitted by the law firm concerning custom and practice in the collections industry were inadmissible under Fed. R. Evid. 701. Even if the affidavit was fully admissible, there was no evidence that an alleged industry standard allowing collection of fees under such circumstances was incorporated into the parties' contract. The law firm collected no funds from the borrower, so the company owed no fees under the terms of the contract, nor was the company unjustly enriched. The ch. 93A claim failed, as there was no showing that the company had a duty to disclose the existence of the insurance policy, nor did such nondisclosure amount to common law fraud.

**OUTCOME:** The magistrate recommended that the company's summary judgment motion be granted.

**CORE TERMS:** insolvency, summary judgment, insurance policy, collection, collected, contingency fee, custom, international banking, quantum meruit, law firm, recommendation, duty, genuine issue of material fact, admissible, genuine, industry standard, undisputed facts, engagement, guidelines, burden of proof, genuine issue, material fact, confidence, specialized knowledge, insurance coverage, forwarder, discovery, disclose, lawsuit, advise

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔗

*HN1* ⚓ Summary judgment purports to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔗

*HN2* ⚓ A party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and supporting that assertion by affidavits, admissions, or other materials of evidentiary quality. After the moving party has met its burden, the burden shifts to the

summary judgment target (the non-moving party) to demonstrate that a trial-worthy issue exists.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍ᴬᴸᴸ

*HN3*⚓ When considering whether to grant summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making this assessment, the court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor. Despite this "notoriously liberal" standard, summary judgment cannot be construed as "a hollow threat."  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔍ᴬᴸᴸ

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍ᴬᴸᴸ

*HN4*⚓ A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. Furthermore, a genuine issue of material fact cannot merely rest upon "spongy rhetoric" but rather requires substantive proof. Genuine issues of material fact are not the stuff of an opposing party's dreams. Thus, in deciding whether a factual dispute is "genuine," a court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. In circumstances where submitting the issue in dispute to the jury amounts to nothing more than an invitation to speculate, summary judgment is appropriate. In weighing whether a factual dispute is "material," the court must examine the substantive law of the case, because only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔍ᴬᴸᴸ

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍ᴬᴸᴸ

*HN5*⚓ The focus at the summary judgment phase should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the non-moving party and taking all inferences in the non-moving party's favor, the non-moving party has raised a genuine issue of fact.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔍ᴬᴸᴸ

Civil Procedure > Summary Judgment > Summary Judgment Standard 🔍ᴬᴸᴸ

*HN6*⚓ A party objecting to summary judgment may not merely rest upon the statements put forth in its own pleadings. A party objecting to summary judgment fails to put forth a genuine issue of material fact merely by filing an affidavit contradicting unambiguous answers contained in a prior deposition. Instead, Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔍ᴬᴸᴸ

Evidence > Procedural Considerations > Burdens of Proof 🔍ᴬᴸᴸ

Legal Ethics > Client Relations > Attorney Fees 🔍ᴬᴸᴸ

*HN7*⚓ Massachusetts has established the regulation of attorney's fees to protect clients and to preserve the integrity of the bar. Massachusetts has established that a lawyer always bears the burden of proof in any proceeding to resolve a billing dispute, whether the lawyer appears as a plaintiff seeking to recover a fee or as a defendant in a suit for a refund. A lawyer will usually have better access than a client to evidence about the lawyer's own services. To satisfy an attorney's burden of


proof under Massachusetts law, he or she must provide more than purely speculative evidence to support a claim that a client owes a particular charge in order to defeat a properly supported motion for summary judgment. Scanty or speculative evidence concerning the value of legal services is insufficient to create a genuine issue for the trier of fact. More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits

HN8⤓ Under federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment. 28 U.S.C.S. § 1746. An affidavit failing to satisfy the technical, non-substantive requirements of execution may be considered as part of a party's opposition to a motion for summary judgment provided the affidavit complies with 28 U.S.C.S. § 1746. More Like This Headnote

Evidence > Witnesses > Opinion Testimony by Lay Witnesses

HN9⤓ See Fed. R. Evid. 701.

Evidence > Witnesses > Expert Testimony

Evidence > Witnesses > Opinion Testimony by Lay Witnesses

HN10⤓ Fed. R. Evid. 701 advisory committee's note (2002 amendment) states that the distinction between lay and expert witness testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field. This suggests that opinions based on experience of the sort that can be acquired in everyday life are admissible under Rule 701 while opinions based on experience of a specialized sort can be admitted only under Fed. R. Evid. 702. More Like This Headnote

Evidence > Witnesses > Opinion Testimony by Lay Witnesses

HN11⤓ Testimony admitted pursuant to Fed. R. Evid. 701 must be rationally based on the perception of the witness. Fed. R. Evid. 701(a). More Like This Headnote

Evidence > Witnesses > Opinion Testimony by Lay Witnesses

HN12⤓ The fact that a witness has specialized knowledge, or that he carried out an investigation because of that knowledge, does not preclude him from testifying pursuant to Fed. R. Evid. 701, so long as the testimony is based on the investigation and reflects his investigatory findings and conclusions, and is not rooted exclusively in his expertise. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his position. Fed. R. Evid. 701 advisory committee's note. However, to the extent the witness's testimony is not a product of his investigation, but rather reflects specialized knowledge he has because of his experience, its admission pursuant to Rule 701 is error. More Like This Headnote

Contracts Law > Remedies > Equitable Relief

Contracts Law > Types of Contracts > Implied-in-Law Contracts

Legal Ethics > Client Relations > Attorney Fees

HN13⤓ Where a client and an attorney have reached an express contract for services, the exercise of non-statutory, supervisory powers over attorney's fees is reserved for exceptional circumstances and a court must accord great weight to the fact that a prior fee agreement was reached between the parties. Thus, an attorney's pleas either for a quantum meruit recovery of the reasonable value of all the services he actually rendered, or that an implied contract existed for his performance, with appropriate remuneration, falter in the face of the express terms of a retainer agreement. If courts have consistently, and liberally, interpreted attorney-client fee agreements in

favor of the client and against the drafting attorney in cases in which mutual intent is murky, then a similar result in situations of unambiguous intention will follow a fortiori. <u>More Like This Headnote</u>

Contracts Law > Contract Conditions & Provisions

*HN14* While it is true that unexpressed terms may be introduced into a contract by virtue of usage and custom, such usage and custom must be universal and uniform. It is also as well settled that, to be admissible, the usage not only must be universal, but must have become notorious by the long and uniform practice of those engaged in the trade at the place where the contract is made. <u>More Like This Headnote</u>

Contracts Law > Performance > Substantial Performance 🔖

Contracts Law > Remedies > Equitable Relief 🔖

*HN15* Under Massachusetts law, quantum meruit is a theory of recovery, not a cause of action. It is a claim independent of an assertion for damages under a contract, although both claims have as a common basis the contract itself. Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract. In a case involving an unenforceable contract, the Massachusetts Supreme Court has allowed quantum meruit recovery, basing its reasoning on the theory of unjust enrichment. A person who has been unjustly enriched at the expense of another is required to make restitution to the other. <u>More Like This Headnote</u>

Evidence > Witnesses > Opinion Testimony by Lay Witnesses 🔖

*HN16* What, if any, duty a party owes surely is not the proper topic of lay opinion under <u>Fed. R. Evid. 701</u>. <u>More Like This Headnote</u>

Torts > Business & Employment Torts > Deceit & Fraud 🔖

*HN17* In Massachusetts, in order to prove fraud by deceit, a plaintiff ordinarily must show that the defendant made a false statement of a material fact with knowledge of its falsity in order to induce the plaintiff to act, together with a reliance by the plaintiff on the false statement to the plaintiff's detriment. <u>More Like This Headnote</u>

Torts > Business & Employment Torts > Concealment 🔖

Torts > Business & Employment Torts > Deceit & Fraud 🔖

*HN18* Under Massachusetts law, usually, nondisclosure does not amount to fraud and is not a conventional tort of any kind. However, nondisclosure may amount to fraud if a party is under a duty to the other party to exercise reasonable care to disclose the matter in question. The duty may arise if there is a fiduciary or other similar relation of trust and confidence between the parties. Thus, the duty of honest advice and full disclosure arises where one party reposes confidence in the integrity of another and the other party in advising voluntarily assumes and accepts the confidence. When confidence is reposed and accepted, the person trusted is liable for concealing facts which by reason of the relationship he should disclose. <u>More Like This Headnote</u>

Torts > Business & Employment Torts > Concealment 🔖

*HN19* Silence alone, in the absence of a duty to disclose, quite simply does not rise to meet the requisite standard for fraud: The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. <u>More Like This Headnote</u>

Torts > Business & Employment Torts > Deceit & Fraud 🔖

*HN20* Under Massachusetts law it is incumbent upon a plaintiff in a fraud case to allege and prove that

the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage. More Like This Headnote

**COUNSEL:** **[*1]** For Bransford & Petz, P.C., (Plaintiff): John W. Kaufmann, Law Office of John Kaufmann, Boston, MA.

For Bank of America Commercial Finance Corporation, (Defendant): Eugene M. Russell Choate, Hall & Stewart Exchange, Boston, MA.

**JUDGES:** ROBERT B. COLLINGS, United States Magistrate Judge.

**OPINIONBY:** ROBERT B. COLLINGS

**OPINION:** *REPORT AND RECOMMENDATION ON DEFENDANTS MOTION FOR SUMMARY JUDGMENT AGAINST THE PLAINTIFF ON ALL COUNTS OF THE COMPLAINT (# 12)*

COLLINGS, U.S.M.J.

## I. *Introduction*

In July of 2003, plaintiff Bransford & Petz, P.C. in its own behalf and as assignee f/k/a Bransford, Kalperis & Petz, P.C., f/k/a Bransford, McGlone & Petz, P.C. (hereinafter "B&P") filed a four-count complaint against defendant Banc of America Commercial Corporation a/k/a Bank of America Commercial Finance Corporation (hereinafter "Banc") in the trial court in the Commonwealth of Massachusetts. The quartet of claims included breach of contract (Count I), quantum meruit (Count II), violation of Massachusetts General Laws chapter 93 A (Count II) and fraud (Count IV). On August 7, 2004, the Banc removed the case to the federal court and shortly thereafter filed an answer to the complaint. **[*2]**

Discovery was undertaken in the normal course and has been completed. On September 24, 2004 the defendant filed a motion for summary judgment (including a statement of undisputed material facts) (# 12) together with a memorandum in support (# 13) and an affidavit with exhibits (# 14). Following an extension of time, B&P filed an opposition (# 21) to the summary judgment motion on November 12, 2004. The dispositive motion has been referred to the undersigned for the issuance of a report and recommendation as to disposition. (# 15)

## II. *The Facts*

The facts as recited hereinafter are culled, sometimes verbatim, primarily from the defendant's statement of undisputed facts which is incorporated in the actual motion for summary judgment document. (# 12) n1 B&P, a law firm specializing in debt collection for financial institutions and other such businesses, is a Massachusetts professional corporation with a usual place of business on Canal Street in Boston, Massachusetts. (# 12 PP 1, 3) n2 B&P has filed suit in its own name and as assignee in writing from A.G. Adjustments Ltd. (hereinafter "A.G."). (# 12 P 2) Banc, a Delaware corporation with a usual place of business **[*3]** in Atlanta, Georgia, "is an account receivable factoring company that . . . purchased a company's accounts receivable functions and also credit protection, collections and bookkeeping services." n3 (# 12 PP 4, 5) Banc opened an account with U.S. Fresh Corporation ("U.S. Fresh") of New Bedford, Massachusetts in late November, 1996. (# 12 P 6) Over two years later, on or about March 4, 1999, Banc purchased an insolvency risk insurance policy, No. 649-8505 (hereinafter "Insolvency Policy"), from AIG Global Trade and Political Risk Insurance Company (hereinafter "AIG") to cover, *inter alia*, the credit risk with respect to U.S. Fresh. (# 12 P 7) On November 19, 1999, Banc sent a letter to U.S. Fresh regarding U.S. Fresh's obligation to pay $ 403,584.50 under its loan agreement. (# 12 P 8) Five days later Banc retained A.G., a commercial collection agency, to collect the U.S. Fresh loan. (# 12 P 9) Collection on the U.S. Fresh loan was to be undertaken pursuant to a "special contingency rate", meaning

a fee based upon the following formula: (i) 10% of the amount collected in the first 30 days from U.S. Fresh if the amount was **[*4]** collected in full, and (ii) 15% of the amount collected from U.S. Fresh if partial payments were to be made ("A.G. Agreement"). The A.G. Agreement stated the rate would change to "the normal rate" if placed for collection with an outside

Defendant's Motion # 12 P 10.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The plaintiff disputes six of the numbered paragraphs in the statement of undisputed facts, specifically paragraphs 11, 15, 20, 24, 29 and 30. *See* # 21 at 3.

n2 Reference is made to the statement of undisputed facts itself rather than the supporting materials cited after each paragraph.

n3 Banc ceased operations in December of 2000. (# 12 P 5)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Banc takes the position that there was no provision in the A.G. Agreement that A.G. would be compensated from any source other than the funds that A.G. collected from U.S. Fresh (# 12 P 11) while B&P contends that it is entitled to be compensated because Banc collected money from its insurance policy. (# 21 at 3)

Within weeks **[*5]** of being engaged by Banc, A.G. became aware that U.S. Fresh had serious financial problems and was attempting to negotiate with its secured lender. (# 12 P 13) According to a December 9, 1999 letter from A.G. to Banc, A.G. had been advised by U.S. Fresh's attorney Andrew Troop that he, Troop, "'was not optimistic that debtor would dig out of its financial difficulties and bluntly indicated that we ["A.G."] should take whatever action necessary.'" (# 12 P 13) In mid-December, 1999, A.G. hired B&P to assist A.G. in collecting the U.S. Fresh loan. n4 (# 12 P 15) On December 29, 1999, Banc filed a claim with respect to the U.S. Fresh loan under the Insolvency Policy with AIG. (# 12 P 31)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 A.G. and B&P had done business in the past and, as of April 30, 2004, B&P was handling more than one hundred fifty cases for A.G. (#12 P 17)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In the defendant's view,

> The agreement between B&P and A.G. ("B&P Contingency Agreement") was created in (i) the engagement **[*6]** letter of A.G. dated December 17, 1999 to B&P; (ii) B&P's "suit requirements letter" to A.G. dated January 24, 2000; and (iii) Banc's acceptance letter dated April 13, 2000. Defendant's Motion (# 12) P 15

The plaintiff, on the other hand, asserts that "there is a very clear collection industry custom and practice that a collection agent or collections law firm becomes entitled to a contingency fee recovery or resolution by the client, regardless of the source." (# 21 at 3) It is undisputed, however, that A.G. notified B&P in the December 17, 1999 engagement letter that recovery of a fee was limited with respect to one source, to wit,

"Creditor reserves the right to file a proof of claim direct in Bankruptcy with no fee to you. [Law Firm's] office." (# 12 P 16)

A.G. advised B&P on January 10, 2000, that U.S. Fresh was liquidating, that a shortfall to its secured lender (the bank) was "very possible" and that unsecured creditors were unlikely to recover anything. (# 12 P 18) Two weeks later B&P sent a letter dated January 24, 2000 to A.G. enclosing its "suit requirements" such as the necessity of receiving advance costs in the amount of $ 285 to cover [*7] expenses. (# 12 P 19) The text of the letter also stated that B&P's "commission fees are contingent upon collection." (# 12 P 20 ) n5 In a February 8, 2000 letter to A.G., B&P again recommended that suit be filed against U.S. Fresh in order to "access information through discovery" even though "a judgment may not be ultimately collectible." (# 12 P 21; # 14, Exh. 11)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 The quoted text is taken directly from B&P's letter to A.G., the accuracy of which is not challenged. It appears that B&P is disputing the second sentence of P 20 of the statement of undisputed facts and the implication that it was not entitled to a fee if Banc collected from its insurance policy.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In a letter dated March 2, 2000, A.G. informed Banc of B&P's recommendation that suit be filed against U.S. Fresh. (# 12 P 22) The suit requirements detailed in B&P's January 24th letter were also forwarded to Banc. (# 12 P 22) About a month and a half later on April 13, 2000, Banc requested [*8] that A.G. advise B&P to file suit and also acknowledged that $ 285 was due for costs. (# 12 P 23) The next day, April 14th, "U.S. Fresh informed B&P that it was insolvent, that its assets were insufficient to pay its secured lender, Fleet National Bank, and that repayment to Banc was unlikely." (# 12 P 25) B&P passed this information on to A.G. on May 4, 2000. (# 12 P 25) Shortly thereafter on May 17, 2000, B&P instituted litigation in the Massachusetts Superior Court on behalf of Banc against U.S. Fresh. (# 12 P 26)

On June 8, 2000, counsel for U.S. Fresh reiterated to B&P that its client had no funds available with which to pay its creditors. (# 12 P 27) Armed with this knowledge, B&P yet continued to pursue the lawsuit to collect the debt for Banc. (# 12 P 28)

AIG notified Banc on July 24, 2000 that Banc would receive a payment of $ 153,584.50 under the Insolvency Policy, that sum representing the principal outstanding balance minus a $ 250,000 deductible. (# 12 P 32)

On October 5, 2000 an execution in the amount of $ 428,050.75 issued in favor of Banc in its lawsuit after U.S. Fresh was [*9] defaulted. (# 12 P 33) B&P collected no money directly from U.S. Fresh in satisfaction of this execution. (# 12 P 33) A.G. submitted an invoice for $ 121,225.35 for services rendered to Banc despite the fact that no monies were ever collected from U.S. Fresh. n6 (# 12 P 34)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 In its statement of undisputed facts the defendant asserts that "Banc did not, orally or in writing, ever agree to pay B&P any legal fee based upon a collection from any source other than directly from U.S. Fresh" (# 12 P 29) and "At no time prior to the engagement of B&P, or before execution issued against U.S. Fresh on October 5, 2000, did B&P or A.G. discuss with Banc, either orally or in writing, the payment of an additional fee beyond a percentage of what B&P collected directly from U.S. Fresh in the [state court] action." (# 12 P 30) B&P disputes these facts in light of the purported industry custom.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

B&P does not deny that no client "has ever paid it a contingency [*10] fee agreement from the proceeds from an insolvency insurance policy" nor has B&P ever "claimed a fee from the proceeds of an insolvency insurance policy against any other client prior to this case." (# 12 P 35) Although B&P contends that the industry standard for collections is set forth in the Operative Guides for Forwarders and Receivers Adopted

By The Commercial Law League of America ("CLLA Operative Guides"), "the CLLA Operative Guides fail to state anywhere as a matter of custom and practice that forwarders such as A.G. and/or receivers such as B&P are entitled to a contingent fee from proceeds paid to a client under an insolvency policy." (# 12 PP 36, 37)

### III. The Summary Judgment Standard

*HN1* Summary judgment purports "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 12 (1 Cir., 2003) (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1 Cir., 1990) (quoting Fed. R. Civ. P. 56 Advisory Committee's note)). *HN2* The party moving for summary judgment bears the **[*11]** initial burden of asserting the absence of a genuine issue of material fact and "supporting that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1 Cir., 2003). After the moving party has met its burden, "the burden shifts to the summary judgment target [the non-moving party] to demonstrate that a trial-worthy issue exists." *Mulvihill*, 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1 Cir., 2000)).

*HN3* When considering whether to grant summary judgment, the Court must determine whether:

. . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the Court must "scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." *Mulvihill*, 335 F.3d at 19 **[*12]** (citing *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1 Cir., 1994)); *see also Podiatrist Ass'n, Inc.*, 332 F.3d at 13; *Pure Distribs. v. Baker*, 285 F.3d 150, 152 (1 Cir., 2002); *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 19 (1 Cir., 2002) (citing *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 39 (1 Cir., 2000)); *Kearney v. Town of Wareham*, 316 F.3d 18, 22 (1 Cir., 2002).

Despite this "notoriously liberal" standard, *Mulvihill*, 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat." *Kearney*, 316 F.3d at 22. *HN4* A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Furthermore, a genuine issue of material fact cannot merely rest upon "spongy rhetoric" but rather requires substantive proof. *Mulvihill*, 335 F.3d at 19 (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1 Cir., 1991), *cert. denied*, 504 U.S. 985 (1992) **[*13]** (explaining that "genuine issues of material fact are not the stuff of an opposing party's dreams")). Thus, in deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Kearney*, 316 F.3d at 22 (citing *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1 Cir., 1992); *Suarez*, 229 F.3d at 53 (citing *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1 Cir., 1995)). In circumstances where submitting the issue in dispute to the jury amounts to "nothing more than an invitation to speculate," summary judgment is appropriate. *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 9 (1 Cir., 2000) (quoting *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 467-68 (1 Cir., 1996)). In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit **[*14]** under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Kearney*, 316 F.3d at 22.

*HN5* The focus at the summary judgment phase "'should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact . . .'" *Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430-31 (1 Cir., 2000)); *see also*

*Leahy v. Raytheon Co.*, 315 F.3d 11, 16-17 (1 Cir., 2002); *Suárez*, 229 F.3d at 53. "A . . . party objecting to summary judgment may not merely rest upon the statements put forth in its own pleadings. *See Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11, 26 (1 Cir., 2002) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1 Cir., 1994) (a party objecting to summary judgment fails to put forth a genuine issue of material fact merely by filing an affidavit contradicting unambiguous answers contained **[\*15]** in a prior deposition)). Instead, <u>Rule 56(c)</u>:

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

<u>*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)</u>.

## IV. Discussion

In seeking summary judgment, Banc has proffered the documents which it considers to constitute the contract between (or among) the parties, to wit, the A.G. agreement, the December 17, 1999 engagement letter between A.G. and B&P, the January 24, 2000 "suit requirements" letter from B&P to A.G., and the acceptance letter from Banc to A.G. dated April 13, 2000. The contents of each document shall be examined.

When Banc first placed the U.S. Fresh account with A.G., "a special contingency rate" was negotiated in the so-called A.G. agreement:

> We [Banc] agreed to place this account with your firm [A.G.] at a rate of 10 percent for the first 30 days only if the amount is collected in full. However if parcel (sic) payments are received the rate **[\*16]** would be at 15 percent. The rate would continue at 15 percent unless placed for collection with an outside attorney. At this point it will go to the normal rate.

Affidavit # 14, Exh. 4.

Thereafter in December, 1999, when A.G. forwarded the claim to B&P the following instructions were included:

> We have been authorized by this creditor as its agent to forward this subject claim to you. Please advise us promptly regarding the possibility of this collection. If you believe suit is advisable, indicate papers and what costs are required.

> Please do not institute proceedings, incur expenses, make any compromise or grant extensions unless authorized by this creditor. . . .

> \* \* \* \* \*

> All partial payments are to be reported and remitted as received. If you fail to acknowledge this claim, answer communications, or follow creditor's instructions, this claim may be recalled by the creditor without payment of commissions due you. Any charges or disbursements due on other claims are not to be deducted from amounts collected on this claim.

> Please acknowledge receipt of this claim by return mail within 21 days from the date of this letter. We will expect your initial **[\*17]** report and recommendations within 21 days thereafter. State whether the terms and conditions, including your contingent fees as set forth below are satisfactory.

Affidavit # 14, Exh. 8.

The referenced terms and conditions were that "CREDITOR RESERVES THE RIGHT TO FILE

A PROOF OF CLAIM DIRECT IN BANKRUPTCY WITH NO FEE TO YOUR OFFICE" and "8.00% of claim". (# 14, Exh. 7)

The next document is the January 24, 2000 "suit requirements" letter from B&P to A.G. The pertinent portion of that document reads:

> In order for us to proceed with a lawsuit, the enclosed **Affidavit** must be executed and returned to us. We require advance costs of $ 285.00 which typically cover our expenses to carry a lawsuit through judgment and execution. However, these costs may not cover post-judgment court costs and sheriff's fees. If we prevail, court costs are recoverable from the debtor. The costs we have requested may cover but are not necessarily limited to asset investigation, a search of the Secretary of States's records, Bankruptcy Court records and a credit reporting service (our tax ID # 04-323-5957). Any unused costs will be returned when the file is closed. Our commission fees **[*18]** are contingent upon collection.
>
> If applicable and available (and not previously sent), please provide us with supporting documentation: including, but not limited to, a ledger sheet or statement of account, any personal guarantees, promissory notes, credit application, and any other relevant documentation or information available which would confirm the debt. **If debtor is liable for interest, finance charges, collection expenses, or attorney's fees, please furnish the appropriate documents to include in our suit.**
>
> If appropriate, we attempt to dispose of contested cases by our initial discovery requests and summary judgment. In the event a counter-claim or cross-claim is filed, we are willing to proceed at an hourly rate with a reasonable retainer. Massachusetts requires a witness at every trial. In case of unusual circumstances, or potential protracted litigation, it may be necessary to request additional fees.

Affidavit # 14, Exh. 8 (emphasis in original).

The final document is the April 13, 2000 letter from Banc to A.G., the relevant part of which states:

> With respect to the above enclosed, please find the affidavit along with invoices and proof of delivery. **[*19]** Please note that the balance of the claim was placed in error. It appears we placed it with your firm for the amount of $ 250,000.00. The claim should have been placed for the amount of $ 403,584.50. Make sure that the attorney is aware of the correct balance before filing suit.
>
> Please instruct the attorney to file suit immediately. Also have him inform us of the date complaint was serviced (sic) on the debtor, and how long it will take to obtain a default judgment should debtor not file an answer. I have submitted your invoice for court cost (sic) in the amount of $ 285.00 for payment, so please advance cost (sic) on our behalf.

Affidavit # 14, Exh. 13.

Banc contends that its understanding of the fee arrangement between the parties is based upon the terms set forth in these documents. Given that there is no mention whatsoever of B&P being entitled to a fee if recovery was had from a source other than U.S. Fresh, Banc takes the position that it owes B&P nothing. In

other words, Banc claims that it is bound by the written terms of the contract to which it agreed, but not to any terms purportedly implied by custom in the industry.

With Banc having properly supported **[\*20]** its motion for summary disposition, the burden is on B&P "to present clear evidence" that Banc owes the fee alleged. *Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C.,* 128 F.3d 10, 18 (1 Cir., 1997). Indeed, as in the *Sears* case,

> this case still turns on the rules for [HN7] the regulation of attorney's fees which Massachusetts has established to protect clients and to preserve the integrity of the bar. Massachusetts has established that a lawyer always bears the burden of proof in any proceeding to resolve a billing dispute, whether the lawyer appears as a plaintiff seeking to recover a fee or as a defendant in a suit for a refund. *First National Bank of Boston v. Brink,* 372 Mass. 257, 361 N.E.2d 406, 410 (1977) (suit for an accounting and refund of a large fee for tax advice); *Smith v. Binder,* 20 Mass. App. Ct. 21, 477 N.E.2d 606 (1985) (suit for an accounting and refund of a portion of large retainer fee); *see also Restatement (Third) of the Law Governing Lawyers* § 56(2) (P.F.D. No. 1, March 29, 1996) (following the Brink rule). As the Restatement notes, "A lawyer . . . will **[\*21]** usually have better access than a client to evidence about the lawyer's own services. . . ." *Id.* at § 56 cmt. c.
>
> \* \* \* \* \*
>
> To satisfy an attorney's burden of proof under Massachusetts law, he or she must provide more than purely speculative evidence to support a claim that a client owes a particular charge in order to defeat a properly supported motion for summary judgment. *See Beatty v. NP Corp.,* 31 Mass. App. Ct. 606, 581 N.E.2d 1311, 1314-16 (1991) (finding evidence of an agreement by a client to pay a performance bonus too "isolated" to support attorneys claim); *accord Davis v. Glenville Haldi, P.C.,* 148 Ga. App. 842, 253 S.E.2d 207, 208 (1979) (rejecting attorney's claim where he introduced "no evidence indicating the amount of time spent on the case or the amount of work he performed," but only the attorney's own opinion that a prospective contingency fee would be $ 25,000). Scanty or speculative evidence concerning the value of legal services is insufficient to create a genuine issue for the trier of fact. *See Beatty,* 581 N.E.2d at 1315-16 (summary judgment appropriate); *accord Davis,* 253 S.E.2d at 208 **[\*22]** (directed verdict appropriate). Placing the burden of proof on the attorney is sensible in light of the difficulty of monitoring the attorney's services.

*Sears,* 128 F.3d at 17-8.

In order to meet its burden, B&P has filed the affidavit of Robert Gerstel (hereinafter "Gerstel"), the Chief Executive Officer of A.G. (# 21, Exh. B) Gerstel states that:

> In the collections industry there is a longstanding custom and practice that a contingency fee is earned whenever a collections agent or an attorney obtains a successful resolution, regardless of the source. Payment is earned and due even if the source is not from the debtor itself but also from a guarantor, surety, insurance carrier, or other source.

Affidavit of Robert Gerstel, # 21, Exh. B.

B&P has also submitted an affidavit from its office manager, John R. Warner (hereinafter "Warner"), a man with more than thirty years of administrative experience in collections matters. (# 21, Exh. A n7) Warner avers that he is the individual at the firm who determines the terms pursuant to which B&P would accept a case from a forwarder such as A.G. (# 21, Exh. A) In his view,

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Although Warner's statement is unsworn, it may be considered by the Court in deciding the summary judgment motion. See _Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc._, 982 F.2d 686, 689-690 (1 Cir., 1993)_HNB_ᵀ("Under federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment. See 28 U.S.C. § 1746; see also _Pfeil v. Rogers_, 757 F.2d 850, 859 (7th Cir. 1985) (holding that an affidavit failing to satisfy the "technical, non-substantive requirements of execution" may be considered as part of a party's opposition to a motion for summary judgment provided the affidavit complies with 28 U.S.C. § 1746), cert. denied, 475 U.S. 1107, 106 S. Ct. 1513, 89 L. Ed. 2d 912 (1986); _Davis v. Frapolly_, 756 F. Supp. 1065, 1067 (N.D.Ill.1991) (holding that unsworn statements signed under penalty of perjury may be considered as evidence in support of a motion for summary judgment)")(footnote omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*23]**

The industry standard is to represent collection cases on a contingency basis, and almost without exception, the fee structure conforms with the guidelines suggested in the Operative Guides for forwarders and receivers adopted by The Commercial Law League of America. This Banc of America case utilized these guidelines.

Affidavit, # 21, Exh. A.

At a minium this evidence, according to B&P, raises a genuine issue of material fact as to whether Banc is obligated to pay B&P a fee on account of its recovery under the insolvency insurance policy. The fundamental problem with B&P's position is that the Court cannot consider the "evidence" proffered to support it.

To digress momentarily, Banc has filed a motion to strike (# 22) portions of Warner's affidavit on various grounds. B&P has filed an opposition to that motion (# 24) wherein the plaintiff flatly states that Warner is not being offered as an expert witness. In these circumstances, Warner's opinions are being offered under Federal Rule of Evidence 701 which, as amended in 2000, provides:

> _HN9_ᵀIf the witness is not testifying as an expert, the witness' testimony in the form **[*24]** of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. n8

The Second Circuit has had occasion to address this modified rule, and its opinion in _Bank Of China, New York Branch v. NBMLLC_, 359 F.3d 171 (2 Cir., 2004), is instructive.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 In discussing the recent amendment to this Rule, a leading treatise explains that:

> _HN10_ᵀThe Advisory Committee's Note to the amendment states, the distinction between lay and expert witness testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists

in the field. This suggests that opinions based on experience of the sort that can be acquired in everyday life are admissible under Rule 701 while opinions based on experience of a specialized sort can be admitted only under Rule 702.

Wright & Gold, *Federal Practice and Procedure:* Evidence § 6253 (1997)(2005 pocket part).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*25]**

In *Bank of China*, one Huang Yangxin ("Huang"), a senior Bank of China employee with extensive experience in international banking, had been assigned by his employer to investigate the defendants' alleged scheme to defraud the bank. *Bank Of China*, 359 F.3d at 181-2. At trial Huang, who had not been identified as an expert, was allowed to testify about the following subjects:

(1) that certain transactions between defendants NBM and GEG did not comport with the business community's understanding of normal, true, trade transactions between a buyer and seller; (2) the concept of a "trust receipt," and how it works in the context of an international commercial transaction; and (3) that it is considered fraud when an importer presents a trust receipt to a bank to obtain a loan knowing that there are no real goods involved.

*Bank of China*, 359 F.3d at 180.

Over the defendants' consistent objections, the trial judge allowed the testimony "based on his [Huang's] many years of experience in international banking and trade." *Bank of China*, 359 F.3d at 180 (footnote omitted).

On appeal the Second Circuit concluded that **[\*26]** admission of the testimony on that ground was an abuse of discretion. *Bank of China*, 359 F.3d at 181. Specifically the Court held that:

*HN11*⬆️Testimony admitted pursuant to Rule 701 must be "rationally based on the perception of the witness." Fed.R.Evid. 701(a). To some extent, Huang's testimony was based on his perceptions. As a Bank of China employee, Huang was assigned to investigate defendants' activities at the tail-end of their scheme and after Bank of China stopped doing business with them. Huang's senior role at the Bank and his years of experience in international banking made him particularly well-suited to undertake such an investigation and was likely a factor in the Bank's decision to assign the task to him. *HN12*⬆️The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking. "Such opinion testimony is admitted not because of experience, **[\*27]** training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [] position in the business." Fed.R.Evid. 701 advisory committee's note. Thus, to the extent Huang's testimony was grounded in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to Rule 701 of the Federal Rules of Evidence because it was based on his perceptions.

However, to the extent Huang's testimony was not a product of his investigation, but rather reflected specialized knowledge he has because of his extensive experience in international banking, its admission pursuant to Rule 701 was error. Thus, Huang's explanations regarding typical international banking transactions or definitions of banking terms, and any conclusions

that he made that were not a result of his investigation, were improperly admitted.

Case 1:05-cv-10214-JLT    Document 38-2    Filed 01/17/2006    Page 4 of 13

*Bank of China*, 359 F.3d at 181-2 (citation omitted).

The analogy to the facts at hand is apparent. While testimony by Warner with respect to his participation in this transaction with Banc **[\*28]** may be admissible, any testimony offered by him regarding custom and practice in the collections industry or the provisions of the Commercial Law League of America's Guide, their interpretation and application, is inadmissible under Rule 701. As a consequence, the Court cannot consider that "evidence" when deciding the summary judgment motion. Since B&P relies almost exclusively on Warner's affidavit to demonstrate genuine issues of material fact, the inadmissibility of key portions of that document essentially eviscerates the plaintiff's opposition and dooms B&P's arguments.

Returning to the substance of the dispositive motion and assuming, *arguendo*, that Warner's affidavit was admissible in its entirety, it must be remembered that *HN13*the parties, A.G., B&P and Banc, had reached an express contract for services, and, in such circumstances

the Court of Appeals for this Circuit has cautioned that the exercise of non-statutory, supervisory powers over attorney's fees is reserved for exceptional circumstances and must accord great weight to the fact that a prior fee agreement was reached between the parties. *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 90 (1st Cir. 1970). **[\*29]** Thus, [the attorney's] pleas either for a quantum meruit recovery of the reasonable value of all the services he actually rendered, or that an implied contract existed for his performance, with appropriate remuneration, of any efforts necessary to rebut plaintiff's title claim, falter in the face of the express terms of the retainer agreement calling for prior notice if the $ 2,000 fee parameter would be exceeded. *Tranberg v. Tranberg*, 456 F.2d 173, 175, 8 V.I. 479 (3d Cir. 1972); *Hogan v. Wright, supra* 322 F.2d 83, at 85. If courts have consistently, and liberally, interpreted attorney-client fee agreements in favor of the client and against the drafting attorney in cases in which mutual intent was murky, e. g., *Jersey Land & Development Corp. v. United States, supra* 342 F. Supp. 48, at 54; 4 S. Williston, *Law of Contracts* s621 (3d ed. W. Jaeger 1961), then a similar result in situations of unambiguous intention would follow a fortiori.

*Baumrin v. Cournoyer*, 448 F. Supp. 225, 228 (D. Mass., 1978).

B&P is trying mightily to engraft a term upon its contract with Banc in order to recoup a fee on the grounds of industry custom and standard. *HN14*While

it is true that **[\*30]** unexpressed terms may be introduced into a contract by virtue of usage and custom, . . . such usage and custom must be universal and uniform. It is also as well settled that, to be admissible, the usage not only must be universal, but has become notorious by the long and uniform practice of those engaged in the trade at the place where the contract is made.'

*Caggiano v. Marchegiano*, 327 Mass. 574, 579, 99 N.E.2d 861, 864 (1951)(citations omitted). It is against this legal backdrop that the facts must be reviewed.

First, the so-called "industry standard" which conforms with the guidelines of the Commercial Law League of America (hereinafter "CLLA") is not mentioned in, or incorporated by reference into, the written contract between (or among) the parties. Second, the plaintiff has offered no evidence to demonstrate that Banc was even aware of this "industry standard". Third, even if these CLLA guidelines were part of the contract, there is no provision in the guidelines which suggests that a party such as B&P who has agreed to accept a percentage of the amount collected from the debtor as a contingency fee is somehow entitled to payment when the creditor collects **[*31]** for its loss from a third-party source, i.e., an insolvency insurance policy. (See # 14, Exh. 20)

Moreover, Warner's own statements appear to undercut this notion of the "industry standard" as it supposedly applies to this case in that he indicates that B&P normally *does not* collect a contingency fee when its client has insolvency insurance. Indeed, Warner specifically declares that:

Non-disclosure of the insolvency insurance in this case is a key issue. **Customarily, a creditor would disclose to the collection agency/law firm that [it] has insolvency insurance coverage on the debts sought to be collected. Then the collection agency/law firm performs services on an hourly rather than contingency basis. This explains why B&P has never collected a contingency fee through a client's insolvency insurance.**

Affidavit, # 21, Exh. A (emphasis added).

The plain implication is that B&P normally does not collect a contingency fee from the proceeds of a creditor's insurance policy as it is trying to do here. n9

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n9 Banc argues that B&P's answer to an interrogatory stating that it had no cases in which it claimed a fee arising out of a credit insurance payment (# 14, Exh. 8, Int. 12) also cuts against finding a "universal and uniform" custom.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*32]**

B&P has collected no funds from U.S. Fresh such that Banc owes the firm a contingency fee under the terms of the written contract. Based on the law and the facts, the plaintiff has not offered sufficient evidence to raise a genuine issue of fact on the question of whether it was entitled to payment from Banc's insolvency policy under the terms of the parties' agreement. Consequently B&P's breach of contract claim must fail.

Even assuming for purposes of argument that the plaintiff would be entitled under industry custom or standard to a contingency fee from the insurance policy if its efforts produced a successful result, the plaintiffs breach of claim still falters. Warner contends that "we understood that our client's intent was to pay us a contingent fee if our efforts enabled them to make any recovery, from whatever source." (# 21, Exh. A) B&P repeatedly argues that Banc used A.G. and B&P's services in obtaining a judgment against U.S. Fresh to recover on the insolvency insurance policy. (See #21 at pp. 2, 3, 8, 9) However, the plaintiff has produced absolutely no evidence to support this argument. n10

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n10 B&P did not submit any of the Bates-numbered documents to which it refers in its opposition. At the Court's request, the plaintiff furnished a document, Bates BA000135, referenced in its memorandum of law (# 21) at page 2 that purportedly supports the statement "that Banc received the benefit of [A.G. and B&P's] services by utilizing them to recover on Banc's insolvency insurance policy." The document, Bates BA000135, is a copy of a check dated 08/11/2000 from National Union Fire Insurance Co. of Pittsburgh to

Bank of America Commercial Cor [sic] for claim no. 00000351 in the amount of $ 155,384.50. Although not authenticated, presumably this check evidences the payment to Banc from the insurance company on the insolvency policy for the U.S. Fresh matter. It shows nothing, however, with respect to Banc's alleged utilization of A.G. and B&P's services.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*33]**

The evidence before the Court shows Banc purchased the insolvency insurance policy in March of 1999 more than eight months prior to the time that Banc hired A.G. to collect the U.S. Fresh loan. (# 14, Exh. 2) On December 28, 1999, Banc filed a claim under the insolvency insurance contract including extensive documentation in support of its Proof of Loss Form. (# 14, Exh. 17) Temporally, the insurance claim was submitted eleven days after A.G. sent the engagement letter to B&P and twenty-seven days before B&P's suit requirements letter was mailed. There is no indication on the face of these documents supporting the Proof of Loss that they came into Banc's possession as a result of either A.G.'s or B&P's efforts.

Further, AIG informed Banc on July 24, 2000, that it would be receiving payment under the insolvency insurance policy for its U.S. Fresh losses. (# 14, Exh. 32) On a time line, this notification came approximately two months after B&P had filed suit on behalf of Banc against U.S. Fresh, but twelve days before an execution in favor of Banc against U.S. Fresh in that litigation. (# 14, Exh. 19) There is nothing in the timing of these events alone from which a reasonable inference **[*34]** can be drawn that it was the plaintiff's efforts that secured a payment under the insurance policy for Banc.

Because B&P has presented no evidence to demonstrate that Banc's recovery on the insolvency insurance policy resulted from B&P's successful efforts on Banc's behalf, summary judgment should enter for the defendant on the breach of contract claim.

This same dearth of evidence dooms B&P's quantum meruit claim. [HN15] Under Massachusetts law,

> Quantum meruit is a theory of recovery, not a cause of action. It is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself. Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract. *See generally*, 5 S. Williston, Contracts § 805 (3d ed. 1961). In a case involving an unenforceable contract, we allowed quantum meruit recovery, basing our reasoning on the theory of unjust enrichment. Salamon v. Terra, 394 Mass. 857, 859, 477 N.E.2d 1029 (1985). "A person who has been unjustly enriched at the expense of another is required to **[*35]** make restitution to the other." *Id.*, quoting Restatement of Restitution § 1 (1937).

J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793-4, 494 N.E.2d 374, 377 (1986). In the absence of any proof whatsoever to show that Banc reaped the benefit of the insolvency insurance payment consequent to B&P's efforts, the plaintiff cannot establish a genuine issue of material fact on the question of whether the defendant was unjustly enriched at B&P's expense. Banc is entitled to the entry of summary judgment in its favor on the quantum meruit claim.

Count III of the complaint is a claim for violation of Massachusetts General Laws chapter 93A. Banc is said to have engaged in unfair and deceptive practices in that it did not advise B&P that it had an insolvency insurance policy to cover the U.S. Fresh account, and it then refused to pay B&P a contingency fee from the proceeds of that policy. The second aspect of this assertion can be summarily addressed. For the same reasons that B&P's contract and quantum meruit claims must fail, so too must its claim that Banc's failure to pay B&P a contingency fee based on the payment it received **[*36]** from a third-party source was an unfair and deceptive act.

The plaintiff argues that Banc is liable because it did not tell B&P about the insolvency insurance policy. Gerstel attests that Banc did not advise A.G. that it had applicable insolvency insurance coverage at the time either A.G. or B&P was engaged to collect the U.S. Fresh account. (# 21, Exh. B) Indeed, according to Gerstel, A.G. did not learn about the insolvency insurance until after B&P had commenced litigation on

behalf of Banc against U.S. Fresh. (# 21, Exhn. B) Further, Warner opines that Banc "had a duty to tell us they had insurance coverage which they failed to do." n11 (# 21, Exh. A)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 This statement, too, is inadmissible. *HN16* What, if any, duty Banc owed, surely is not the proper topic of lay opinion under Rule 701.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A review of the correspondence among the parties reveals that neither A.G. nor B&P ever asked Banc about insurance coverage. What B&P requested was "supporting documentation: including, but not limited to, a ledger sheet or statement **[*37]** of account, any personal guarantees, promissory notes, credit application, and any other relevant documentation or information available *which would confirm the debt.*" (# 14, Exh. 10) The existence of the insolvency insurance policy simply is not responsive to this request as it has no relevance at all in confirming the debt owed by U.S. Fresh.

*HN17* In Massachusetts,

In order to prove fraud by deceit, a plaintiff ordinarily must show that the defendant made a false statement of a material fact with knowledge of its falsity in order to induce the plaintiff to act, together with a reliance by the plaintiff on the false statement to the plaintiff's detriment. *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982). See *Wellman v. Carter*, 286 Mass. 237 at 253,190 N.E. 493. Here, there is no evidence that Newberg made a false representation or statement of a material fact which was deceptive. See *Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 678-679, 42 N.E.2d 808 (1942). See also *Kannavos v. Annino*, 356 Mass. 42, 49, 247 N.E.2d 708 (1969). Instead, it is undisputed that Newberg said nothing at **[*38]** all to Shaffer about her mistaken accusations against Rood.

*HN18* Usually, "nondisclosure does not amount to fraud and is not a conventional tort of any kind." *Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass.App.Ct. 73, 77, 628 N.E.2d 1291 (1994). However, nondisclosure may amount to fraud if a party "is under a duty to the other [party] to exercise reasonable care to disclose the matter in question." Restatement (Second) of Torts § 551(1) (1977). . . . The duty may arise if there is a "fiduciary or other similar relation of trust and confidence between [the parties]." Restatement (Second) of Torts § 551(2)(a). See also *Swinton v. Whitinsville Sav. Bank*, 311 Mass. at 678, 42 N.E.2d 808. Thus, "the duty of honest advice and full disclosure arises where one party reposes confidence in the integrity of another and the other party in advising voluntarily assumes and accepts the confidence." *Reed v. A.E. Little Co.*, 256 Mass. 442, 448-449, 152 N.E. 918 (1926). "When confidence is reposed and accepted, the person trusted is . . . liable for concealing facts **[*39]** which by reason of the relationship he should disclose." *Id.* at 449,152 N.E. 918.

*Rood v. Newberg*, 48 Mass. App. Ct. 185, 192, 718 N.E.2d 886, 892-3 (1999), *review denied*, 431 Mass. 1106, 733 N.E.2d 126 (2000).

In this case it is the plaintiff law firm, B&P, that owed the fiduciary duty to its client, Banc, not vice versa. See, e.g., *Beatty v. NP Corp.*, 31 Mass. App. Ct. 606, 612, 581 N.E.2d 1311, 1315 (1991); *Sanguinetti v. Nantucket Const. Co., Inc.*, 5 Mass. App. Ct. 227, 237, 361 N.E.2d 954, 961 (1977). B&P has cited no case law to suggest that Banc, the client, owed a duty to the plaintiff, the law firm, to disclose this information on the facts of this case. *HN19* Silence alone, in the absence of a duty to disclose, quite simply does not rise to meet the requisite standard: "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149, 153 (1979); *VMark Software, Inc. v. EMC*

*Corp.,* 37 Mass. App. Ct. 610, 620, 642 N.E.2d 587, 593 (1994). **[\*40]** As a matter of law, the chapter 93 A claim must fail.

The final claim in the complaint, Count IV, is one for fraud. *HN20*⊀Under Massachusetts law it is incumbent upon the plaintiff to

> . . . allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.' *Kilroy v. Barron,* 326 Mass. 464, 465, 95 N.E.2d 190, 191. *Alpine v. Friend Bros. Inc.,* 244 Mass. 164, 167, 138 N.E. 553.

*Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867, 868 *(1963); Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1471 (1 Cir., 1996).

In this case there has been no allegation of a false representation or any half-truths. Rather, the claim is that the Banc failed to disclose the existence of the insurance policy. As has been discussed, given the facts of this case Banc was under no obligation or duty to reveal the existence of the policy. As such, "this failure is mere nondisclosure and fails to reach the watermark of fraud. **[\*41]** " *Nei v. Burley,* 388 Mass. 307, 310, 446 N.E.2d 674, 676 (1983)(citations omitted).

Further, the plaintiff has proffered nothing to evidence that it relied upon the existence of this insolvency insurance policy for payment of its contingency fee. Rather, the contract provided that the fee was to be a percentage of the amount collected from the debtor.

In short, summary judgment should enter for Banc on Count IV of the complaint.

### V. Conclusion And Recommendation

For all the reasons stated, I RECOMMEND that Defendant's Motion For Summary Judgment Against The Plaintiff On All Counts Of The Complaint (# 12) be ALLOWED and that JUDGMENT enter for the defendant.

### VI. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P, any party who objects to this recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. **[\*42]** The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. See *Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete,* 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); see also *Thomas v. Arn,* 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466(1985).

ROBERT B. COLLINGS

United States Magistrate Judge

June 13, 2005

 LexisNexis®    About LexisNexis  |  Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*1998 U.S. Dist. LEXIS 22722, \**

UNIVERSITY EMERGENCY MEDICINE FOUNDATION v. RAPIER INVESTMENTS, LTD. and MEDICAL BUSINESS SYSTEMS, INC.

C.A. No. 97-549-T

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

1998 U.S. Dist. LEXIS 22722

October 15, 1998, Decided

**DISPOSITION:** **[\*1]** UEMF's motion for summary judgment declaring that it gave a valid notice of non-renewal granted and the defendants' cross-motion for summary judgment denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff service provider brought an action for a declaratory judgment that it validly terminated the contract, or, in the alternative, that the provider was entitled to terminate the contract because defendants, company and its subsidiary, breached the contract. The provider sought replevin of property in the company's possession and damages for wrongful retention of that property.

**OVERVIEW:** Defendants counterclaimed for breach of contract. The parties brought cross-motions for summary judgment on the issue of notice of termination. The parties entered into a written contract pursuant to which the company was to render services to the provider. The initial term was one year and the contract would renew automatically unless either party gave written notice of its intent to terminate at least four months prior to the expiration date. Any notices given would be deemed to have been effectively given if sent by registered or certified mail. The provider sent two letters by certified mail stating its intention not to renew. The court granted defendants' motion for summary judgment and denied the provider's motion. The court found that the first letter sent to the person who negotiated the contract for the company satisfied the notice requirement. Such person had at least implied or apparent authority to accept notice. The contract did not require notice to be sent to the address in the contract. The court noted that there was no showing that the provider frustrated the purpose of the notification period by giving notice of 119 days or even 110 days, instead of the 120 days.

**OUTCOME:** The court granted the provider's motion for summary judgment declaring that it gave a valid notice of non-renewal and denied defendants' cross-motion for summary judgment.

**CORE TERMS:** notice, notice of termination, actually received, effective, summary judgment, certified mail, cross-motion, ineffective, declaratory judgment, automatically, non-renewal, terminated, renewed, prejudiced, lessee, notice requirement, termination, negotiated, registered, purported, terminate, invalid, validly, entity, mailed, bid

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Contracts Law > Contract Conditions & Provisions > Express Conditions 🔍

Contracts Law > Performance > Discharges & Terminations 🔍

*HN1* ⬆ It is true that when a contract prescribes the manner in which notice of termination must be given, failure to follow that method may render the notice ineffective. Even where a contract requires a particular method of giving notice, notice given by a different method is effective if it is actually received unless the method by which notice is given is an essential element of the transaction. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** For UNIVERSITY EMERGENCY MEDICINE FOUNDATION, plaintiff: Charles S. Beal, Cameron & Mittleman, Providence, RI.

For RAPIER INVESTMENTS, LTD., MEDICAL BUSINESS SYSTEMS, INC., defendants: William Richard Grimm, Mark Bianchi, Hinckley, Allen & Snyder, Providence, RI.

For RAPIER INVESTMENTS, LTD., MEDICAL BUSINESS SYSTEMS, INC., counter-claimants: William Richard Grimm, Mark Bianchi, Hinckley, Allen & Snyder, Providence, RI.

For UNIVERSITY EMERGENCY MEDICINE FOUNDATION, counter-defendant: Charles S. Beal, Cameron & Mittleman, Providence, RI.

**JUDGES:** ERNEST C. TORRES, United States District Judge.

**OPINIONBY:** ERNEST C. TORRES

**OPINION: MEMORANDUM AND ORDER**

ERNEST C. TORRES, United States District Judge.

University Emergency Medicine Foundation ("UEMF") brought this action for a declaratory judgment that it validly terminated a contract with Rapier Investments, Ltd. ("Rapier"); for replevin of property in Rapier's possession; and for damages allegedly caused by Rapier's wrongful retention of that property. The case **[*2]** is presently before the Court for consideration of the parties' cross-motions for summary judgment with respect to the declaratory judgment claim.

The issue presented is whether the notice of termination provided by UEMF satisfies the requirements of the contract. Because I answer that question in the affirmative, the plaintiff's motion is granted and the defendants' motion is denied.

**Background**

With apologies to William Shakespeare, the dispute regarding the validity of the purported termination by UEMF can be described as "much ado about nothing." It occupies the Court's time and attention only because the defendants' preoccupation with hypertechicalites has converted what apparently is their pique at being spurned into a "federal case."

The facts material to these cross-motions are undisputed. UEMF provides emergency medicine services at several hospitals in Rhode Island. Medical Business Systems, Inc. ("MBS"), a subsidiary of Rapier, provides billing and accounts receivable services to health care entities.

On October 1, 1995 UEMF and Rapier entered into a written contract pursuant to which MBS was to provide its services to UEMF. The initial term of the contract **[*3]** was one year, but the contract stated that it would be renewed automatically for additional one-year terms unless either party gave written notice of its intent to terminate at least four months prior to the expiration date.

A different section of the contract contained the following provision dealing with notice:

> Any notices given pursuant to this Agreement shall be deemed to have been effectively given if sent by registered or certified mail to the party to whom the notice is directed at the address set forth for such party herein above or at such other address as such party may hereafter specify in a notice given in accordance with this paragraph.

The contract listed Rapier's address as 7 Wells Avenue, Newton, Massachusetts.

During the first year of the contract, neither party gave notice of termination and the contract automatically was renewed until September 30, 1997. On May 30, 1997, UEMF sent two letters stating that it did not intend to renew the contract for a third year.

One letter was sent via certified mail addressed to JoAnn Barato-Mills, the individual who had negotiated the contract on behalf of Rapier, at 20 Altieri Way, Warwick, Rhode Island. It **[\*4]** was received by her on June 2, 1997.

The second letter was sent via certified mail to Alan Carr-Locke of Rapier at 1238 Chestnut Street, Newton, Massachusetts. Since that street address was incorrect, the letter was returned as undelivered on June 10. UEMF promptly mailed the notice to 7 Wells Avenue in Newton and Rapier received it shortly thereafter.

UEMF later sought bids for the services it had been receiving from MBS. MBS submitted a bid, but when UEMF selected another provider, MBS asserted that UEMF's notice of non-renewal was invalid and that the contract between the parties was renewed automatically through September 1998.

UEMF seeks a declaratory judgment that it validly terminated the contract, or, in the alternative, that it is entitled to terminate the contract because the defendants breached it. The defendants have counterclaimed for breach of contract asserting that UEMF's purported notice of termination was ineffective. The parties' cross-motions for summary judgment address only the validity of the termination notice.

## Discussion

The defendants argue that UEMF's notice of termination was ineffective because (1) it was not sent to the address set forth **[\*5]** in the contract, and (2) it was untimely.

*HN1* It is true that when a contract prescribes the manner in which notice of termination must be given, failure to follow that method may render the notice ineffective. 6 Arthur Linton Corbin, Corbin on Contracts § 1266, at 64 (1962); 1 Maurice H. Merrill, Merrill on Notice § 601, at 658-60 (1952). However, the contract at issue does not require that notice directed to Rapier be sent to 7 Wells Avenue. Rather, it permits notice to be sent to that address and deems notice so sent "to have been effectively given." Thus, it allows the party giving notice to establish that it has complied with the notice requirement by showing that it followed the method described in the contract. It does not purport to make that method the exclusive means by which notice can be given.

Even where a contract requires a particular method of giving notice, notice given by a different method is effective if it is actually received unless the method by which notice is given is an essential element of the transaction. 1 Merrill, supra, § 603, at 662-63. Thus, a notice of non-renewal that actually is received may be effective even though sent to an **[\*6]** address other than the address specified in the contract. See U.S. Broad. Co. v. National Broad. Co., 439 F. Supp. 8, 10 (D. Mass. 1977) (applying New York law) ("Here it is clear that plaintiff and plaintiff's counsel timely received both notices and it would be 'hypertechnical in the extreme' to hold that notice actually received was ineffective." (quoting Ives v. Mars Metal Corp., 23 Misc. 2d 1015, 196 N.Y.S.2d 247, 249 (N.Y. Sup. Ct. 1960))); see also In re Scarsdale Tires Inc., 47 B.R. 478, 481 (Bankr. S.D.N.Y. 1985) (where lessee actually received notice of termination of lease, notice was deemed effective even if it was not sent to address specified by lessee's predecessor-in-interest); Lloyd's Plan, Inc. v. Brown, 268 N.W.2d 192, 195 (Iowa 1978) (notice of defendant's right to cure default was effective even when sent to an address other than that designated in the contract where defendant actually received the notice and was not prejudiced by the sending of the notice to an undesignated address).

In this case, UEMF's letter to Barato-Mills at MBS satisfied the notice requirement. MBS was the entity providing **[\*7]** the contract services and Barato-Mills was the person who negotiated the contract on behalf of Rapier. Consequently, Barato-Mills and MBS had at least implied or apparent authority to deal with UEMF regarding the performance of services pursuant to the contract and to accept notice of termination of those services. See Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., Inc., 539 A.2d 523, 526 (R.I. 1988); Calenda v. Allstate Ins. Co., 518 A.2d 624, 628 (R.I. 1986); Restatement (Second) of Agency § 27 (1958).

The defendants have the effrontery to assert that the notice is invalid because the contract required that it had to be given by May 31 and it was not received by MBS until June 2 or by Rapier until sometime after June 10. That argument ignores the fact that the notice provision clearly states that "any notices given pursuant to this Agreement shall be deemed to have been effectively given if sent by registered or certified mail to the party to whom the notice is directed . . . ." (emphasis added). See, e.g., Trust Co. of Chicago v. Shea, 3 Ill. App. 2d 368, 122 N.E.2d 292, 293 (Ill. App. Ct. 1954) (where **[\*8]** terms of contract specified

that "mailing of . . . notice by registered mail shall constitute service thereof," the effective date of notice was the date it was mailed). Here, it appears that the notice must have been sent by May 31 in order to be received on June 2.

Even if the notice was not sent until June 1, Rapier has failed to indicate any way in which it was prejudiced by the one-day delay or even the ten-day delay in delivering the notice to Carr-Locke. By the defendants' own admission, the purpose of the four-month notification period was "to provide Rapier with sufficient time to make changes to MBS's operations, personnel, budget planning and management resources in the event UEMF terminated the Agreement." (Defs.' Rule 12.1 Statement P 3.) There is absolutely no indication that such purpose was frustrated by providing Rapier with notice of 119 days or even 110 days instead of 120 days. See, e.g., Music, Inc. v. Henry B. Klein Co., 213 Pa. Super. 182, 245 A.2d 650, 652 (Pa. Super. Ct. 1968) (finding no prejudice where notice of termination was received fifty-eight days before termination date instead of the required sixty days).

## Conclusion [*9]

For all of the foregoing reasons, UEMF's motion for summary judgment declaring that it gave a valid notice of non-renewal is hereby granted and the defendants' cross-motion for summary judgment is denied.

IT IS SO ORDERED,

Ernest C. Torres
United States District Judge
Date: October 15, 1998

Service: **Get by LEXSEE®**
Citation: **1998 us dist lexis 22722**
View: Full
Date/Time: Tuesday, January 17, 2006 - 5:46 PM EST

* Signal Legend:
⬤ - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis® | About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: Get by LEXSEE®
Citation: 1996 us dist lexis 22318
Case 1:05-cv-10214-JLT    Document 38-3    Filed 01/17/2006    Page 1 of 9

*1996 U.S. Dist. LEXIS 22318, ***

IBP, Inc., Plaintiff, vs. FDL FOODS, INC., Defendant, CITY OF DUBUQUE, Intervenor.

No. C96-1005

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA, EASTERN DIVISION

1996 U.S. Dist. LEXIS 22318

April 1, 1996, Decided
April 1, 1996, Filed

**DISPOSITION:** [*1] Plaintiff's claim for relief in Count 1 of amended and substituted complaint denied. Request of plaintiff IBP, inc. for specific performance and injunctive relief as against defendant FDL Foods, Inc. and intervenor City of Dubuque denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff corporation sought a decree of specific performance and a permanent injunction directing defendant corporation to close on a merger agreement and enjoining defendant from consummating a sale of its business to another company. Plaintiff argued that defendant's oral termination of the agreement was invalid, and hence defendant violated the no-shop clause in the agreement by soliciting proposals from other companies.

**OVERVIEW:** Plaintiff corporation filed suit seeking a decree of specific performance directing defendant corporation to close on a merger agreement. Plaintiff also requested the court to permanently enjoin defendant from consummating a sale of its business to another company. Plaintiff argued that the contract was not terminated when the parties' negotiations reached a stalemate, but merely modified. Defendant argued that it terminated the agreement pursuant to its provisions when the parties reached an impasse, and hence the no-shop clause in the agreement did not remain in effect. The court ruled that although the agreement required written notice of a termination, defendant's oral termination was valid because under Iowa law, a written contract can be modified or terminated by oral agreement even though the contract provides that it can only be modified or rescinded by a written agreement. Thus, the court found that defendant's intent was to exercise its right to terminate the written agreement and make a new offer with different terms. Once the contract was terminated, neither party had any rights or duties under the contract, and defendant was free to solicit new proposals.

**OUTCOME:** The court denied plaintiff's complaint for specific performance and its request for injunctive relief because defendant properly exercised its right under the contract to terminate the agreement once the parties reached an impasse in their negotiations. Upon such termination, defendant was no longer bound by the agreement or any of its restrictions.

**CORE TERMS:** shareholder, conversation, merger agreement, negotiation, merger, escrow, terminated, stock, contingency, no-shop, written agreement, definitive agreement, purchase price, oral contract, non-voting, bid, written contract, reduced to writing, oral agreement, closing date, reduction, voting, telephone call, new contract, termination, stockholder, dissenters, terminate, negotiate, paperwork

**LexisNexis(R) Headnotes** ✦ Hide Headnotes

Contracts Law > Contract Modifications 🔍

Contracts Law > Types of Contracts > Oral Agreements 🔍

*HN1* ⚓ Under Iowa law, a written contract can be modified or terminated by oral agreement even though the contract provides that it can only be modified or rescinded by a written agreement. More Like This Headnote

Contracts Law > Performance > Discharges & Terminations

HN2 When a contract is terminated or rescinded neither party has any rights or duties under the contract.  More Like This Headnote

Contracts Law > Types of Contracts > Oral Agreements

HN3 Under Iowa law, the enforceability of an alleged oral contract turns, in part, upon whether the parties intended to reduce the contract to writing. When the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, an oral contract will be upheld unless the parties intended not to be bound until the agreement was reduced to writing. The courts analyze two separate elements: (1) whether the terms of the alleged oral contract can be established with reasonable certainty; and (2) whether the parties intended to be presently bound by such oral agreement, or rather intended not to be bound until such agreement was reduced to writing. With respect to the latter element, whether preliminary negotiations actually ripened into an oral contract depends on the intention of the parties as gleaned from the facts of the case. An oral contract may exist even though the parties intend to reduce it to writing at a later date. However, if either party intends not to be bound in the absence of a fully executed document, no amount of negotiation or oral agreement as to specific terms will result in the formation of a binding contract.  More Like This Headnote

Contracts Law > Types of Contracts > Oral Agreements

HN4 A court should consider this list of factors in its determination of whether the parties intended to be bound prior to execution of a written document: (1) whether the contract is of a class usually found to be in writing, (2) whether it is of a type needing a formal writing for its full expression, (3) whether it has few or many details, (4) whether the amount is large or small, (5) whether the contract is common or unusual, (6) whether all details have been agreed upon or some remain unresolved, and (7) whether the negotiations show a writing was discussed or contemplated.  More Like This Headnote

Business & Corporate Entities > Business Combinations > Mergers

HN5 The Iowa Business Corporation Act, Iowa Code § 490.1101 et seq., requires that any merger agreement be submitted in writing to the shareholders for their approval and that the shareholders be notified of and allowed to exercise their shareholder dissenters' rights. In addition, the contract must be in writing since many of the shareholders are not privy to any oral agreements which may be negotiated. Finally, in any merger situation there may very well be shareholders who have fiduciary obligations, in which corporate board approval must be obtained in order to vote for a merger or, in the case of a fiduciary such as a trustee or executor, court approval obtained to enter into this type of transaction.  More Like This Headnote

Business & Corporate Entities > Business Combinations > Mergers

HN6 The power of a corporation to merge must be derived from the law of the state which created it. Under the common law, mergers require unanimous consent of all of the stockholders. Today, the Iowa Business Corporation Act, Iowa Code § 490.1101 et seq., authorizes mergers upon majority shareholder approval where such approval is received pursuant to the procedures outlined in the statute, including the provision of shareholder dissenters' rights. The right to merge is conditional. Failure to comply with the statute authorizing the transaction leaves the corporation without a common law or statutory right to merge absent consent of all shareholders.  More Like This Headnote

**COUNSEL:** For IOWA BEEF PROCESSORS INC., plaintiff: Mark McCormick, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA.

For DUBUQUE, CITY OF, intervenor: Les V Reddick, Kane Norby and Reddick PC, Dubuque, IA.

For FDL FOODS INC, ROBERT H WAHLERT, defendants: Patrick M Roby, Elderkin Law Firm, Cedar Rapids, IA.

Case 1:05-cv-10214-JLT   Document 38-3   Filed 01/17/2006   Page 3 of 9

For FDL FOODS INC, defendant: Les V Reddick, Kane Norby and Reddick PC, Dubuque, IA.

For FDL FOODS INC, ROBERT H WAHLERT, defendants: Rene A Torrado, Jr, James E Bayles, Jr, Vedder Price Kaufman & Kammholz, Chicago, IL.

For FDL FOODS INC, counter-claimant: Patrick M Roby, Elderkin Law Firm, Cedar Rapids, IA.

For FDL FOODS INC, counter-claimant: Rene A Torrado, Jr, James E Bayles, Jr, Vedder Price Kaufman & Kammholz, Chicago, IL.

For IOWA BEEF PROCESSORS INC., counter-defendant: Mark McCormick, Belin Lamson McCormick Zumbach Flynn, Des Moines, IA.

**JUDGES:** Michael J. Melloy, Chief Judge, UNITED STATES DISTRICT COURT.

**OPINIONBY:** Michael **[*2]** J. Melloy

**OPINION: OPINION and ORDER**

On March 25 and 26, 1996, this court held a bench trial on Count 1 of Plaintiff's amended and substituted complaint. In Count 1, the Plaintiff, IBP, Inc. ("IBP"), requests that the court grant a decree of specific performance directing the Defendant, FDL, Foods, Inc. ("FDL") to close on a contract which IBP alleges was entered into on December 12, 1995, and amended pursuant to an oral agreement on January 26, 1996. Count 1 also requests that the court permanently enjoin FDL from conveying any land to the City of Dubuque, Iowa, and from entering into or consummating a sale of its business to Farmland Foods, Inc ("Farmland"). For the reasons stated below, the court finds that IBP's complaint for specific performance and request for injunctive relief should be denied.

**A. BACKGROUND AND STIPULATED FACTS**

It is undisputed that IBP and FDL entered into a fully integrated, written and approved agreement and plan of merger dated December 12, 1995 (the "December 12, 1995 agreement"). The December 12, 1995 agreement gave IBP the absolute right to terminate the agreement if certain conditions contained within the agreement could not be met prior **[*3]** to closing. It is also undisputed that when certain of those conditions could not be met, the President of IBP made a proposal to the President of FDL on January 24, 1996, to waive such conditions in return for a reduction in the purchase price. On January 26, 1996, after various telephone conversations -- the details of which will be further outlined below -- the President of FDL responded to IBP's January 24th offer by stating to the President of IBP: "Let's go forward with it to get it done. If you have Nate [IBP's attorney] get a hold of Chuck Naylor [FDL's attorney], a, to see what we need to do paperwork wise to, to, to expedite the closing let's get on with it."

The first issue that the court must resolve is whether the conversations of January 24-26, 1996, and the events surrounding those conversations terminated the December 12, 1995 agreement, so as to relieve FDL from certain restrictions in that agreement, including the "no-shop" clause, which prohibited FDL from soliciting other offers for its business. If the court finds that the December 12, 1995 agreement was indeed terminated, the second issue that the court must resolve is whether the discussions between the **[*4]** President of FDL and the President of IBP resulted in the creation of an enforceable oral merger agreement, or alternatively, whether it was the intent of the parties that no binding contract be created until the agreement was reduced to writing, signed by all parties and submitted to FDL shareholders for approval pursuant to the Iowa Business Corporation Act.

With respect to the first issue, I conclude that there is little question but that IBP intended to exercise its right to terminate the December 12, 1995 agreement and propose a new contract to FDL with materially different terms on January 24, 1996. It is my further conclusion that while Mr. Robert L. Peterson, the President of IBP, may have felt that he had a binding "gentlemen's" agreement with Mr. Robert H. Wahlert, the President of FDL, to go forward with a merger on the terms outlined in the telephone call of January 24, 1996, the facts presented reveal that it was the intent of the parties that no enforceable agreement be created until the agreement was reduced to writing, signed by all applicable parties, submitted to FDL's

In many respects, there are not a large **[*5]** number of significant factual disputes in this case. Much of the background to the negotiations are not in dispute and have been stipulated to by the parties. In addition, Mr. Peterson secretly taped most of the relevant telephone calls, including all of the telephone calls between himself and Mr. Wahlert on January 24 and January 26, 1996. Consequently, the court is not put in the position of choosing between differing versions of what was said in a call, but rather has the actual tapes and transcripts to refer to in deciding this case.

Pursuant to the agreement and stipulation of the parties as contained in the Final Pretrial Order in this case, the stipulated facts are set forth below. n1

    1. Plaintiff, IBP, Inc., is a Delaware corporation, whose principal place of business is located in Dakota City, Nebraska.

    2. Defendant, FDL, Foods, Inc., is an Iowa corporation, whose principal place of business is located in Dubuque, Iowa.

    3. Intervenor, the City of Dubuque, is an Iowa municipal corporation.

    4. In August 1995, FDL closed its hog slaughtering operations. Subsequently, FDL began looking for a company to purchase FDL.

    5. In September 1995, FDL was engaged **[*6]** in discussions with Farmland Foods, Inc. ("Farmland") regarding Farmland's possible acquisition of FDL by means of a merger for $ 15 million, but negotiations terminated when Farmland's Board of Directors declined to approve the proposed transaction.

    6. Subsequently, IBP made an offer to acquire FDL for $ 15 million.

    7. The substance of IBP's offer was confirmed in a Letter of Intent dated September 26, 1995 prepared by IBP and accepted by FDL.

    8. Subsequently, as of November 15, 1995, FDL and IBP executed a written document known as the "Conditional Agreement" which, among other things extended the closing date until December 22, 1995 and conditioned the closing on the execution of a mutually agreed upon definitive agreement.

    9. On December 12, 1995, IBP and FDL executed an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which IBP was to acquire FDL for $ 15 million.

    10. The Merger Agreement provided, among other things, that IBP could terminate the Merger Agreement if it had not reached a satisfactory agreement with Hormel for the continuation of the Custom Manufacturing Agreement by the date set for closing: December 22, 1995.

    11. **[*7]** The Merger Agreement was submitted in writing upon notice to FDL shareholders and unanimously approved by them on December 22, 1995.

    12. As of December 22, 1995, the parties, pursuant to written agreement, extended the closing date set forth in the Merger Agreement to January 8, 1996.

    13. On January 8, 1996, the parties pursuant to a second written agreement, extended the closing date to March 31, 1996.

    14. On January 24, 1996, Robert Peterson, Chairman and Chief Executive Officer of IBP, called Robert Wahlert, Chairman and Chief Executive Officer of FDL, and informed Wahlert that IBP and Hormel had reached an impasse in their negotiations to extend the Custom Manufacturing Agreement.

    15. During that January 24, 1996 conversation, Peterson and Wahlert discussed a reduction in

the acquisition price of FDL from $ 15 million to $ 9.9 million.

Case 1:05-cv-10214-JLT   Document 38-3   Filed 01/17/2006   Page 5 of 9

16. Over the course of the next 48 hours, FDL communicated with Hormel, Smithfield Foods and Farmland concerning the interest of any of these companies in acquiring FDL for a higher price and on better terms.

17. Also over the course of that 48 hours, Wahlert contacted certain FDL shareholders to inform them of IBP's **[*8]** proposal and to determine whether they would support a merger with IBP under the new terms.

18. On January 26, 1996, Wahlert called Peterson and had another discussion about the reduction in the acquisition price of FDL.

19. After the January 26, 1996 conversation with Peterson, Wahlert directed FDL's attorneys to prepare a draft of a new proposed merger agreement, which FDL's attorneys entitled Restated and Amended Agreement and Plan of Merger (the "Draft Merger Agreement") and which reflected, among other things, a reduction in the acquisition price of FDL from $ 15 million to $ 9.9 million.

20. FDL's counsel faxed the Draft Merger Agreement to IBP on January 29, 1996.

21. On February 4, 1996, Farmland made a proposal to acquire FDL.

22. On February 5, 1996, FDL accepted Farmland's proposal.

23. Also on February 5, 1996, FDL advised IBP that FDL's Board of Directors voted not to recommend IBP's offer to acquire FDL for $ 9.9 million.

24. After IBP was noticed of FDL's decision, IBP learned about Farmland's proposed acquisition of FDL.

25. On February 14, 1996, IBP filed this suit against FDL seeking, among other things, to require FDL to merge **[*9]** with IBP for the $ 9.9 million acquisition price.


- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 Additional factual findings as to each of the disputed issues are set forth in the sections discussing those issues.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## B. CONTRACT TERMINATION

IBP argues that the December 12, 1995 agreement was never terminated, only modified, and therefore the provision contained within that agreement commonly referred to as the "no-shop" clause remained in effect after the conversation between Mr. Peterson and Mr. Wahlert on January 24, 1996. FDL counters by arguing that the conversation and surrounding events make it clear that the December 12, 1995 agreement was "off the table" and the parties were discussing the formation of a new contract. According to FDL, Mr. Peterson's "take-it-or-leave-it" offer on January 24, 1996, made it clear that IBP was not going forward on the terms of the December 12, 1995 agreement, and that such agreement was terminated.

The December 12, 1995 agreement provided at paragraph 8.4(b) that IBP could terminate the agreement by written **[*10]** notice to FDL if one of the conditions precedent, such as the negotiation of an acceptable CMA with Hormel, was not met. The parties' conversations and the events proceeding Mr. Peterson's phone call to Mr. Wahlert on January 24, 1996 show that when IBP reached an impasse in its negotiations with

Hormel for an acceptable CMA, IBP terminated the December 12, 1995 agreement -- as it had a right to do -- pursuant to paragraph 8.4(b) of that agreement.

The fact that paragraph 8.4(b) of the December 12, 1995 agreement required "written notice" of a termination pursuant to that paragraph does not change this result. **HN17** Under Iowa law, a written contract can be modified or terminated by oral agreement even though the contract provides that it can only be modified or rescinded by a written agreement (or in this case "written notice"). Humiston Grain Co. v. Rowley Interstate Transportation Company, inc., 483 N.W.2d 832, 834 (Iowa 1992); Whalen v. Connelly, 545 N.W.2d 284, 1996 WL 133229, *4 (Iowa 1996). The evidence in the present case clearly shows that IBP intended to exercise its right to terminate the December 12, 1995 agreement and enter into negotiations for a new contract on materially **[*11]** different terms.

The December 12, 1995 agreement contained several material provisions relevant to this issue. These provisions include the following:

(a) *"No-Shop" Clause:* FDL agreed to not solicit any other offers for the sale of FDL or its assets. This provision at paragraph 5.3(e) of the agreement is commonly referred to as the "no-shop" clause;

(b) *Price:* IBP was to acquire 100% of the stock of FDL through a merger agreement. The total consideration for the stock was to be $ 15 million;

(c) *Escrow Accounts:* There were three separate escrow accounts to be established at the time of closing. There was a general escrow of $ 1.5 million (which represented 10% of the sale price), a tax escrow of $ 1,120,000, and a worker's compensation escrow of $ 354,507. Escrow agreements incorporated into the merger agreement made provision for the conditions upon which the escrow payments would be paid out to the shareholders or paid to cover claims of IBP pursuant to the escrow agreements;

(d) *Conditions Precedent:* Article VI contained various conditions which had to be satisfied prior to closing. In the event any of the conditions could not be satisfied, **[*12]** IBP had the absolute right to either terminate the agreement or waive compliance with the condition to closing. The two most significant conditions to this dispute are the ones found at paragraph 6.9 which conditioned closing upon IBP entering into an acceptable custom manufacturing agreement ("CMA") with George A. Hormel & Company ("Hormel") and the condition at paragraph 6.11 which conditioned closing on IBP entering into satisfactory understandings with the various labor unions representing FDL employees;

(e) *Plan of Merger:* The agreement incorporated as Exhibit "A" the plan of merger between IBP and FDL. That Plan of Merger included a provision requiring submission of the agreement and Plan of Merger to the shareholders of FDL for approval and adoption pursuant to the applicable provisions of law [the agreement provided for Iowa law to apply to the contract] and the Articles of Incorporation and Bylaws of FDL; and

(f) *Closing Date:* The merger was to be consummated by December 22, 1995. Those dates were subsequently extended by a written amendment to the agreement which first extended the closing date to January 8, 1996, and subsequently to March 31, 1996.

**[*13]**

The condition that IBP be able to negotiate a satisfactory CMA with Hormel was an extremely important component of the agreement. Hormel was essentially FDL's only customer and made all of its purchases under the terms of the existing CMA. At trial Mr. Wahlert testified that Farmland's inability to negotiate an acceptable CMA with Hormel was one of the reasons given for Farmland's decision not to pursue its initial proposal to FDL in the Fall of 1995. If IBP was not able to negotiate an acceptable CMA with Hormel, it would either have to terminate the existing CMA currently in place and have no customer base for the FDL products, or alternatively sell to Hormel on terms which IBP found to be unacceptable.

It was IBP's inability to come to an acceptable agreement with Hormel for a new CMA which precipitated

Mr. Peterson's call to Mr. Wahlert on January 24, 1996. Discussions between representatives of IBP and Hormel over the terms of a new CMA had not been successful. As a result, Mr. Peterson and Mr. Joel Johnson, President of Hormel, conducted direct negotiations in an attempt to resolve the impasse. When those negotiations, including discussions on January 24, 1996, proved unsuccessful, **[*14]** Hormel representatives indicated that they would contact Mr. Wahlert of FDL and advise him that the parties were at an impasse and that the contingency in the merger agreement between FDL and IBP which required negotiation of an acceptable CMA with Hormel would not be met. In turn, Mr. Peterson indicated to Mr. Johnson that he would be going back to Mr. Wahlert with a new proposal to purchase FDL at $ 9 million instead of the original $ 15 million price. Mr. Peterson further advised Hormel officials that with the $ 6 million reduction IBP would have more flexibility on an agreement with Hormel for a new CMA. In his conversations with Hormel -- the tapes and transcripts of which were entered into evidence at trial -- Mr. Peterson made several comments such as ". . . if we go to him and offer him price X [$ 9 million] . . ." and comments such as "I can assure you that when we bid whatever we bid Wahlert that we will make every attempt to try to make something work with Hormel." Finally, shortly before making the call to Mr. Wahlert, Mr. Peterson made the comment to Hormel officials ". . . we're going to figure out what we're going to bid Wahlert and how much risk we want to take." **[*15]**

I conclude that the conversations with the Hormel officials clearly show that Mr. Peterson intended to make a new offer or "bid" to Mr. Wahlert for the purchase of FDL. This conclusion is bolstered by the statements made by Mr. Peterson in his conversations with Mr. Wahlert -- the tapes and transcripts of which were also entered into evidence at trial. The first relevant conversation between Mr. Peterson and Mr. Wahlert occurred on the evening of January 24, 1996, just after IBP concluded its failed discussions with Hormel. Shortly into the conversation, Mr. Peterson told Mr. Wahlert that IBP was ". . . going to change our offer." Mr. Peterson went on to state "we would like, will bid you two ways but we would rather have it one way." Mr. Peterson then made two proposals to Mr. Wahlert, the first being a $ 9 million offer accompanied by a two-year consulting contract for Mr. Wahlert at $ 450,000 per year and the second being a straight $ 9.9 million offer with no consulting contract for Mr. Wahlert. n2 Mr. Peterson further stated that IBP would waive all the contingencies and specifically referred to both the Hormel contingency and Union contract contingency. Mr. Peterson specified **[*16]** that there would be no contingencies, but that the escrows would remain in place.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Mr. Wahlert immediately rejected the first proposal. The only proposal which was seriously considered from that point forward was the $ 9.9 million offer.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Mr. Peterson and other IBP representatives who were on a speaker phone with Mr. Peterson did state that the deal was essentially the same as the prior agreement, except that the price would change from $ 15 million to $ 9 million and there would be no contingencies. Further, IBP would now be in a position to close immediately.

Later in the conversation, Mr. Peterson related to Mr. Wahlert some of his conversations with Hormel in which Mr. Peterson had advised Hormel that he was going to "bid" X to Mr. Wahlert for FDL. Still later in the conversation, Mr. Peterson made it clear to Mr. Wahlert that the $ 9.9 million was a take it or leave it proposal and that Mr. Wahlert had 48 hours to either accept the proposal in which case IBP would be "in" or reject the proposal in which **[*17]** case Mr. Peterson said ". . . we're out, we want out and we want to know we are out within 48 hours. And if we're in, we're in. But, but one way or the other, by Friday night we want in or out."

If there was any doubt that the old deal was off the table and a new proposal was being made, those doubts were dispelled by a subsequent conversation which occurred during the morning of January 26, 1996. After discussing the proposal with several of his Board members and shareholders, Mr. Wahlert called Mr. Peterson and was attempting to negotiate a higher price for the company. In the first telephone call of January 26, Mr. Wahlert outlined the reasons why he felt the company was worth more than the $ 9.9 million being offered by IBP and requested that IBP consider a "counter offer" of $ 12 million. Mr. Wahlert also requested that IBP drop the escrows, particularly the tax escrow. Again, there were discussions about the offer and about the fact that a new proposal was being made. Mr. Peterson related to Mr. Wahlert his

conversations with Hormel representatives in which Mr. Peterson told Hormel that he was going ". . . to get the asset if he [Wahlert] sells it to me, if he doesn't I will [*18] walk away." A few seconds later, Mr. Peterson stated that he told Hormel ". . . we are going to bid Bob Wahlert X and when I come to you [Hormel] I will give you a deal and you can tell me stick it or take it I don't care take your pick. So I am taking with you a $ 9.9 million deal that has these amount of costs on top of it." The conversation between Mr. Peterson and Mr. Wahlert proceeded with further references to the "bid" of $ 9.9 million and the fact that IBP was not prepared to offer even $ 9.91 million and would not agree to any modifications to the escrow arrangements.

Based upon the terms of the December 12, 1995 agreement, the parties' telephone conversations and the other surrounding events, I find that it was the intent of IBP to exercise its right to terminate the December 12, 1995 agreement because of its inability to reach an acceptable CMA with Hormel and to make a new and different offer to FDL for purchase of 100% of the FDL stock. In addition to the taped conversations, which in and of themselves lead to this conclusion, I find significant the fact that the subject of the alleged "modifications" to the existing agreement deal with virtually all of the essential [*19] terms of that agreement. Mr. Peterson testified at trial that this was a fairly simple deal. IBP was to pay $ 15 million for the stock of FDL, subject to two very important contingencies which related to FDL's only customer (Hormel) and FDL's single biggest cost factor, its Union contract. Additionally, pursuant to the agreement escrows equal to $ 2,974,507 (19.8% of the $ 15 million purchase price) were to be established.

While the other terms of the agreement were not unimportant, the terms of the negotiations of January 24 and 26, 1996, went to the very heart of the agreement. IBP has stipulated that a 34% reduction in the sales price and waiver of the contingencies are material modifications to the agreement. By materially changing the purchase price and waiving the contingencies, there was a fundamental change in the agreement. In addition, the change in the percentage of the purchase price to be held in escrow was not inconsequential to FDL. Mr. Wahlert's statements to Mr. Peterson in the first conversation of January 26, 1996, make this clear, as does the testimony of FDL witnesses such as Charles Naylor, one of FDL's attorneys. Since the general escrow was set up as a percentage [*20] of the total purchase price, it was to be reduced from $ 1.5 million to $ 990,000. However, the other two escrows for the tax credit and worker's compensation would remain the same. As a result, the percentage of the total purchase price to be held in escrow increased from 19.8% to 24.9%. As Mr. Wahlert stated, having one-quarter of the purchase price held in escrow was considered a "double hit" to the FDL shareholders.

The significance of whether the December 12, 1995 agreement was terminated relates to the argument of IBP that FDL remained bound to the restrictions contained in such agreement, even after the telephone call of January 24, 1996, in which Mr. Peterson made the $ 9.9 million offer. [HN2] When a contract is terminated or rescinded neither party has any rights or duties under the contract. Recker v. Gustafson, 279 N.W.2d 744, 755 (Iowa 1979).

Immediately following the January 24, 1996, telephone call, Mr. Wahlert called various officers, directors, and shareholders of FDL to advise them of the new developments. A number of meetings were held at FDL offices the following morning, January 25, 1996. One of the first topics of discussion was whether FDL remained bound to the [*21] "no-shop" clause contained in the December 12, 1995 merger agreement. It was the consensus of the attorneys advising FDL that the discussions and proposal of January 24, 1996, constituted a termination of the agreement, as IBP was entitled to do under paragraph 8.4(b) of the December 12, 1995 agreement, and that FDL was therefore no longer bound by its obligations and covenants under that agreement.

As a result of the advise of counsel, Mr. Wahlert did not consider himself bound by the "no-shop" clause and accordingly contacted various parties to see if there was any interest in making a higher offer for FDL. The only party that expressed any interest was Farmland. Mr. George E. Grazier, President of Farmland, indicated that Farmland might have some renewed interest in FDL but felt it would be an uphill battle. Given the long approval process that Mr. Wahlert had previously experienced with Farmland and given the 48 hour deadline that had been imposed by IBP, Mr. Wahlert took Mr. Grazier's answer as a "no." Mr. Wahlert did not pursue the Farmland proposal any further, however, there were independent efforts being made by economic development officials with the City of Dubuque and [*22] State of Iowa which ultimately culminated in Farmland making an offer to FDL on February 4, 1996.

In conclusion, I find that it was the intent of IBP and FDL that the December 12, 1995 merger agreement be terminated as of January 24, 1996. Upon such termination, FDL was no longer bound by the December

12, 1995 agreement nor any of the restrictions contained therein. Consequently, once the December 12, 1995 agreement was terminated, the "no-shop" clause no longer operated to prohibit FDL from soliciting new proposals for the company. As such, the inquiries made by Mr. Wahlert to Farmland and other entities after the January 24, 1996 termination could not and did not constitute a breach of the December 12, 1995 agreement. Accordingly, any relief sought in Count 1 based upon a violation of the "no-shop" clause is denied.

## C. FORMATION OF NEW CONTRACT

The more difficult issue in this case is whether FDL is bound to a new oral contract which requires FDL to submit to its shareholders a written contract of merger containing the terms agreed upon in the telephone conversations between Mr. Peterson and Mr. Wahlert, or alternatively, whether the parties intended not to be bound to any **[*23]** agreement until the agreement had been reduced to writing, signed by all parties and submitted to FDL shareholders for their approval. Based upon the totality of the evidence, I conclude that it was the intent of the parties that FDL not be bound until the contract had been reduced to writing, signed by all interested parties and ratified by 100% of FDL's shareholders.

HN3 Under Iowa law, the enforceability of an alleged oral contract turns, in part, upon whether the parties intended to reduce the contract to writing. See Faught v. Budlong, 540 N.W.2d 33, 35-40 (Iowa 1995); Continental Labs, Inc. v. Scott Paper Co., 759 F. Supp. 538, 541-42 (S.D. Iowa 1990); Severson v. Elberon Elevator, Inc., 250 N.W.2d 417, 420-21 (Iowa 1977); and Elkader Coop. Co. v. Matt, 204 N.W.2d 873, 875 (Iowa 1973); See also Restatement (Second) of Contracts § 27 and comments. n3 In Severson, the Iowa Supreme Court stated the law as follows:

> When the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, an oral contract will be upheld *unless the parties intended not to be bound until the agreement was reduced to writing*.

**[*24]** Severson, 250 N.W.2d at 420 (emphasis added). The Severson court broke the analysis down into two separate elements: (1) whether the terms of the alleged oral contract could be established with reasonable certainty; and (2) whether the parties intended to be presently bound by such oral agreement, or rather intended not to be bound until such agreement was reduced to writing. Severson, 250 N.W.2d at 420. With respect to the latter element, the Severson court explained that "whether preliminary negotiations actually ripened into an oral contract depends on the intention of the parties as gleaned from the facts of the case." Severson, 250 N.W.2d at 420. "An oral contract may exist even though the parties intend to reduce it to writing at a later date." Severson, 250 N.W.2d at 421 (citing former version of Restatement (Second) Contracts § 27). However, "if either party intends not to be bound in the absence of a fully executed document, no amount of negotiation or oral agreement as to specific terms will result in the formation of a binding contract." Continental Labs., Inc., 759 F. Supp. at 540 (citing Severson, 250 N.W.2d at 420; Marti v. Ludeking, **[*25]** 193 Iowa 500, 185 N.W. 476, 477-78 (1921) and Restatement (Second) Contracts § 27 comment b (1981)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Comments a and b to § 27 of the Restatement (Second) of Contracts further explain this principle as follows:

> a. Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the

b. On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts § 27 (1981).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*26]**

In Severson, the Iowa Supreme Court set forth $^{HN4}$ a list of factors that a court should consider in its determination of whether the parties intended to be bound prior to execution of a written document:

[1] whether the contract is of a class usually found to be in writing, [2] whether it is of a type needing a formal writing for its full expression, [3] whether it has few or many details, [4] whether the amount is large or small, [5] whether the contract is common or unusual, [6] whether all details have been agreed upon or some remain unresolved, and [7] whether the negotiations show a writing was discussed or contemplated.

Id. (citing Emmons v. Ingebretson, 279 F. Supp. 558, 572 (N.D.Iowa 1968)). See Restatement (Second) of Contracts § 27 (1981) comment c (1981) (listing essentially the same factors as set forth in Severson); Continental Labs, Inc., 759 F. Supp. at 541-42 (employing the factors listed in Restatement § 27 comment c and Severson, and finding that based on such factors the defendant intended only to be bound by a written agreement signed by both parties); Faught, 540 N.W.2d at 35-40 (citing Restatement § 27 comment **[*27]** c, Continental Labs., Inc. and Severson, and finding that as a matter of law the parties never reached a binding oral agreement since the parties intended that no binding obligation would arise until both parties signed a written agreement); Bradley v. West Sioux Community School Board of Education, 510 N.W.2d 881, 884-85 (Iowa 1994) (considering factors listed in Severson).

In this case, IBP contends that through the conversations of Mr. Peterson and Mr. Wahlert the parties created an oral agreement on January 26, 1996 by which they intended to be presently bound irrespective of any subsequent writing or formal shareholder approval. According to IBP, a subsequent written contract was contemplated only as a memorial of the parties' binding oral agreement. In contrast, FDL argues that although it agreed to go forward with the preliminary paperwork, FDL never intended to be bound until the parties had fully executed a written agreement, signed by the proper parties and formally approved by all of FDL's shareholders. Furthermore, FDL contends that Mr. Wahlert specifically and clearly communicated this condition to a binding formal agreement to Mr. Peterson in their conversation **[*28]** on January 26, 1996. According to FDL, Mr. Peterson not only acknowledged formal shareholder approval as a condition to the formation of a binding merger agreement, but in fact took the further step of demanding 100% shareholder approval along with the return of the documents signed by all shareholders. In sum, FDL takes the position that submission of a written and signed agreement to FDL's shareholders and 100% shareholder approval were conditions precedent to the formation of a binding merger contract itself.

In applying Iowa law to the facts of this case, it is necessary to set forth some of the extensive background to the negotiations which culminated in the second telephone call of January 26, 1996. To start, a brief discussion of the corporate structure of FDL is appropriate. FDL is a corporation which is essentially controlled by the Wahlert Family. There are a limited number of shareholders. Robert H. Wahlert controls, either individually or as general partner of Sunset Limited Partnership, 78.6% of the voting shares of FDL, and 35.4% of the nonvoting shares. Robert Wahlert's brothers, David W. Wahlert and James R. Wahlert, do not own any voting shares, however, they **[*29]** control either individually or as custodians for minors, 18.9% of the non-voting stock.

The next largest shareholder, after Robert H. Wahlert, of voting shares is Dubuque Foods, Inc. ("Dubuque Foods"). Dubuque Foods, Inc., is a wholly owned subsidiary of Hormel. Dubuque Foods owns 2,431 shares of voting stock which is 12.9% of the total voting shares, and 42,419 shares of non-voting stock, which represents 27.9% of the non-voting shares. Thus, between Robert H. Wahlert and Dubuque Foods, Inc., the two entities control well in excess of 90% of the voting shares and over 50% of the non-voting stock. If the other members of the Wahlert Family are included in the non-voting share computation, the Wahlert Family and Dubuque Foods, Inc., control over 82% of the non-voting shares. The balance of the voting and non-voting stock is divided between seven other entities with Clarke College of Dubuque being the largest of the "small" shareholders.

By way of further background, a review of the history of the negotiations between IBP and FDL on the issue of the intent of the parties concerning a written contract shows the following relevant events. The initial agreement between IBP and FDL was **[*30]** a Letter of Intent dated September 26, 1995, signed by Robert L. Peterson for IBP and Robert H. Wahlert for FDL. That Letter of Intent set forth the outlines of a merger agreement and went on to state at paragraph 7:

> . . . this letter is not intended to constitute an agreement which will legally binding on either FDL or IBP. If FDL accepts this letter and the terms herein set forth, it is contemplated that IBP will prepare a draft of the Definitive Agreement for negotiation by the parties. Neither the expenditure of funds by FDL or IBP nor either's undertaking actions towards the negotiation and execution of the Definitive Agreement will be regarded as the partial performance of a binding agreement or entitle the party expending the funds or taking action to any right to assert claims for reimbursement or damages against the other party. This letter is written with the understanding that, except as otherwise provided in this Section 7, neither FDL nor IBP will be bound by any of its terms.

Letter of Intent, September 26, 1995. The next document was a "Conditional Agreement" dated November 15, 1995. That Agreement contained a "no-shop" clause similar to the one contained **[*31]** in the ultimate Definitive Agreement, as well as other provisions which were intended to lead up to the preparation and signing of a Definitive Agreement. The Conditional Agreement again contained a provision that conditioned the acquisition of FDL on the execution and delivery of a mutually agreed upon Definitive Agreement and approval of the Definitive Agreement by the Board of Directors and shareholders of FDL.

The Definitive Agreement is the agreement dated December 12, 1995, which has been referred to throughout this decision. That agreement is fully executed by authorized representatives of IBP and FDL and contains a number of sections and schedules. Included in the agreement packet is the notice to FDL's shareholders of the special meeting of the shareholders to be held on December 22, 1995, with notice of shareholders dissenters rights, the December 12, 1995 agreement itself, the Plan of Merger which is incorporated into the December 12, 1995 agreement, and various exhibits, including the escrow agreements. The December 12, 1995 agreement and Plan of Merger were approved by 100% of the shareholders of FDL at a special meeting on December 22, 1995.

As noted above, there were **[*32]** two extensions of the closing date for consummation of the merger. Each of the extensions were made pursuant to a written extension agreement signed by representatives of both IBP and FDL.

There are also a number of relevant conversations and events during the period from January 24, 1996 through February 4, 1996 which help to uncover the intent of the parties. Starting with the conversation of January 24, 1996, between Mr. Peterson and Mr. Wahlert in which the $ 9.9 million offer is made, there is no specific discussion as to whether any new agreement would have to be the subject of a written contract. The discussions do indicate that the deal being offered is basically the deal that is on the table subject only to the change in the purchase price and removal of contingencies.

The second telephone call of January 26, in which Mr. Wahlert indicated the parties should go forward with the deal, does contain significant statements concerning the parties intent as to the creation of a written contract. Immediately after Mr. Wahlert had made the statement that Nate (IBP's attorney) should get in touch with Chuck Naylor (FDL's attorney) to do the paperwork, Mr. Wahlert went on to explain **[*33]** to

Mr. Peterson that it was Mr. Naylor's opinion that the change was a significant change to what the stockholders had previously approved, and that it would be necessary to submit the agreement to the shareholders for their re-approval. Mr. Wahlert did opine that he did not anticipate any problems with the shareholders since they had approved the agreement previously, and that the shareholders whom he had been able to contact up to that point were supportive of going forward with the deal. The following exchange then occurred concerning the requirement to provide for dissenters' rights and the ultimate agreement of the parties that the transaction would be conditioned on getting 100% shareholder approval:

> RP: [Robert Peterson] Well, Bob assuming when you say that based on what you said this morning that, that, that, Hormel has done it, you are, you're a major stockholder . . .

> RW: [Robert Wahlert] Oh you got majority, you got 80% of the voting and all that without any but I mean we still have to you know so that they can, they have their dissenters' rights and all kind of crap.

> RP: Yea listen Bob for your benefit and mine I want a 100% so that, that there can't **[\*34]** be that.

> RW: Yea I know and that, and that was our, that's our agreement.

> RP: Yea okay.

> RW: I mean I have to, I still have to legally send out to all of them, ah, because it is a change.

> RP: Okay I'll agree to. I don't have any problem with that but they just, we want the documents back (emphases added) signed that they're agreeing so . . .

> RW: Absolutely. .

On Monday, January 29, 1996, FDL's attorneys prepared a "black-lined" document which was captioned "Restated and Amended Agreement and Plan of Merger." Essentially, this document took the initial December 12, 1995 agreement and Plan of Merger and made black-lined changes in an attempt to reflect the discussions between Mr. Wahlert and Mr. Peterson. The Restated and Amended Agreement and Plan of Merger, however, was not entirely consistent with the parties discussions. Although the Restated and Amended Agreement and Plan of Merger deleted the condition to closing which required negotiation of an acceptable CMA with Hormel, it did not delete (as discussed) the condition which gave IBP the right to terminate the Agreement if it did not come to an acceptable understanding with the various labor unions. **[\*35]** In addition, the Restated and Amended Agreement and Plan of Merger did not contain the requirement imposed by Mr. Peterson that 100% of FDL's shareholders approve the merger agreement.

The black-lined Restated and Amended Agreement and Plan of Merger was faxed to IBP around noon on Monday, January 29, 1996. Attorney Nate Hodney, in-house counsel for IBP, advised FDL's attorneys that he would review the agreement promptly, consult with IBP officials to make certain that it conformed to IBP's understanding of the new contract and get back to FDL promptly. There is a dispute as to whether Mr. Hodney agreed to get back to FDL within a day, which would mean by the end of the day on January 30, 1996. Mr. Hodney did not feel he was bound to any particular time frame but only to a prompt response since it was the intent of the parties to close the transaction as soon as possible. For the purposes of this decision, I will assume that Mr. Hodney did not agree to a specific time frame but did agree to a prompt response.

On January 30, 1996, Mr. Wahlert was contacted by Mr. Grazier of Farmland who asked two questions of Mr. Wahlert. Mr. Grazier first wanted to know if IBP and FDL had entered **[\*36]** into a written contract as of yet, to which Mr. Wahlert responded that they had not. Secondly, Mr. Grazier inquired about the status of certain buying stations owned by FDL. Mr. Wahlert answered Mr. Grazier's questions concerning the status of the buying stations. Mr. Grazier said nothing further about Farmland's interest in purchasing the company beyond those comments.

On the same day, that is January 30, 1996, Mr. Wahlert had a further conversation with Mr. Peterson in

which he again tried to get IBP to increase the purchase price for FDL. In that conversation (which was not taped) Mr. Wahlert tried to get IBP to agree to allow FDL to share in any profits or benefits which might be generated in the event that IBP was ultimately successful in negotiating a favorable CMA with Hormel. Mr. Wahlert continued to be concerned that FDL shareholders would sell the company "cheap" and that IBP would then enter into a very favorable agreement with Hormel and reap all the benefits of a new CMA. Since the original rationale for the reduction in the purchase price was the inability of IBP to negotiate an acceptable CMA, Mr. Wahlert was attempting to obtain some protection for the shareholders [*37] in the event those negotiations ultimately did lead to a profitable CMA for IBP. Mr. Peterson gave a noncommittal response to Mr. Wahlert's request.

It was during that conversation on January 30, 1996, that Mr. Wahlert received by facsimile transmission a copy of a letter addressed to Mr. Larry Shipley, Executive Vice-President, IBP, from Mr. Stan E. Kerber, Group Vice-President, Hormel Foods, in which Mr. Kerber made the following statement: "Mr. Bob Wahlert has informed us that IBP's revised offer for FDL's stock has been accepted by all FDL stockholders and that a closing is scheduled in the next couple weeks." The letter then went on to discuss various other matters concerning outstanding obligations owed by FDL to Hormel and the status of the CMA.

IBP considers this letter to be a particularly significant document in the series of events in this transaction. As indicated, the letter was received by Mr. Wahlert during the course of a telephonic conversation with Mr. Peterson. Mr. Wahlert read the letter to Mr. Peterson and discussed the portions of the letter dealing with FDL's obligation to Hormel and the status of the CMA. However, Mr. Wahlert did not discuss or take issue [*38] with the quoted paragraph in which Mr. Kerber indicated that all FDL stockholders had accepted the IBP revised offer and gave no indication to Mr. Peterson that Mr. Wahlert had less than 100% approval.

The depositions and trial testimony reveal, however, that several of the minority shareholders had indicated to Mr. Wahlert that they were supportive of his decision to go forward with the revised offer but they were reserving final judgment on the transaction until they saw the paperwork and could actually vote at a stockholder's meeting. At trial, the President of Clarke College testified that she did not have the authority to agree to the revised offer without first presenting any paperwork to the Finance Committee of her Board of Trustees. Likewise, the Principal of Wahlert High School, which owned a small amount of stock, indicated that he was similarly not in a position to commit his institution until the paperwork was received and he could review it with his Board and the Archbishop of Dubuque. Mr. Kerber testified in deposition that he had been advised by Mr. Wahlert that Mr. Wahlert had shareholder approval and assumed that meant there was 100% shareholder approval. n4

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Any statement by Mr. Wahlert that he had shareholder approval would be correct in the sense that the interests that he controlled, as well as the interest of Hormel, for which Mr. Kerber was the spokesman, constituted more than 90% of the voting stock and more than 50% of the non-voting stock.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*39]

FDL heard nothing further from IBP concerning the proposed agreement during the week of January 29, 1996. Mr. Hodney and Mr. Shipley of IBP testified that they had met on either Thursday or Friday of that week and had reviewed and approved the Revised and Amended Merger Agreement on behalf of IBP. Mr. Hodney attempted to call one of FDL's outside counsel, Dalius F. Vasys, at the Vedder Price firm in Chicago to discuss the proposed changes with him. This call was made in the early afternoon of Friday, February 2, 1996. Mr. Vasys was not available; Mr. Hodney left a voice mail message for Mr. Vasys to call Mr. Hodney to discuss the agreement. Mr. Vasys did not return Mr. Hodney's phone call prior to the decision being made to terminate further discussions with IBP.

During the week of January 29, 1996, there was significant activity between Farmland and the Economic Development Offices for the City of Dubuque and the State of Iowa. Initially, those efforts were not known to FDL, however, by January 30, 1996, FDL became aware of at least some of the economic development activity. Mr. Wahlert testified that he had discussions with David Lyons, and possibly other individuals, with the [*40] Iowa Economic Development Office. Mr. Wahlert essentially discouraged the efforts because of his prior experience with Farmland and his belief that Farmland would not be in a position to act quickly on

any economic development proposal which may be received from the State of Iowa or City of Dubuque.

Farmland did, however, make a proposal to FDL on February 2, 1996. On that date Mr. Grazier faxed a letter to Mr. Wahlert setting forth the basic terms and conditions of Farmland's proposed purchase of FDL. The FDL board held a special meeting on February 3, 1996, and decided that since FDL had received no response to the proposed Amended and Restated Merger Agreement which had been faxed to IBP on January 29, that FDL should pursue the Farmland proposal. The FDL Board authorized Mr. Wahlert to respond favorably to the Farmland proposal which culminated in the submission of a Letter of Agreement by Farmland dated February 4, 1996, and accepted by FDL on February 5, 1996. Although the Farmland agreement was not introduced into evidence, it is the court's understanding that the agreement does not contain a no-shop clause and Farmland was aware the FDL could solicit and consider other offers.  [*41]

On February 5, 1996, Mr. Wahlert sent a letter to Mr. Peterson indicating that since there had been no response to the draft of the new merger agreement sent to IBP on January 29, 1996, FDL did not consider itself bound to any merger agreement with IBP. Mr. Wahlert went on to state that FDL would be exploring other options but that it would be willing to entertain any new proposals from IBP; he did not advise Mr. Peterson that FDL had signed a new agreement with Farmland. Mr. Peterson responded the same day by indicating that he felt that FDL and Mr. Wahlert were both ethically and legally obligated to sell FDL to IBP for $ 9.9 million and that IBP was prepared to close by February 20, 1996. IBP did not become aware of the fact that FDL had entered into a new agreement with Farmland until news reports appeared in the news media on February 13, 1996, reporting the proposed sale and the involvement of the City of Dubuque in the transaction.

The court has outlined in some detail the background of the transaction in order to assess the factors set forth in the Severson case that are to be considered in determining whether the parties intended to be bound prior to the execution of [*42]  a written document. Severson, 250 N.W.2d at 421. The first factor under Severson is whether the contract is of a class usually found to be in writing. The type of contract involved in this case, that is, a merger agreement, must be in writing. HN5 The Iowa Business Corporation Act requires that any merger agreement be submitted in writing to the shareholders for their approval and that the shareholders be notified of and allowed to exercise their shareholder dissenters' rights. See Iowa Code §§ 490.1101-1103, 490.1302 and 490.1322 (1991). In addition, the contract must be in writing since many of the shareholders are not privy to any oral agreements which may be negotiated. Finally, in any merger situation there may very well be shareholders who have fiduciary obligations, such as, Clarke College and Wahlert High School in this case, in which corporate board approval must be obtained in order to vote for a merger or, in the case of a fiduciary such as a trustee or executor, court approval obtained to enter into this type of transaction.

The history of the dealings between the parties also shows that this is the type of contract which is usually found to be in writing. The [*43]  parties were very explicit in the initial Letter of Intent that neither side would be bound until there was a formal written merger agreement which had been approved by the shareholders of FDL in accordance with applicable law and the Bylaws and Articles of Incorporation of FDL. Likewise, each of the subsequent extensions of the closing date had been in writing signed by authorized representatives of each corporation.

The second factor under Severson is whether the agreement is of the type needing a formal writing for its full expression. Again, a merger agreement and plan of merger is clearly this type of document. In addition to the reasons stated above as to why merger agreements are of a class usually found to be in writing, merger agreements typically require numerous schedules and addenda to be attached to the agreement. In this case there is not only the basic agreement itself, but there are the escrow agreements and various schedules that go along with the merger agreement.

IBP takes the position that while a formal written agreement may normally be required that this case is unusual in that there was a formal agreement in place which had been ratified by 100% of the [*44]  shareholders and that the written agreement need only be modified to reflect the changes orally agreed to between Mr. Wahlert and Mr. Peterson. However, the draft of the Amended and Restated Merger Agreement and Plan of Merger illustrates the problems with such an argument. Two essential terms agreed to between the parties, that is, the waiver of the Labor Union condition and the 100% shareholder approval condition were not contained in the written draft of the Amended and Restated Merger Agreement and Plan of Merger as submitted to IBP. In short, the changes requested by IBP are much more significant than IBP would have the court believe.

The third factor under Severson is whether the details are many or few. Again, there are many details in a merger agreement which must be set out with some specificity. As discussed above, these include factors such as the escrow accounts, shareholder dissenters' rights, and other details required by both the terms of the business arrangement itself, as well as the Iowa Business Corporation Act and the Articles and Bylaws of the corporation.

The next factor in Severson is whether the amount in question is large or small. In this case, not **[*45]** only is the $ 9.9 million offer a large amount in itself, but the variance in price from the original agreement of $ 15 million -- namely a $ 5.1 million decrease -- is also of a significant size.

The sixth factor set forth in Severson is whether the contract is common or unusual. A merger agreement is clearly an unusual contract. There is a high degree of formality required by statute. See Iowa Code §§ 490.1101-1103, 490.1302 and 490.1322 (1991); Rath v. Rath Packing Co., 257 Iowa 1277, 136 N.W.2d 410, 415 (1965). In Rath, the Iowa Supreme Court explained that *HN6* "the power of a corporation to merge must be derived from the law of the state which created it." Rath, 136 N.W.2d at 415. At common law, mergers required unanimous consent of all of the stockholders. Id. Today, the Iowa Business Corporation Act authorizes mergers upon majority shareholder approval where such approval is received pursuant to the procedures outlined in the statute, including the provision of shareholder dissenters' rights. Id. "The right to merge is conditional. Failure to comply with the statute authorizing the transaction leaves the corporation without a common law or statutory **[*46]** right to merge absent consent of all shareholders." Shidler v. All American Life & Financial Corp., 775 F.2d 917, 925 (8th Cir. 1985) (citing Rath, 136 N.W.2d at 415). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Although both Rath and Shidler involved actions brought by minority shareholders seeking to enforce their statutory rights against their own corporations, in contrast with the present case involving a contract dispute between two corporations, the court finds that cases such as Rath and Shidler nonetheless speak to the general state of the law regarding statutory requirements for corporate mergers. The court recognizes that the purpose of such statutory requirements is to protect the rights of shareholders and that failure to comply with such statutory requirements is generally not grounds for invalidation of a merger at the insistence of persons other than shareholders, such as the corporation itself. See South Ottumwa Bancshares, Inc. v. First Interstate of Iowa, Inc., 484 N.W.2d 586, 588 (Iowa 1992). However, the court does not cite Rath and Shidler for the proposition that failure to comply with the Iowa Business Corporation Act invalidates the merger per se; rather, the court cites Rath and Shidler as support for the fact that corporate merger agreements are the type of agreements generally found to be in writing and are "unusual" in the sense that there are elaborate statutory requirements with which corporate merger agreements must generally comply.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*47]**

The Sixth factor set forth in Severson is whether all details have been agreed upon or some remain unresolved. IBP takes the position that all the details of the contract had been agreed upon and that nothing remained to be done except to execute the draft of the Amended and Restated Merger Agreement which had been prepared by FDL's attorneys. However, the subsequent course of discussion between the parties shows that the merger was still a work in progress during the week of January 29, 1996. Specifically, Mr. Wahlert was still attempting to negotiate a higher price as of January 30, 1996. Although Mr. Peterson did not acquiesce in that request, the fact that negotiations were ongoing is at least some indication that Mr. Wahlert felt that there was still some room for further refinement or change in the terms of the agreement.

I also find it curious that IBP did not respond favorably to the draft of the Amended and Restated Agreement prior to Mr. Peterson's letter of February 5, 1996. By the morning of February 5, 1996, when Mr. Wahlert sent the letter to Mr. Peterson terminating the discussions, IBP had the draft agreement for a full week. IBP was the one that imposed a 48 **[*48]** hour deadline on Mr. Wahlert to respond to its offer because of the urgency of closing this deal. Yet, IBP did not respond favorably in any fashion to the draft of the Amended and Restated Agreement as of a week after it had been submitted to IBP for its review. IBP

takes the position that when Mr. Hodney called Mr. Vasys on Friday, February 2, 1996, and left the voice mail message, that it was IBP's intent at that time to indicate its agreement with the draft contract. However, I find it curious that Mr. Hodney, rather than indicating in the voice mail message to Mr. Vasys that the draft agreement was acceptable, instead stated that he wanted to "discuss" the agreement with Mr. Vasys. Likewise, the parties frequently used facsimile transmission to indicate their position on any particular issue. It would seem that if IBP did find the draft agreement acceptable, that it need only have faxed a short letter to that effect to Mr. Vasys, and have Mr. Vasys remove the black line markings and submit the "clean copy" for signature by the parties. In short, I find that the delay in response by IBP warrants a finding that there were still details in the draft agreement which IBP felt needed **[\*49]** to be discussed and negotiated before the agreement could be signed by all parties.

The final, and possibly most significant, factor set forth in Severson is whether the negotiations show a writing was discussed or contemplated. The discussions between Mr. Wahlert and Mr. Peterson during the second conversation of January 26, 1996, clearly show that a writing was contemplated and discussed. Both parties knew that the agreement had to be formally resubmitted to the shareholders for their approval. Mr. Peterson insisted not only upon 100% shareholder approval, but also upon the fact that he get the documents back signed. It is clear that the parties anticipated that there would be a written document prepared which would set forth all the terms and conditions of the proposed merger between the corporations, and moreover that they would not be bound until such writing was drafted, signed by the proper parties and formally ratified by FDL's shareholders.

In summary, I find that the weight of the evidence clearly shows that it was the intent of the parties that neither party be bound until a written agreement was prepared, reviewed by the respective lawyers for each party, approved **[\*50]** by the Board of Directors of each party, signed by authorized representatives of each party and submitted to the shareholders of FDL for their approval. Just as expressed in the initial Letter of Intent, neither party would be bound to the transaction until the contract had been reduced to writing and fully ratified by both parties.

## D. ENVIRONMENTAL ISSUE

A new issue in this case surfaced shortly before trial. IBP became aware of an environmental study Farmland had conducted on the FDL property during the period leading up to the initial decision by Farmland not to go forward with the purchase of FDL. The study raised some concerns that played a part in Farmland's decision in September, 1995, not to go forward with the purchase.

IBP argues that FDL's failure to disclose the existence of this report to IBP during the due diligence phase of IBP's investigation is a violation of the December 12, 1995, agreement. FDL disputes any violation of its duty to disclose. Mr. Wahlert testified that he knew a report had been prepared and that Farmland had some concerns but neither he nor anyone else at FDL had seen the report. Mr. Wahlert did not feel any environmental concerns were of **[\*51]** a serious nature because the area of concern to Farmland was adjacent to property on which a new highway had recently been constructed and the Iowa Department of Transportation had done extensive testing and identified no environmental problems.

IBP indicates that it is reluctant to go forward with the purchase if the court finds there is a valid contract, until, it could do its own environmental testing. IBP asks for a minimum of two weeks to close in order to have an engineering firm go on the FDL property and conduct environmental tests of all areas. Since I have determined that the December 12, 1995, contract has been terminated and that there is no new contract, this is now a moot issue. For purposes of this phase of the litigation, I am making no determination as to whether FDL breached any duty to IBP during IBP's due diligence, conducted in connection with the December 12, 1995, contract and whether IBP suffered any damages as a result of any alleged breach.

## E. CONCLUSION AND APPEAL

In conclusion, IBP terminated and rescinded the contract of December 12, 1995, on January 24, 1996, and therefore there was no breach of that agreement when Robert H. Wahlert contacted **[\*52]** Farmland and other prospective purchasers of FDL on January 25 and 26, 1996. It is the further conclusion of the court that no new enforceable oral contract was created as the result of the negotiations and conversations of January 24-26, 1996, between Robert L. Peterson and Robert H. Wahlert. Consequently, the IBP's request for specific performance of the oral contract and request that the court enjoin FDL from selling any of its property to Farmland or the City of Dubuque must be denied.

Since this decision involves the denial of a request for injunctive relief, it would appear that the decision is immediately appealable. See, 18 U.S.C. § 1292(a)(1). To the extent, it is determined that this decision is interlocutory and not subject to an appeal of right, the court certifies that this decision involves a controlling question of law as to which there is substantial difference of opinion and an immediate appeal will materially advance the ultimate termination of the litigation. See, 18 U.S.C. § 1292(b). The reason the court makes this finding is because of the necessity of a timely resolution of this dispute so that the FDL facility can be promptly sold while there is still **[*53]** anything left to sell. I would also note that this court's decision on the issues of termination of the December 12, 1995, contract and creation of a new contract will likely resolve a number of the damage claims that still remain for trial.

## ORDER

It is therefore ordered that plaintiff's claim for relief in Count 1 of the amended and substituted complaint is denied. The request of plaintiff, IBP, inc. for specific performance and injunctive relief as against defendant, FDL Foods, Inc., and the intervenor, City of Dubuque, is denied.

Done and Ordered this 1st day of April, 1996.

Michael J. Melloy, Chief Judge

UNITED STATES DISTRICT COURT

Service: **Get by LEXSEE®**
Citation: **1996 us dist lexis 22318**
View: Full
Date/Time: Tuesday, January 17, 2006 - 5:47 PM EST

\* Signal Legend:

- Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis® | About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*1988 Tenn. App. LEXIS 671, \**

CHARLES H. **WRITZMANN,** Plaintiff/Appellant, v. PATRICIA G. **BAUST,** Defendant/Appellee

Court of Appeals of Tennessee, Middle Section

1988 Tenn. App. LEXIS 671

November 2, 1988, Filed

**PRIOR HISTORY:  [\*1]**

Smith Circuit, App. No. 87-217-II, APPEAL FROM THE CIRCUIT COURT FOR SMITH COUNTY, TENNESSEE AT CARTHAGE, THE HONORABLE BOBBY CAPERS, JUDGE

**DISPOSITION:** The judgment of the trial court, as modified by this opinion, is affirmed. The case is remanded for the entry of an appropriate order and for whatever other proceedings may be required. The costs of the appeal are taxed in equal proportions to Charles H. Writzmann and Patricia G. Baust and their sureties for which execution, if necessary, may issue.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff lessor leased a farm, with the right to purchase during the term of the lease, to defendant lessee. The lessor sold the farm after the lessee failed to exercise his purchase option. The lessee filed suit against the lessor to recover lease payments and lost profits. The Circuit Court for Smith County (Tennessee) awarded the lessee $ 2,732, representing the payments made in excess of those required by the lease. Both parties appealed.

**OVERVIEW:** The lease permitted either party to terminate the lease with 90 days written notice. The lease also gave the lessee the first option to purchase the farm at any time during the period of the lease. Additionally, the lessee executed a promissory note payable to the lessor's husband for $ 10,000 on or before the transfer of title of the farm. The lessor told the lessee that he had 90 days to exercise his option, he made some overpayments of rent, but did not purchase the farm. The lessee did not have a claim based on the lessor's failure to provide written notice of her intent to terminate the lease because the lessee was not prejudiced by the oral notice and had not requested the lessor comply with the written notice provision. As to the $ 10,000 note, the court held that because payment by the lessee was not due since the title to the farm was not being transferred to him, she could not claim any portion of his overpayment to overset that debt. And, since the parties were in agreement that the lessee's rent payments were current, the trial court had no basis to conclude that the lessee was three months delinquent. Accordingly, the lessee was entitled to the entire overpayment.

**OUTCOME:** The trial court's decision that the lessor could not credit $ 4,250 of the payments the lessee made after June 3, 1984 against the "promissory note" was affirmed. However, the trial court's decision to deduct $ 1,518 from the award to the lessee was reversed because the evidence did not support its finding that the lessee was three months behind in his rent. The lessee was, therefore, entitled to a judgment in the amount of $ 4,250.

**CORE TERMS:** lease, farm, notice, lessee, former husband, written notice, promissory note, ninety, option to purchase, monthly payments, terminate, rent, chose in action, transferred, assignee, transfer of title, conversation, delinquent, lessor, deed, buy, right to receive, lease agreement, receive notice, definite time, credibility, definite, property settlement, strict compliance, right to purchase

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

Civil Procedure > Appeals > Standards of Review > Standards Generally 

HN1⬇ It is the trial court's prerogative, not that of the appellate court, to evaluate the credibility of the witnesses. The appellate court accords great weight to findings of fact that resolve conflicts in the proof and that are based upon the trial court's view of the witnesses' credibility.  More Like This Headnote

Contracts Law > Performance > Discharges & Terminations 🔦

HN2⬇ Parties to a contract may agree upon the manner in which notices required by the contract should be given. If a contract requires that notice be given in a particular form, the parties have the right to expect that they will receive notice in the manner provided. However, strict compliance with contractual requirements or conditions may be waived by the party An whose favor they were made. The waiver need not be express to be effective. It is sufficient if a party's conduct evidences an intent to relieve the other of its duty to comply strictly with the contract. For example, remaining silent when one is expected to speak may later result in an estoppel. Generally, this type of implied waiver is recognized where a party accepts an alternate performance which provides roughly the same protection as strict performance would have provided. The purpose of requiring notice is to give a party forewarning of an event. Notice enables a party to be on guard to protect its interests. Written notice helps promote definite understandings between the parties and helps avoid controversies like the one involved in this case. In the absence of prejudice, the object of requiring notice is accomplished when the party entitled to receive notice has actual knowledge of the matter that would have been covered by the notice.  More Like This Headnote

Contracts Law > Types of Contracts > Negotiable Instruments 🔦

HN3⬇ A note is a written, unconditional promise, signed by the maker, to pay a definite sum of money at a definite time.  More Like This Headnote

Contracts Law > Types of Contracts

Contracts Law > Breach > Causes of Action 🔦

HN4⬇ Even though a document is not a note, it still may be enforceable as a chose in action because it evidences a right to receive or recover money or a debt.  More Like This Headnote

Contracts Law > Types of Contracts > Negotiable Instruments 🔦

HN5⬇ A party cannot recover on an obligation that is not yet due.  More Like This Headnote

Contracts Law > Types of Contracts > Lease Agreements 🔦

Contracts Law > Contract Interpretation > Interpretation Generally 🔦

HN6⬇ A lease should be construed using the general rules of contract construction. Thus, the intention of the parties should be gathered from the language of the lease agreement, and the language should be given its natural and ordinary meaning, not a strained or unnatural interpretation. The courts should refrain from construing leases in accordance with expectations that are not expressed in the contract. A lessee does not become a purchaser just because the lease agreement contains an option to purchase. The landlord-tenant relationship continues until the option is exercised. Thus, until the option is exercised, the lessee's payments are considered rent because they are for the use of the land.  More Like This Headnote

**COUNSEL:** For the Plaintiff/Appellant: Neal Agee, Jr., AGEE, BOND & HUNT, Lebanon, Tennessee

For the Defendant/Appellee: Jacky O. Bellar, Carthage, Tennessee

**JUDGES:** WILLIAM C. KOCH, JR., JUDGE; CONCURS: SAMUEL L. LEWIS, JUDGE, BEN H. CANTRELL, JUDGE

**OPINIONBY:** KOCH, JR.

**OPINION:** OPINION

WILLIAM C. KOCH, JR., JUDGE

This appeal involves the lease of a farm in which the les see was given the right to purchase the property during the term of the lease. The lessor sold the farm after the lessee failed to exercise his option within the allotted time. The lessee sued the lessor in the Circuit Court for Smith County, seeking to recover his lease payments and lost profits. The trial court heard the case without a jury and gave the lessee a $ 2,732 judgment, representing the payments made in excess of those required by the lease. Both parties take issue with the trial court's decision. We find that the lessee is entitled to the return of the payments made in excess of those required by the lease.

I.

Patricia G. Baust and her former husband met Charles H. Writzmann in the early 1970's **[*2]** while they were living in California. They became such good friends that on several occasions the Bausts assisted Mr. Writzmann with bail money when he got into trouble with the authorities. On one occasion, the Bausts were forced to forfeit a $ 10,000 bond when Mr. Writzmann failed to appear in court.

The Bausts left California in 1978 and moved to Smith County in 1981. In May, 1983, they purchased a 241-acre farm on Dean Hill Road in Difficult, Tennessee. Later in the month, they leased the farm to Mr. Writzmann for a five year term. The lease permitted either party to terminate the lease "with 90 days written notice to the other party" and required Mr. Writzmann to pay the Bausts $ 506.09 each month, as well as an additional $ 1,000 on January 1st of each year. It also provided:

The lessee shall have the first option to purchase the farm at any time during the period of this lease. He has a standing purchase price offer of $ 55,000 that he may accept at any time during the period of the lease. Should the lessor find another buyer who is willing to pay this purchase price or a greater price, they must notify the lessee in writing and he has 90 days in which to exercise his option **[*3]** and purchase the land or lose his option.

In a related transaction, Mr. Writzmann executed a promissory note" payable to Ms. Baust's husband on September 28, 1983, stating:

I, CHARLES WRITZMANN, agree to pay PETER BAUST an old debt n1 in the sum of Ten Thousand Dollars ($ 10,000.00) on or before the time of transfer of title deed for the farm in Smith County, Tennessee presently owned by Peter R. and Patricia Baust, which I am now leasing with an option to buy.

n1 The old debt apparently referred to the appearance bond the Bausts had forfeited in California when Mr. Writzmann failed to appear in court.

The Bausts separated in October or November, 1983 and were divorced in April, 1984. Mrs. Baust received the Smith County farm as part of the property settlement. She also obtained possession of Mr. Writzmann's note, even though it was not mentioned in the property settlement agreement. Mr. Baust did not endorse the note, but Mrs. Baust insists that she and her former husband considered the note to be part of the farm property.

Mr. Writzmann failed to make the $ 1,000 payment required on January 1, 1984 but continued to make the monthly payments required by the lease. On June 3, **[*4]** 1984, Mrs. Baust told Mr. Writzmann that she had decided to sell the farm because she needed the money and gave him ninety days within which to exercise his option to purchase the property.

Mr. Writzmann paid Mrs. Baust $ 1,000 in June, 1984. He paid her another $ 250 later in the month while she was visiting California. He made another $ 2,000 payment in July, 1984 and another $ 2,000 payment in September, 1984. Notwithstanding these payments, Mrs. Baust sold the farm in November, 1984 at public auction for $ 48,250.

Mr. Writzmann, who was residing in California, learned in December, 1984 that Mrs. Baust had sold the

farm. Insisting that the lease had not been terminated properly, Mr. Writzmann sued Mrs. Baust in November, 1985 seeking to recover all his lease payments and $ 20,000 in lost profits. The trial court found that $ 2,732 of the payments Mr. Writmann made after June, 1984 were not required for the lease and gave Mr. Writzmann a judgment accordingly.

II.

*Termination of the Lease*

*Mr. Writzmann takes issue with the trial court's determination that Mrs. Baust gave him effective notice of her intent to terminate the lease. He insists that he contracted for written notice* **[*5]** *and, therefore, that oral notice was not sufficient. We find that Mr. Writzmann waived the written notice requirement and is now estopped to insist upon strict compliance with this condition.*

A.

*The parties do not agree on the substance of their June 3, 1984 conversation concerning the sale of the farm. Mrs. Baust testified that she told Mr. Writzmann face to face that she needed to sell the farm and that she wanted him to buy it within ninety days. While conceding that he had a conversation with Mrs. Baust in June, 1984, Mr. Writzmann testified that Mrs. Baust told him only that "she would like to get the farm sold, have me buy it" because "her husband left and took all the money."*

HN1 *It is the trial court's prerogative, not ours, to evaluate the credibility of the witnesses. Weaver v. Nelms, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987); First Nat'l Bank of Shelbyville v. Mutual Benefit Life Ins. Co., 732 S.W.2d 278, 280 (Tenn. Ct. App. 1987); Royal Ins. Co. v. Alliance Ins. Co., 690 S.W.2d 541, 543 (Tenn. Ct. App. 1985). We accord great weight to findings of fact that resolve conflicts in the proof and that are based upon the trial court's view of the witnesses' credibility.* **[*6]** *McGann v. United Safari, Inc., 694 S.W.2d 332, 336 (Tenn. Ct. App. 1985); Brown v. Weik, 725 S.W.2d 938, 946 (Tenn. Ct. App. 1983).*

*We have reviewed the testimony of both Mr. Writzmann and Mrs. Baust in accordance with Tenn. R. App. P. 13(d). The proof does not preponderate against the trial court's finding that on June 3, 1984, Mrs. Baust told Mr. Writzmann that she intended to terminate the lease and that he would be required to exercise his option to purchase the property within ninety days.*

B.

HN2 *Parties to a contract may agree upon the manner in which notices required by the contract should be given. See 58 Am. Jur. 2d Notice § 24 (1971). If a contract requires that notice be given in a particular form, the parties have the right to expect that they will receive notice in the manner provided.*

*However, strict compliance with contractual requirements or conditions may be waived by the party An whose favor they were made. American Oil Co. v. Rasar, 203 Tenn. 37, 46, 308 S.W.2d 486, 490 (1957); Tennessee Adjustment Serv., Inc. v. Miller, 54 Tenn. App. 313, 325, 390 S.W.2d 696, 701 (1964); Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Pub. Co., 42 Tenn.* **[*7]** *App. 92, 102, 298 S.W.2d 788, 793 (1956). Thus, a party may waive its contractual right to receive written notice. Atkinson v. Orkin Exterminating Co., 5 Kan. App. 2d 739, 625 P.2d 505, 510, aff'd, 230 Kan. 277, 634 P.2d 1071 (1981); 3A A. Corbin, Corbin on Contracts § 759 (1960); see also 50 Am. Jur. 2d Landlord & Tenant § 1186 (1970).*

*The waiver need not be express to be effective. It is sufficient if a party's conduct evidences an intent to relieve the other of its duty to comply strictly with the contract. For example, remaining silent when one is expected to speak may later result in an estoppel. Lusk v. Consolidated Aluminum Corp., 655 S.W.2d 917, 920 (Tenn. 1983); Duke v. Hopper, 486 S.W.2d 744, 748 (Tenn. Ct. App. 1972). Generally, this type of implied waiver is recognized where a party accepts an alternate performance which provides roughly the same protection as strict performance would have provided. Little Beaver Enters. v. Humphreys Ry., 719 F.2d 75, 79 (4th Cir. 1983).*

*The purpose of requiring notice is to give a party forewarning of an event. Gray v. American Express Co., 743 F.2d 10, 17 (D.C. Cir. 1984). Notice enables a party to* **[*8]** *be on guard to protect its interests. Philbrook v. Berry, 679 S.W.2d 651, 652-53 (Tex. Ct. App. 1984); Land Constr. & Plumbing Co. v. Green, 451 P.2d 947, 951 (Okla. 1969). Written notice helps promote definite understandings between the parties*

and helps avoid controversies like the one involved in this case. *Bannon v. Jackson, 121 Tenn. 381, 391, 117 S.W. 504, 506 (1908).*

In the absence of prejudice, the object of requiring notice is accomplished when the party entitled to receive notice has actual knowledge of the matter that would have been covered by the notice. *Brownson v. Lewis, 233 Or. 152, 377 P.2d 327, 330 (1962); E. Carl Schiewe, Inc. v. Brady, 46 Or. App. 441, 611 P.2d 1184, 1188 (1980); Hotel Claridge Co. v. Blank, 169 Tenn. 575, 578, 89 S.W.2d 758, 759 (1936);* see also 2 J. Pomeroy, A Treatise on Equity Jurisprudence § 592, at 606-07 (5th ed. 1941).

Mr. Writzmann's actions following his June 3, 1984 conversation with Mrs. Baust are consistent with the conclusion that he knew he had ninety days within which to exercise his option to buy the property. He and Mrs. Baust discussed assuming the existing mortgage loan and paying her the value **[*9]** of the equity in the property in lieu of a straight sale. He discussed assuming Mrs. Baust's mortgage loan with the bank. He also agreed to begin making payments for Mrs. Baust's equity and, in fact, made several payments between June and September.

There is no proof that Mr. Writzmann requested Mrs. Baust to comply with the lease's written notice requirements after she told him she intended to sell the farm. He has never claimed that he was prejudiced because Mrs. Baust gave him oral notice instead of written notice. Relying on Mr. Writzmann's silence, Mrs. Baust proceeded to sell the farm after it became evident to her that Mr. Writzmann would be unable to purchase it within the time allotted. Under these circumstances, Mr. Writzmann has no claim based on Mrs. Baust's failure to give him written notice of her intent to terminate the lease.

III.

The Award for Excess Payments

The trial court also found that $ 4,250 of the $ 5,250 Mr. Writzmann paid Mrs. Baust after June 3, 1984 was not required by the lease. n2 After deducting $ 1,518, which represented three months of delinquent lease payments, the trial court ordered Mrs. Baust to return $ 2,732 to Mr. Writzmann. Mrs. Baust **[*10]** takes issue with this decision, stating that she should be permitted to keep the entire $ 4,250 as a credit against another indebtedness. Mr. Writzmann also disputes the decision on the ground that there is no proof to support the trial court's finding that he was delinquent in his rent payments.

n2 Apparently, the trial court accredited Mr. Writzmann's testimony that the remaining $ 1,000 was the late payment of the annual lease payment that had been due on January 1, 1984. Even though Mrs. Baust had another explanation for the payment, we are in no position to find that the evidence does not support the trial court's conclusion.

A.

Mrs. Baust insists that Mr. Writzmann owed her former husband $ 10,000 as evidenced by a "promissory note" dated September 28, 1983. She claims that she received the note as part of the property settlement, even though it was not mentioned in the divorce decree. Mrs. Baust has the note in her possession, but it has not been endorsed by her former husband.

Mrs. Baust did not mention the note in her pleadings. However, her presentation at trial centered around her contention that the note entitled her to keep all the funds Mr. Writzmann paid her after **[*11]** June 3, 1984. Mr. Writzmann did not object to Mrs. Baust's interjection of this issue into the trial, and thus we conclude that it was tried by consent. At the conclusion of the proof, the trial court found that it did "not have sufficient proof in front of it to show that she is entitled to these payments because there is a promissory note made to her former husband in this amount."

The trial court found that Mrs. Baust had not proved that the note entitled her to the additional funds Mr. Writzmann paid her after June 3, 1984. While this conclusion may be correct, there are two additional reasons why Mrs. Baust's theory cannot succeed. First, the document Mr. Writzmann signed is not a promissory note. Second, the obligation described in the document has not matured.

**HN3** A note is "a written, unconditional promise, signed by the maker, to pay a definite sum of money at a definite time. *Grissom v. Commercial Nat'l Bank, 87 Tenn. 350, 364, 10 S.W. 774, 779 (1889); McDowell, McGaughey & Co. v. Keller, 44 Tenn. (4 Cold.) 258, 261 (1867); Tenn. Code Ann. § 47-3-104(1) (1979).* The document signed by Mr. Writzmann provides only that payment must be made "on or before the time of transfer  **[*12]**  of title deed for the farm." When the note was signed, it was not certain when or if the title to the farm would ever be transferred. The document does not require payment at a definite time and, therefore, should not be viewed as a promissory note. *First Nat'l Bank v. Russell, 124 Tenn. 618, 625, 139 S.W. 734, 735 (1911); Calfo v. D. C. Stewart Co., 717 P.2d 697, 700 (Utah 1986); Tenn. Code Ann. § 47-3-109 (1979); see also 2 F. Hart & W. Willier, Commercial Paper Under the Uniform Commercial Code § 2.13[3] (1988); 4 W. Hawkland & L. Lawrence, Uniform Commercial Code Series § 3-109:02 (1984).*

**HN4** Even though the document is not a note, it still may be enforceable as a chose in action because it evidences a right to receive or recover money or a debt. *Moran v. Adkerson, 168 Tenn. 372, 376, 79 S.W.2d 44, 45 (1935).* Being a chose in action, it is assignable. *Johnson v. Donohue, 113 Tenn. 446, 450-51, 83 S.W. 360, 361-62 (1904); Ford v. Robertson, 739 S.W.2d 3, 5 (Tenn. Ct. App. 1987); Union & Planters Bank & Trust Co. v. Linden St. Christian Church, 3 Tenn. App. 540, 548 (1926).* Thus, Mrs. Baust could enforce her former husband's right to payment from  **[*13]**  Mr. Writzmann, as long as she proves that she is the assignee of the chose in action.

Other than Mrs. Baust's testimony, there is no proof that Mrs. Baust's former husband transferred his right to collect $ 10,000 from Mr. Writzmann. The Bausts' divorce decree does not mention the debt or the note. Mr. Baust did not endorse the instrument. Neither Mr. Baust nor Mrs. Baust notified Mr. Writzmann that the right to collect the debt had been assigned to Mrs. Baust. n3 There is no other independent evidence from Mr. Baust that he intended to assign his expectation of payment to Mrs. Baust. Like the trial court, we find that Mrs. Baust's unsubstantiated testimony is not sufficient to prove that she is the assignee of her former husband's right to receive payment from Mr. Writzmann.

n3 *Until notice is given, the debtor may continue to regard the assignor as the owner of the thing assigned. See 6A C.J.S. Assignments § 64a (1975); see also Naill & Naill v. Blackwell, 164 Tenn. 615, 618, 51 S.W.2d 835, 836 (1932); Union Lifestock Yards, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, 552 S.W.2d 392, 396-97 (Tenn. Ct. App. 1976).*

Even if Mrs. Writzmann were an assignee, she  **[*14]**  cannot base her claim to the $ 4,250 on Mr. Writzmann's agreement with her former husband. By its own terms, Mr. Writzmann was not required to perform until "the time of transfer of title deed for the farm." At the time of trial, payment by Mr. Writzmann was not yet due because the title to the farm was not being transferred to him. **HN5** A party cannot recover on an obligation that is not yet due. *See Russellville Bank & Trust Co. v. McGhee, 16 Tenn. App. 460, 476, 65 S.W.2d 202, 210 (1932).*

B.

Mr. Writzmann insists that the evidence does not support the trial court's finding that he had not made three monthly payments while the lease was still in effect. We agree. After reviewing the record as required by Tenn. R. App. P. 13(d), we find that the evidence preponderates against the trial court's finding.

Mr. Writzmann insisted that he made all the monthly payments required by the lease. While Mrs. Baust's testimony is far from consistent, she conceded that Mr. Writzmann made all required monthly payments through September, 1984 and that she returned his October, 1984 payment because the lease and his right to purchase the farm expired at the end of September, 1984. There is no evidence  **[*15]**  concerning Mr. Writzmann's connection with the farm after September, 1984; however, it is clear that Mrs. Baust considered the lease to be terminated. Since the parties are in agreement that Mr. Writzmann's lease payments were current through September, 1984, the trial court had no basis to conclude that Mr. Writzmann was three months delinquent.

C.

Mr. Writzmann continues to insist that he contracted to buy the Bausts' farm and that all his payments should be returned because Mrs. Baust sold the farm to another. This argument is without merit.

*HN6* *A lease should be construed using the general rules of contract construction. Thus, the intention of the parties should be gathered from the language of the lease agreement, First Am. Nat'l Bank v. Chicken Sys. of Am., Inc., 510 S.W.2d 906, 908 (Tenn. 1974), and the language should be given its natural and ordinary meaning, not a strained or unnatural interpretation. Evco Corp. v. Ross, 528 S.W.2d 20, 23 (Tenn. 1975). The courts should refrain from construing leases in accordance with expectations that are not expressed in the contract. National Garage Co. v. George H. McFadden & Bro., Inc., 542 S.W.2d 371, 373 (Tenn. Ct. App. [\*16] 1975).*

A lessee does not become a purchaser just because the lease agreement contains an option to purchase. See 49 Am. Jur. 2d Landlord & Tenant § 372 (1970). The landlord-tenant relationship continues until the option is exercised. Thus, until the option is exercised, the lessee's payments are considered rent because they are for the use of the land. See Performance Sys. v. First Am. Nat'l Bank, 554 S.W.2d 616, 618 (Tenn. 1977); Gibbs v. Ross, 39 Tenn. (2 Head) 437, 440 (1859).

No dispute exists that Mr. Writzmann had the use and enjoyment of the farm from June, 1983 through September, 1984 or that he did not exercise his option to purchase within ninety days after Mrs. Baust requested him to do so. He received rental profits from the corn and tobacco raised on the farm during this time. Therefore, the monthly payments he made during this period should be regarded as rent, not payments toward the purchase of the farm.

IV.

The trial court's decision that Mrs. Baust could not credit $ 4,250 of the payments Mr. Writzmann made after June 3, 1984 against the "promissory note" is affirmed. However, the trial court's decision to deduct $ 1,518 from the award to Mr. Writzmann [\*17] is reversed because the evidence does not support its finding that Mr. Writzmann was three months behind in his rent. Mr. Writzmann is, therefore, entitled to a judgment in the amount of $ 4,250.

Source:    Legal > / . . . / > **Federal & State Cases, Combined** ⓘ
Terms:    **name(writzmann and baust)** (Edit Search | Suggest Terms for My Search)
View:    Full
Date/Time: Tuesday, January 17, 2006 - 5:49 PM EST

 LexisNexis® | About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 1:05-cv-10214-JLT     Document 38-5     Filed 01/17/2006     Page 8 of 12

*1994 U.S. App. LEXIS 35228, **

WILLIAM L. BERRY; ROBERT R. WEBB, JR., Plaintiffs-Appellants, v. CARNACO TRANSPORT, INC., a foreign corporation, and TRANSCORP LEASING, INC., a foreign corporation, Defendants-Appellees. WILLIAM L. BERRY; ROBERT R. WEBB, JR., Plaintiffs-Appellants, v. CARNACO TRANSPORT, INC., a foreign corporation, and TRANSCORP LEASING, INC., a foreign corporation, Defendants-Appellees.

No. 92-36844, No. 93-35301

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

1994 U.S. App. LEXIS 35228

May 3, 1994, Argued and Submitted, Portland, Oregon
December 13, 1994, FILED

**NOTICE: [*1]** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION AND MAY NOT BE CITED TO OR BY THE COURTS OF THIS CIRCUIT EXCEPT AS PROVIDED BY THE 9TH CIR. R. 36-3.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 43 F.3d 1478, 1994 U.S. App. LEXIS 39909.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Oregon. D.C. No. CV 90-540-JU, D.C. No. CV 90-00540-JU. Helen J. Frye, District Judge, Presiding.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant employees sought review of a judgment from the United States District Court for the District of Oregon, which dismissed certain claims made by appellants and granted summary judgment on the remaining claims in favor of appellees, employer and lessor, in appellants' action that was brought after appellee employer allegedly terminated appellants without adhering to the termination provisions in an employment agreement.

**OVERVIEW:** Appellant employees were terminated by oral notification, and shortly thereafter, appellants received written notifications of termination. Consequently, appellants were required to relinquish possession of trucks leased from appellee lessor. Thereafter, appellants brought an action against appellees, employer and lessor, and the district court dismissed certain claims made by appellants and granted summary judgment on the remaining claims in favor of appellees. Appellants sought review, and the court affirmed, finding that even thought there had been an employment agreement providing for written notification of termination, such a fact had not precluded termination by oral notification. The court found that when oral notification was received, appellants clearly understood that they were terminated, just as if written notification had been given. Furthermore, the court found that appellee employer's driver contracts and appellee lessor's finance contracts had not been unlawful investment contracts under the Oregon Securities Act because the provisions of the contracts had made clear that appellants had not been under the management and control of others.

**OUTCOME:** The court affirmed a judgment dismissing certain claims made by appellant employees and granting summary judgment on the remaining claims in favor of appellees, employer and lessor, because notwithstanding an agreement that termination be in writing, appellants' oral termination had been proper and because appellee employer's driver contracts and appellee lessor's finance contracts had not violated the Oregon Securities Act.

**CORE TERMS:** termination, notice, summary judgment, written notice, oral notice, notification, contractor, recommended, terminated, terminate, recommendation, tractor, leased, notice of default, breach of contract, common enterprise, secured party, actual notice, postage prepaid, certified mail, confirmation, registered

**LexisNexis(R) Headnotes** ◆ Hide Headnotes

Labor & Employment Law > Wrongful Termination > Breach of Contract 🔒

HN1 ⚡ In Oregon, if there is an agreement that a termination be in writing, that fact does not preclude a termination by oral notice. Where there is actual notice, courts will not be hypertechnical in the interpretation of notice provisions.  More Like This Headnote

Contracts Law > Performance > Discharges & Terminations 🔒

HN2 ⚡ When a contract contains a provision that it may only be terminated by a notice in writing, the notice of termination, if oral, must be unequivocal and must be proved by clear and convincing evidence.  More Like This Headnote

Securities Law > Blue Sky Laws > Stocks & Investment Contracts 🔒

HN3 ⚡ In defining an investment security, Oregon requires: (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profit, (4) to be made through the management and control of others.  More Like This Headnote

Civil Procedure > Costs & Attorney Fees > Attorney Fees 🔒

Civil Procedure > Appeals > Frivolous Appeals 🔒

HN4 ⚡ The court will decline to award fees for a frivolous appeal pursuant to Fed. R. App. P. 38.  More Like This Headnote

**JUDGES:** Before: ALARCON, NORRIS, and LEAVY, Circuit Judges.

**OPINION:** MEMORANDUM *

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The appellants truckers William L. Berry and Robert R. Webb, Jr., who were terminated by Carnaco Transport, Inc. ("Carnaco") and thereafter required to relinquish possession of the trucks they leased from Transcorp Leasing Corporation, appeal the district court's dismissal under Federal Rule of Civil Procedure 12 (b)(6) of certain of their claims and grant of summary judgment of the remaining claims in favor of the appellees in this diversity case, No. 92-36844.

In their first amended complaint, **[\*2]** Berry and Carnaco alleged nine claims: (1) breach of contract against Transcorp; (2) breach of contract against Carnaco; (3) conversion against Carnaco and Transcorp; (4) unjust enrichment against Carnaco and Transcorp; (5) violations of statutory rights under the Oregon Uniform Commercial Code, ORS 79.5010 to 79.5060; (6) wrongful discharge against Carnaco; (7) breach of the covenant of good faith and fair dealing against Carnaco and Transcorp; (8) violation of the Oregon securities laws, ORS 59.010 et seq., and (9) conspiracy against Carnaco and Transcorp. Carnaco and Transcorp moved to dismiss claims six through nine for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The magistrate judge recommended dismissal, and the district court adopted the magistrate judge's findings and recommendations.

Transcorp moved for summary judgment on Berry and Webb's remaining claims, claims one through five. Carnaco joined the motion. Berry and Webb also moved for summary judgment. The magistrate judge recommended that summary judgment be granted in favor of Transcorp and Carnaco, with the exception of

Webb's claim (claim five) under the Oregon UCC that Transcorp **[*3]** failed to provide Webb with proper notice under <u>Idaho Code § 28-9-504(3)</u> (<u>ORS 79.5040(3)</u>) of the disposition of the tractor Webb had leased. n1 The magistrate judge recommended that Webb be granted summary judgment against Transcorp on that claim, finding that Transcorp had failed to give notice of the sale. The district court adopted the findings and recommendations of the magistrate judge.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 <u>Idaho Code § 28-9-504(3)</u> and <u>ORS 79.5040(3)</u> are practically identical statutes that provide in relevant part that a secured party after default may dispose of collateral provided that reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor[.]"

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

After these proceedings, the only matter left for trial was Webb's claim under the Oregon UCC that his tractor had not been sold, as required, in a commercially reasonable manner. <u>Idaho Code § 28-9-507(2)</u>; <u>ORS 79.5070(2)</u>. **[*4]** Transcorp moved for summary judgment on that issue. Webb failed to respond to the motion. The magistrate judge recommended that the motion be granted. The district court adopted the recommendation.

A judgment was entered on October 9, 1992, dismissing the action. Berry and Webb appeal from that judgment. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Webb does not appeal the issue regarding the commercial reasonableness of the sale of the tractor he leased.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The main issue on which most of the claims depend is whether P 2 of the Carnaco Contract, containing the termination provisions, must be followed to the letter. n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Paragraph 2 of the Carnaco Contract states:

> TERM. The term of this Agreement shall commence on the 1 day of January, 1988, and shall continue in effect until this Agreement is terminated as set forth herein. Either party may terminate this Agreement, with or without cause, at any time after the effective date hereof by mailing to the other party by registered or certified mail, postage prepaid, or delivering to the other party at the address listed in Paragraph 13 below, a written notice of termination of this Agreement; termination of the Agreement shall be effective on the date of receipt of said written notice, or at such later date as may be specified in said written notice. Additionally, Carnaco may terminate this Agreement immediately by oral notice followed by written confirmation thereof sent to Contractor by registered or certified mail, postage prepaid, in the event Contractor breaches this Agreement or violates any law or regulation governing operations performed under this Agreement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In Oregon, if there is an agreement that a termination be in writing, that fact does not preclude a termination by oral notice. See Oregon Portland Cement Co. v. E.I. Du Pont de Nemours & Co., 118 F. Supp. 603, 607 (D. Or. 1953) (termination of contract); see also Bailey v. Universal Underwriters Ins. Co., 258 Ore. 201, 216, 474 P.2d 746 (1970) (where there was actual notice, the fact that the notice did not comply with the contract is "wholly immaterial"); accord Terminal Transfer, Inc. v. Truck Ins. Exchange, 821 F. Supp. 1398, 1399 (D. Or. 1993); Lusch v. Aetna Cas. & Surety Co., 272 Ore. 593, 599, 538 P.2d 902 (1975); Halsey v. Fireman's Fund Ins. Co., 68 Ore. App. 349, 352-53, 681 P.2d 168, rev. denied, 297 Ore. 601, 687 P.2d 795 (1984). The idea these cases espouse is that where there is actual notice, courts will not be hypertechnical in their interpretation of notice provisions.

Thus, there are three acceptable notices for the terminations **[*6]** at issue here: (1) oral notice of termination for cause, followed by written confirmation; (2) oral notice of termination in place of written notice of termination, and (3) written termination. Berry and Webb were provided with both (2) and (3). The fact that written notices, which specified no reasons for termination, were sent to the appellants shortly after they received oral notification demonstrates that the appellees intended to terminate at will. n4 There is only one proviso:

> HN2⤒
> When a contract contains a provision that it may only be terminated by a notice in writing, the notice of termination, if oral, must be unequivocal and must be proved by clear and convincing evidence.

Oregon Portland Cement, 118 F. Supp. at 607; see also Ring Bros. Co. v. Martin Bros. Container & Timber Products Corp., 438 F.2d 420, 422 (9th Cir. 1971) (Oregon law). There is no genuine issue of material fact regarding the oral terminations of Webb and Berry: both testified at deposition that they clearly understood they were terminated when they received oral notification, just as if they had been given written notification.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Both Carnaco's written notice of termination and Transcorp's notice of default followed immediately after the oral terminations: Berry received oral notice on May 12, 1988; Carnaco's written notice was dated May 12, 1988 and received May 20, 1988; Transport's notice of default is dated May 12, 1988. Webb's oral notice was on April 6, 1989; Carnaco mailed its notice on April 7 (although Webb says he "doesn't remember" receiving it); and Transport's notice of default is dated April 7, 1989. These dates are consistent with an intention to terminate under the at-will clause.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*7]**

The appellants' eighth claim for relief alleged that the Carnaco driver contracts and Transcorp finance contracts were investment contracts, and that Carnaco and Transcorp had violated the Oregon Securities Act. The Oregon courts modify the test set out in Securities Exchange Comm'n v. W.J. Howey Co., 328 U.S. 293, 299, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946) to define an investment security. Pratt v. Kross, 276 Ore. 483, 497, 555 P.2d 765 (1976) (en banc). n5 HN3⤒Oregon requires: (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) to be made through the management and control of others. Id. The district court did not err in adopting the finding of the magistrate judge that there were no investment contracts. The provisions of the contracts make clear that the appellants were not under the management and control of others. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 For purposes of the federal Securities Act, an investment contract means "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." <u>Securities Exchange Comm'n v. W.J. Howey Co., 328 U.S. 293, 299, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946).</u> **[*8]**

n6 Paragraph 5 of the Carnaco Operating Agreements provides: "The relationship of Contractor to Carnaco shall at all times be that of independent contractors . . . . Contractor shall be free, in its sole discretion, to determine the means and methods of the performance of all transportation services undertaken by it hereunder[.]"

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The appeal numbered 93-35301 relates only to attorneys' fees. An amended judgment filed March 18, 1993, awarded $ 20,000 in attorneys' fees and $ 1,006.50 in costs to Carnaco and $ 18,047.00 in attorneys' fees and $ 203.00 in costs to Transcorp Leasing Co., Inc. See Civil No. 90-540-JU, docket no. 195 (filed March 26, 1993). Since we affirm the district court on the merits, we also affirm the award of attorneys' fees and costs to Carnaco and Transcorp.

*HN4* We decline to award fees for a frivolous appeal pursuant to <u>Federal Rule of Appellate Procedure 38</u>. Carnaco and Transcorp have given notice that they will seek contractual attorneys' fees on appeal. We allow those fees and remand to the district court for a determination of the proper amount.

AFFIRMED. REMANDED for **[*9]** a determination of the amount of attorneys' fees on appeal.

Service: **Get by LEXSEE®**
Citation: **1994 us app lexis 35228**
View: Full
Date/Time: Tuesday, January 17, 2006 - 5:49 PM EST

\* Signal Legend:
 - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
ⓘ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

🌐 LexisNexis®  <u>About LexisNexis</u>  <u>Terms & Conditions</u>
<u>Copyright ©</u> 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*1983 U.S. Dist. LEXIS 14491, \*; 99 Lab. Cas. (CCH) P10,622*

Bernie McCain, Plaintiff v. National Broadcasting Company, Defendant.

No. 83-1490.

United States District Court for the District of Columbia.

1983 U.S. Dist. LEXIS 14491; 99 Lab. Cas. (CCH) P10,622

August 18, 1983

**CORE TERMS:** arbitrator, termination, written notice, cycle, oral notice, arbitrator exceeded, contract provision, motion to vacate, effective date, thirteen-week, arbitration, terminate, salary, vacate

**OPINIONBY: [\*1]**

FLANNERY

**OPINION:** FLANNERY, D.J.: This matter comes before the court on plaintiff's motion to vacate an arbitrator's award. Plaintiff, Bernie McCain, requests this court to vacate the March, 1983 arbitrator's decision rejecting plaintiff's claims for damages arising out of an alleged breach of his employment contract. For the reasons set forth below, plaintiff's motion is denied.

Background

In early 1982, plaintiff began work as a talk show host on WRC-AM radio, an AM radio station in Washington, D.C. owned and operated by the National Broadcasting Company (NBC). Plaintiff began work under a two-year personal services contract. The term of the contract was divided into eight thirteen-week cycles. In accordance with P3 of the contract, either party was entitled to terminate the contract prior to the end of its term. That paragraph is at the center of this contract dispute and provides

The effective date of this agreement is February 1, 1982. The term shall commence on the effective date and shall continue for One Hundred and Four (104) consecutive weeks. The term shall be divided into eight (8) thirteen (13) week cycles. Either party may at any time during the term cancel **[\*2]** this agreement as of the end of any cycle upon not less than 28 days written notice prior to the end of any cycle.

On September 13, 1982, the Director of Operations of WRC-AM orally informed McCain that NBC chose to exercise its option to terminate the contract. Plaintiff rendered no services to WRC following his oral notice of termination. n1 Shortly thereafter, WRC tendered to plaintiff his salary for the remaining seven weeks of the current cycle (September 13, 1982 through October 29, 1982) and pro-rated severance pay. On October 22, 1982, plaintiff received a written confirmation of his September 13, 1982 termination.

n1 Plaintiff testified at the arbitration proceeding, and stated that he was not surprised by WRC's action, expected it, and had begun to look for another job. Arbitrator's Decision, at 7.

Plaintiff argues that NBC violated P3 of the contract when it gave him oral notice of termination rather than written notice, and that notice was not effective until written notice was given in October. Accordingly, plaintiff argues that NBC must pay him through the next successive thirteen-week cycle (ending January 29, 1984).

The agreement under which plaintiff **[\*3]** was employed contains an arbitration clause providing for mandatory submission of contract disputes to arbitration. McCain submitted his grievance to arbitration, and following a hearing, the arbitrator issued a decision denying McCain's claim. The arbitrator's decision found that WRC failed, in a technical sense, to adhere to the written notice provision of the contract when it terminated plaintiff's services on September 13. However, the arbitrator found that oral termination of the

contract satisfies the purpose and intent of the termination provision. Oral termination, according to the arbitrator, provided the discharged employee with actual and timely notice of his termination. Additionally, the arbitrator found that failure to give effect to the oral termination would give the employer greater rights than he would have had if written notice had been given. Therefore, the arbitrator denied McCain's request for additional salary and perquisites.

Discussion

A court may vacate an arbitration award only if the arbitrator exceeded his powers in making the award. See United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564 (1960) United Steelworkers of [*4] America v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960). Plaintiff agrees that this court must apply a deferential standard of review to the arbitrator's decision, but argues that this case represents an abuse of authority on the part of the arbitrator. Plaintiff asks this court to vacate the award because

the arbitrator exceeded his authority by going beyond the stated issue to render an opinion as to whether or not the provision [of P3 of the Contract] was a valid contractual provision, notwithstanding the fact that it was agreed to during arms length negotiation and its validity is not in dispute.

Plaintiff's Mem. at 2. Plaintiff appears to argue that the arbitrator's authority is limited to reading and applying the express language of the contract, determining whether the parties complied with that language in all respects, and awarding damages for any breach. Plaintiff argues that the arbitrator may not interpret the contract provision, or determine whether the mutual intent of the parties in drafting the provision had been realized.

This court is aware of no authority for the [*5] proposition that an arbitrator must apply the express terms of a contract provision, however, unjust or unreasonable the result. Rather an arbitrator must read and apply contract provisions in light of reason, and the evident purpose underlying such provisions. The court finds that the arbitrator's interpretation of the essence of the termination clause was well within its authority, and is consistent with general principles of contract law. The arbitrator quite accurately concluded that the written notice provision was intended to ensure that the parties would be appraised of termination of the contract. Since this purpose was served through unequivocal oral notice of termination, the arbitrator concluded that written notice was necessary and superfluous. The arbitrator could "discern no prejudice to the claimant by reason of not having been given a written notice of termination." Arbitrator's Decision at 8.

The court finds that the arbitrator's exploration of the parties' intent underlying P3 was within his power, and that his conclusion is supported by established principles of contract law. Accordingly, plaintiff's motion to vacate the arbitrator's award is denied. An [*6] appropriate Order will accompany this Memorandum.

Service: **Get by LEXSEE®**
Citation: **1983 us dist lexis 14491**
View: Full
Date/Time: Tuesday, January 17, 2006 - 5:50 PM EST

 LexisNexis®   About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*2004 U.S. Dist. LEXIS 976, *; 175 L.R.R.M. 2233*

THOMAS J. MALEK, Plaintiff v. VERIZON COMMUNICATIONS, INC.; and LOCAL 2324 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Defendants

Civil Action No. 02-30164-MAP

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2004 U.S. Dist. LEXIS 976; 175 L.R.R.M. 2233

January 27, 2004, Decided

**DISPOSITION:** **[*1]** Defendants' motions to enforce settlement agreement was denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee filed an action against defendants, his former employer and a union, alleging that the employer wrongfully terminated his employment and that the union breached its duty of fair representation. The employer and union filed motions to enforce a settlement agreement.

**OVERVIEW:** An employee was terminated from his employment, and he filed a union grievance. The employee's employer offered to settle the grievance by paying the employee $ 10,000, but the employee rejected the proposed settlement, and he filed suit against the employer and the union, alleging wrongful termination by the employer and breach of the duty of fair representation by the union. An attorney who represented the employee in his lawsuit engaged in settlement negotiations with the employer's attorney, and they reached a verbal agreement to settle the case for $ 10,000. However, when the employer's attorney put that agreement in writing, she added terms that were not discussed, including a term which provided that the employee would not be allowed to work for the employer in the future. When the employee refused to accept the written agreement, the employer and the union filed motions to enforce it. The trial court held that the written agreement drafted by the employer's attorney changed the verbal agreement which the employee's attorney proposed, and because the employee did not accept conditions which were added, the parties did not have an agreement the court could enforce.

**OUTCOME:** The court denied the employer and union's motions to enforce the settlement agreement.

**CORE TERMS:** settlement agreement, enforceable, mutual, settlement, settle, non-employment, conversation, one-way, drafted, motion to enforce, negotiation, covenant, oral agreement, case law, formation, enforcing, concedes, clear indication, formal agreement, unenforceable, deposition, purported, scheduled, cancelled, recommend

## LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Settlements > Settlement Agreements 🔍

*HN1* Parties either have a complete, enforceable settlement agreement, requiring no further negotiation on any material point, or they have no settlement agreement at all. More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements 🔍

*HN2* The formation of a settlement agreement, like any other contract, requires a bargain in which there is a manifestation of mutual assent, i.e., a meeting of the minds to the exchange and consideration. An oral agreement to settle a claim may be enforced as any other contract. More Like This Headnote

*HN3* A written draft which contains terms that differ markedly from those agreed to orally is unenforceable.  More Like This Headnote

Contracts Law > Formation > Formation Generally 🔍

*HN4* It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of the contract, and a failure of the parties to agree on material terms may prevent any rights or obligations from arising on either side for lack of a completed contract.  More Like This Headnote

**COUNSEL:** Thomas J Malek, PLAINTIFF, Pro se, Chicopee, MA USA.

For Thomas J Malek, PLAINTIFF: Lynn M Mahoney, Mark J Albano, Michele A Testa, Law Offices of Leon M Rosenblatt, West Hartford, CT USA.

For Verizon Communication, Inc, DEFENDANT: Arthur G Telegen, Sheila O'Leary, Foley Hoag LLP, Boston, MA USA.

For Electrical Workers, Local 2324, DEFENDANT: Harold L Lichten, Jennifer B Rieker, Pyle, Rome Lichten & Ehrenberg, PC, Boston, MA USA.

For Verizon Communication, Inc, Counter CLAIMANT: Arthur G Telegen, Foley Hoag LLP, Boston, MA USA.

Thomas J Malek, Counter DEFENDANT, Pro se, Chicopee, MA USA.

For Thomas J Malek, Counter DEFENDANT: Mark J Albano, Michele A Testa, Law Offices of Leon M Rosenblatt, West Hartford, CT USA.

**JUDGES:** KENNETH P. NEIMAN, U.S. Magistrate Judge.

**OPINIONBY:** KENNETH P. NEIMAN

**OPINION:** MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTIONS TO ENFORCE SETTLEMENT AGREEMENT (Document Nos. 31 and 41)

NEIMAN, U.S.M.J.

The two defendants in this employment termination case -- Verizon Communications, Inc. ("Verizon") and Local 2324 of the International Brotherhood **[*2]** of Electrical Workers, AFL-CIO ("the union") (together "Defendants") -- have separately moved to enforce a settlement agreement purportedly reached with Thomas Malek ("Plaintiff") in the Spring of 2003. For the reasons indicated below, the court will deny both motions. As will be described, the court concludes that the purported settlement agreement is unenforceable. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 District Judge Michael A. Ponsor initially referred the motions to this court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). However, by December of 2003, following a hearing, the parties had all consented to having this court enter this final order on the motions in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

I. BACKGROUND

The following facts come directly from undisputed affidavits and other evidence supplied at the hearing. Sometime in 2000, Plaintiff was terminated from his employment at Verizon. He thereafter **[\*3]** filed a union grievance and an arbitration was scheduled. On March 29, 2002, representatives from Verizon and the union executed a settlement agreement which, inter alia, called for Verizon to pay Plaintiff $ 10,000.

Plaintiff, however, refused to sign the proposed agreement. Instead, on October 8, 2002, he filed this lawsuit in which he alleges wrongful termination (by Verizon) and breach of the duty of fair representation (by the union). Verizon's answer, filed on October 31, 2002, includes counterclaims in which it seeks damages from Plaintiff for his wrongful deprivation of Verizon's compensation and equipment.

On April 24, 2003, Plaintiff's counsel at the time, Leon Rosenblatt, and Verizon's counsel, Sheila O'Leary, engaged in settlement negotiations. Rosenblatt was also in communication with the union's counsel, Jennifer Rieker. During his negotiations with O'Leary, Rosenblatt made several overtures: that Plaintiff was willing to settle the case in exchange for $ 10,000; that Plaintiff did not want to return to work for Verizon; and that if the "original offer" was placed back on the table, and there were mutual releases, Plaintiff would "walk away from" the case. As Rosenblatt **[\*4]** put it:

> My authority was to settle for $ 10,000 and mutual releases. I informed [O'Leary] that it was
> my practice not to recommend that my clients sign a settlement agreement with one-way
> promises. For example, I informed [O'Leary] that I would not recommend that ... Plaintiff sign
> an agreement with a non-confidentiality commitment unless it were a mutual commitment.

(Rosenblatt Aff. P 2.)

In a telephone call on April 25, 2003, O'Leary told Rosenblatt that Verizon would indeed pay Plaintiff $ 10,000 to settle the case. Rosenblatt and O'Leary then agreed that both parties would mutually release their claims. During the conversation, Rosenblatt stated that he would review the terms of the oral "agreement" with Plaintiff, but that he could not imagine there would be a problem with it. At no time during the conversation did Rosenblatt indicate that he lacked authority to settle the matter.

On April 28, 2003, O'Leary sent to Rosenblatt, by facsimile, a multiple-page document entitled "Settlement Agreement." (To avoid confusion with other purported *oral* agreements, the court will follow the parties' lead and use capital letters when referring to this document.) **[\*5]** In a conversation with O'Leary later that day, Rosenblatt confirmed that the parties had reached an agreement "in principle" and that the terms of the agreement were "unusually fair." Believing that the parties had indeed reached an agreement, O'Leary cancelled a deposition scheduled for the next day. Another deposition was also cancelled.

Rosenblatt sent the Settlement Agreement to Plaintiff who strongly objected to a particular portion which would have prevented him not only from working for Verizon, but also from working for any company affiliated with Verizon. According to Rosenblatt, "Plaintiff's fear was that he might find himself employed by a company which is acquired by Verizon, and the Settlement Agreement could force him to resign." (Rosenblatt's Aff. P 4.) Meanwhile, on April 30, 2003, the union modified the Settlement Agreement by adding itself as a party and adopting the Agreement's standard terms.

In a letter dated May 14, 2003, Rosenblatt informed O'Leary that, although he had not yet reviewed the Settlement Agreement with Plaintiff, certain terms were unsatisfactory. Specifically, Rosenblatt told O'Leary that Plaintiff took issue with the clause prohibiting him from **[\*6]** working for Verizon, or any affiliate, in the future. Rosenblatt also noted that while some of the covenants were mutual, not all of them were, at least not to the same degree. n2 On May 21, 2003, O'Leary left a message for Rosenblatt explaining that Verizon insisted on maintaining the non-employment clause, but asking Rosenblatt to propose a way to deal with the other matters.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 For example, the Settlement Agreement stated that Plaintiff would not disparage Verizon; however, there was no non-disparagement clause directed at Verizon. (Verizon's Ex. 1 P 4(b).) Moreover, while the Settlement Agreement included covenants by both parties that they would not sue the other concerning the

subject matter of the agreement, only Plaintiff's covenant included an "indemnity" and "hold harmless" clause which also stated that, if he did sue Verizon, he would "pay the expenses, attorneys' fees, and costs actually incurred in defending such suit or legal proceeding." (*Id.* P 7.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On May 27, 2003, Rosenblatt **[*7]** and Plaintiff had a further discussion about the terms of the Settlement Agreement. Thereafter, Rosenblatt had several telephone conversations with O'Leary. "In an effort to break the impasse," Rosenblatt avers, "I asked whether Verizon would agree to a simple boilerplate exchange of releases rather than an elaborate settlement agreement." (Rosenblatt Aff. P 6.) Verizon refused, which Rosenblatt took "to be a clear indication that the terms of [the] Settlement Agreement were essential elements." (*Id.*)

On June 12, 2003, O'Leary contacted Rosenblatt to further discuss the Settlement Agreement. Rosenblatt, however, informed both O'Leary and Rieker that Plaintiff had changed his mind and was unwilling to settle for less than $ 20,000. In due course, Defendants filed the instant motions to enforce, Plaintiff tendered an opposition, the court held a hearing, and Verizon, at the court's request, filed a post-hearing memorandum.

## II. VERIZON'S MOTION TO ENFORCE

The court was initially unclear as to what "agreement" Verizon sought to have enforced. On the one hand, Verizon's motion repeatedly stated that the court should enforce the "Settlement Agreement," i.e., the multi-page document **[*8]** which Plaintiff never signed. On the other hand, Verizon implied at the hearing that it is actually seeking to enforce an agreement to make a good faith effort to come to a formal agreement.

With regard to the latter possibility, Verizon has since acknowledged that, although given the opportunity to do so, it has discovered no case law to support its position that "an agreement to make a good faith effort to come to a formal agreement" is enforceable. (Document No. 45.) Such a concession is appropriate. As District Judge Steven McAuliffe explained in *Clark v. Mitchell,* 937 F. Supp. 110 (D.N.H. 1996), [HN1] "parties either have a complete, enforceable settlement agreement, requiring no further negotiation on any material point, or they have no settlement agreement at all." *Id.* at 114 (rejecting argument that the plaintiff "should be ordered to negotiate the remaining disputed terms in good faith" and holding that there is "no middle ground between an enforceable settlement agreement and no settlement agreement at all"). Accordingly, the court is left with Verizon's request, as set forth in its motion, that the court enforce the Settlement Agreement as written. **[*9]** The question the court needs to answer, therefore, is whether this document formed a valid contract.

As this court has previously observed, [HN2] the formation of a settlement agreement, like any other contract, requires a bargain in which there is a manifestation of mutual assent, i.e., a meeting of the minds to the exchange and consideration. *See O'Rourke v. Jason, Inc.,* 978 F. Supp. 41, 45 (D. Mass. 1997) (citing *Restatement (Second) of Contracts* § 17(1) cmt c). *See also Trifiro v. New York Life Ins. Co.,* 845 F.2d 30, 31 (1st Cir. 1988). To be sure, an oral agreement to settle a claim may be enforced as any other contract. *See O'Rourke,* 978 F. Supp. at 45-46 (citing cases). As described, however, Verizon -- despite some references in its memoranda to the contrary -- is not seeking to enforce an oral contract. Rather, Verizon argues that the written Settlement Agreement encapsulates the parties' oral understanding and, therefore, that the *document* should be enforced as drafted by Verizon. (See, e.g., Verizon's Motion at 5 ("[Plaintiff] cannot, and has not, claimed that Verizon's proffered **[*10]** *draft* was inconsistent with the settlement ... [Plaintiff]'s demand for $ 20,000 constitutes a repudiation of *the Settlement Agreement* and [Verizon] is entitled to enforce the terms of *the Agreement.*"), 6 ("There is no indication that [Rosenblatt] did not have authority to agree to the terms of *the Settlement Agreement.*") and 7 ("Allowing Plaintiff to nullify *the Settlement Agreement* would undermine the Court's preference for the voluntary settlement of matters.") (emphasis added).)

Verizon's argument notwithstanding, the court cannot enforce the written Settlement Agreement. The reason is simple. The written proposal materially changed the terms upon which the parties had orally agreed: Verizon added a non-employment clause as well as several other one-way promises. Put differently, the Settlement Agreement constituted a new offer by Verizon, Plaintiff rejected that offer and, as a result, no agreement exists.

4 of 6

As Plaintiff pointed out at the hearing, the present matter is analogous to two New Hampshire cases. n3 In _Arapage v. Odell,_ 114 N.H. 684, 327 A.2d 717 (N.H. 1974), the court held that where counsel accepted the monetary part of a **[\*11]** settlement offer, but specifically rejected other provisions, there was no enforceable agreement between the parties. _See id._ 114 N.H. 684, 327 A.2d 717, at 718. A similar result was reached by Judge McAuliffe in _Clark,_ 937 F. Supp. at 113-14 (holding that _HN3_ a written draft which "contains terms that differ markedly from those agreed to orally" is unenforceable).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 New Hampshire, like Massachusetts, follows traditional contract law principles: "Offer, acceptance and consideration are essential to contract formation." _Chisholm v. Ultima Nashua Indus. Corp.,_ 150 N.H. 141, 834 A.2d 221, 225 (N.H. 2003). Compare _Quinn v. State Ethics Comm'n,_ 401 Mass. 210, 216, 516 N.E.2d 124 (Mass. 1987) (observing, under Massachusetts law, that the "essential elements" of a contract are "bargained-for exchange -- offer, acceptance and consideration").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Like the plaintiff's attorney in _Clark,_ Rosenblatt "readily concedes he agreed to certain provisions and personally considered the case settled on those **[\*12]** terms," _id._ at 114, i.e., $ 10,000 and the exchange of mutual releases. "He also specifically rejected other material provisions proposed by defendants," _id.,_ namely the non-employment clause and the other one-way promises. "Curiously, however" -- and to paraphrase Judge McAuliffe -- Verizon is "not seeking to enforce the agreement [Rosenblatt] concedes. It is _defense counsel,_ not [Plaintiff], who has strived mightily to disprove the enforceable agreement ... by trying to prove a materially different one. Given [Verizon's] position, there simply was no enforceable settlement between the parties." _Id._ (emphasis in original). In short, as in _Clark,_ "the broad settlement sought to be enforced by [Verizon] is not a settlement that was ever in fact reached by counsel" and, ergo, cannot be enforced. _Id._ (citation and internal quotation marks omitted).

Of course, Verizon also argues that the "essential elements" of the oral deal, in fact, had been reached, that the added written provisions were "not material," and that, as a result, there is no barrier to enforcing the Settlement Agreement as drafted. The court, however, disagrees. _HN4_ "It is axiomatic that to **[\*13]** create an enforceable contract, there must be agreement between the parties on the material terms of that contract," _Situation Mgmt. Systems, Inc. v. Malouf, Inc.,_ 430 Mass. 875, 724 N.E.2d 699, 703 (Mass. 2000), and "[a] failure of the parties to agree on material terms ... may prevent any rights or obligations from arising on either side for lack of a completed contract," _Rosenfield v. U.S. Trust Co.,_ 290 Mass. 210, 195 N.E. 323, 325 (Mass. 1935). Here, it is clear that the non-employment clause in particular, if not the other one-way promises (see n.2), was material. Certainly, Plaintiff himself viewed these terms as critical. Moreover, Verizon's refusal on May 27, 2003, to agree to an exchange of releases was a "clear indication," as Rosenblatt avers, that it too deemed the additional terms "essential."

To be sure, the situation might have been different had Verizon promptly sought to enforce the oral agreement reached by the parties on April 25, 2003: $ 10,000 and the exchange of mutual releases. As described, however, Verizon is bent on enforcing the Settlement Agreement as drafted. Since there has been no meeting of the minds with respect **[\*14]** to that document, Verizon's motion to enforce will be denied.

## III. THE UNION'S MOTION TO ENFORCE

The union's motion to enforce -- filed just prior to the hearing and, by its own terms, dependent on Verizon's motion -- is riddled with deficiencies. For one thing, the motion makes no reference to case law or other authority. Also, the motion is unsupported by affidavit or other suitable evidence. Finally, and perhaps most importantly, the motion is vague as to what "verbal agreement" the union wants enforced and how it has standing with respect thereto. At best, the union states that it "agreed to settle the case for $ 10,000 payable by Verizon to ... Plaintiff," but it overlooks the other material terms that are at the heart of this dispute and which Verizon incorporated into the draft Settlement Agreement which it seeks to have enforced. Accordingly, the union's motion to enforce will be denied as well.

IV. CONCLUSION

For the reasons stated, Defendants' motions to enforce are hereby DENIED. The clerk shall schedule a case management conference.

IT IS SO ORDERED.

DATED: January 27, 2004

/s/

KENNETH P. NEIMAN

U.S. Magistrate Judge

Service:    **Get by LEXSEE®**
Citation:   **2004 us dist lexis 976**
View:       Full
Date/Time:  Tuesday, January 17, 2006 - 5:52 PM EST

 About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*2002 U.S. Dist. LEXIS 16202, \**

INTERPAY, INC., Plaintiff, v. GEORGE BIGHAM, Defendant.

CIVIL ACTION NO. 01-10779-DPW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2002 U.S. Dist. LEXIS 16202

August 15, 2002, Decided

**DISPOSITION: [\*1]** Defendant's and plaintiff's motions for summary judgment denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** In plaintiff employer's action against defendant employee seeking a declaration that it was not required to make salary continuation payments (SCPs) to the employee under the parties' employment agreement, both parties moved for summary judgment.

**OVERVIEW:** The employee began working for the employer under an employment agreement that provided that if the employee became disabled, retired, or was terminated without cause, the employer was required to pay him additional compensation or SCPs. After 11 years the employee left the employer to work for another company. The employer paid him SCPs for six months until its chief financial officer determined that it was not obligated to pay the SCPs because the employee had not retired. The employer filed suit seeking a declaratory judgment that it was not required to pay the employee SCPs. On the parties' motions for summary judgment, the court determined that the reasonable inferences that could be drawn about the parties' intentions from the agreement's language was sufficient to raise a material issue of genuine fact as to the meaning of "retire." The agreement's language indicated that "retire" meant the withdraw from the workforce, while the employer's executives who negotiated the agreement stated that it meant only to resign the employee's position with the employer and that SCPs were available so long as the employee did not work for a competitor.

**OUTCOME:** The parties' motions for summary judgment in the employer's action seeking interpretation of an employment agreement was denied.

**CORE TERMS:** retire, termination, retirement, permanently, workforce, ambiguous, plain meaning, negotiation, summary judgment, withdrawing, fleet, extrinsic evidence, withdrawal, entitled to receive, occupation, departure, withdraw, sweat, parol evidence, separately, construing, cessation, terminated, negotiated, payroll, termination of employment, material fact, contemporaneous, factfinder, quotation

**LexisNexis(R) Headnotes** ♦ Hide Headnotes

---

Civil Procedure > Summary Judgment > Summary Judgment Standard 

HN1 ⚡ Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one which has the potential to affect the outcome of the suit under the applicable law. An issue is genuine only when the relevant evidence could lead a reasonable factfinder, drawing favorable inferences, to decide it in the manner described by the nonmoving party. More Like This Headnote

---

Contracts Law > Contract Interpretation > Interpretation Generally 

HN2 ⚡ Under Massachusetts Law, interpretation of a contract is ordinarily a question of law for the court,



and therefore a matter that is appropriate for determination on summary judgment. However, if the contract's terms are ambiguous, contract meaning normally becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

*HN3* A court should seek to give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible. Contracts are to be construed as a whole, to give meaning and effect where possible to each phrase and clause. Words should be given their plain and ordinary meaning where no inconsistency results or there is no controlling indication in the instrument of other intent.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

Contracts Law > Contract Interpretation > Parol Evidence Rule 

*HN4* The task of interpreting a contract begins with the language and structure of the agreement itself. In Massachusetts, the parol evidence rule precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement. Therefore, when construing a fully integrated contract, as here, the court can consult external evidence only once it determines that the contract language is ambiguous, itself a matter of law for the court. A contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken. Where a contract is ambiguous, ambiguities are typically resolved against the drafter of the document.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

*HN5* The word "retire" is susceptible to varying meanings depending on the reference to which it is made. In one sense, it connotes a permanent withdrawal from gainful employment altogether, namely, to give up business or public life and live on one's income, savings, or pension. However, "retire" may also refer simply to withdrawal from a particular occupation or even from a particular position within an occupation. Thus, the scope of retirement--whether it means withdrawal from a particular job or occupation, or complete withdrawal from the workforce--depends on the word's context.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

*HN6* Different terms should be construed to give each independent meaning.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

*HN7* Separately negotiated or added terms are given greater weight than standardized terms or other terms not specifically negotiated.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 

*HN8* A person who in the middle of his career quits his job to take another is ordinarily described as having voluntarily terminated employment rather than having retired.  More Like This Headnote

Contracts Law > Contract Interpretation > Parol Evidence Rule 

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem 

*HN9* Massachusetts law may permit, in limited circumstances, the use of extrinsic evidence for the very purpose of deciding whether the documentary expression of the contract is

ambiguous. More Like This Headnote

Contracts Law > Contract Interpretation > Parol Evidence Rule

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem

*HN10* Where the terms of a written contract are ambiguous, both parties may testify as to what they understood by the terms of the contract when they executed it. Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; (3) trade usage in the relevant industry and (4) prior course of dealing. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem

*HN11* An argument between parties about the meaning of an ambiguous contract is typically an argument about a material fact and summary judgment is normally unwarranted unless the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary. More Like This Headnote

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem

*HN12* Exploring the intent of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties' discerned intent. More Like This Headnote

**COUNSEL:** For INTERPAY, INC., Plaintiff: Robert D. Hillman, Rodney G. Hoffman, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA.

For GEORGE BIGHAM, Defendant: Alan D. Rose, Alan D. Rose, Jr., Rose & Associates, Boston, MA.

For GEORGE BIGHAM, Counter-Claimant: Alan D. Rose, Jr., Alan D. Rose, Rose & Associates, Boston, MA.

For INTERPAY, INC., Counter-Defendant: Robert D. Hillman, Rodney G. Hoffman, Deutsch, Williams, Brooks, DeRensis, Holland & Drachman, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT COURT.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:** MEMORANDUM AND ORDER

August 15, 2002

This action involves the construction of an employment agreement (the "Agreement") between plaintiff InterPay, Inc. ("InterPay") and defendant George Bigham ("Bigham"). InterPay seeks a declaratory judgment that it is not obligated under the Agreement to make Salary Continuation Payments ("SCPs") to Bigham and recovery of approximately $ 50,000 in SCPs already paid to Bigham. Bigham counterclaims for breach of contract based on InterPay's refusal to make present and future Salary Continuation Payments. Both **[*2]** parties move for summary judgment on all of the claims.

I. BACKGROUND

InterPay, a corporation which is principally located in Mansfield, Massachusetts, is engaged in the business of payroll check processing. In May 1989, Roger Siebel ("Siebel"), an executive with InterPay, known at the

time as Automatic Payroll Service, Inc. ("APS"), contacted Bigham about possible employment. At the time, Bigham, a resident of Arlington Heights, Illinois, was employed by Paychex, also a payroll check processing company, as a District Sales Manager.

Over the next several months, Bigham met multiple times with Siebel and other APS executives to discuss their proposal to hire Bigham to open an APS branch office in Chicago. The parties negotiated the terms of Bigham's compensation package, including ways of earning a "sweat equity interest" in exchange for his leaving Paychex. On August 16, 1989, Bigham and APS executed the Agreement establishing the terms and conditions of Bigham's employment at APS/InterPay. The term of the Agreement commenced on September 2, 1989 and was to continue through April 30, 2011, subject to prior termination pursuant to the Agreement.

At issue in this dispute is a provision **[*3]** of the Agreement entitled "Salary Continuation Payments," which provides for payment of "additional compensation for the services rendered by [Bigham] to [InterPay] during his employment." Agreement P 7. The Agreement provides that Bigham will receive SCPs, according to a formula provided in the Agreement, "in the event that Bigham should become completely disabled (as defined in Paragraph 9 hereof) or retire during the term hereof." Id. Paragraph 12 also provides that Bigham will receive SCPs in the event he is terminated by APS without cause.

Bigham worked for InterPay from September 1989 until April 2000, as Branch Manager of its Chicago office. On March 12, 2000, Bigham accepted an offer of permanent employment with Donlen Corporation ("Donlen"), an automobile fleet management company which does not compete with InterPay. On March 27, 2000, Bigham informed InterPay by letter that he intended to terminate his employment with InterPay and requested exercise of the Salary Continuation Payment provision contained in Paragraph 7 of the Agreement. n1 Subsequently, Bigham spoke with InterPay's CEO William Scott to confirm his decision to leave InterPay and to exercise the SCP **[*4]** provision.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 In his March 27 letter, Bigham stated that "I have chose this as the right time to leave my position... I have accepted a position with Donlen Inc. as Vice President of Sales effective May 1." He goes on to state: "Consequently, I respectfully request to exercise the terms of my employment contract as outlined in Section 7, items (1) and (2) respectively...."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

After consultation with Siebel, InterPay's Senior Vice President of Operations and General Counsel, Scott replied by letter dated April 5, 2000 that InterPay would pay SCPs pursuant to Paragraph 7 of the Agreement. The letter stated that Bigham was entitled to receive SCPs in the amount of six months full pay through October 4, 2000 followed by ten years at 35% of Bigham's current salary through October 4, 2010. Bigham's salary at the time was approximately $ 107,496. On April 14, 2000, Bigham signed and returned to InterPay a copy of Scott's letter, as requested by Scott, indicating his agreement with InterPay's interpretation of the SCP **[*5]** provision.

Soon thereafter, InterPay began making Salary Continuation Payments according to the terms laid out in the letter. Between April and October 2000, InterPay made SCPs totaling $ 51,680.75. On October 5, 2000, John Doyle ("Doyle"), InterPay's new Chief Financial Officer, sent a letter to Bigham denying InterPay's obligation to make further SCPs on the basis that Bigham had not "retired" and therefore was not eligible for SCPs under Paragraph 7 of the Agreement. n2 Following the October 5 letter, InterPay ceased making SCPs to Bigham, and subsequently filed this action.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 In 1995, Fleet (Shawmut Bank) acquired a minor ownership interest in InterPay. Between 1995 and 2000, Fleet steadily increased its ownership, until it eventually completely bought out the company in September 2000. Doyle was brought in by Fleet after they obtained full ownership.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## II. Standard of Review

HN1⚓Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with **[*6]** the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal quotation marks and citation omitted). "An issue is genuine only when the relevant evidence could lead a reasonable factfinder, drawing favorable inferences, to decide it in the manner described by the nonmoving party." Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996).

The Agreement, by its terms, is governed by Massachusetts law. HN2⚓"Under Massachusetts Law, interpretation of a contract is ordinarily a question of law for the court," and therefore a matter that is appropriate for determination on summary judgment. Bank v. IBM, 145 F.3d 420, 424 (1st Cir. 1998) (quoting Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)). However, "if the contract's terms are ambiguous, contract meaning normally **[*7]** becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Id. (internal quotation marks and citations omitted).

## III. Analysis

### A. Principles of Contract Interpretation

I begin with several familiar canons of construction that will guide my interpretation of the contract. HN3⚓A court should seek to "give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." Shea v. Bay State Gas Co., 383 Mass. 218, 224-225, 418 N.E.2d 597 (1981). Contracts are to be construed as a whole, Murray v. Edes Mfg. Co., 309 Mass 395, 401, 35 N.E.2d 203 (1941), to give meaning and effect where possible to each phrase and clause. G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass. App. Ct. 274, 277, 669 N.E.2d 787 (1996). Words should be given their plain and ordinary meaning "where no inconsistency results or there is no controlling indication in the instrument of other intent." Forte v. Caruso, 336 Mass. 476, 480, 146 N.E.2d 501 (1957) **[*8]** (citations omitted).

HN4⚓The task of interpreting a contract begins with the language and structure of the agreement itself. "In Massachusetts, 'the parol evidence rule precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement....'" Bank, 145 F.3d at 424 (quoting New England Fin. Resources, Inc. v. Coulouras, 30 Mass. App. Ct. 140, 566 N.E.2d 1136 (1991)). Therefore, when construing a fully integrated contract, as here, the court can consult external evidence only once it determines that the contract language is ambiguous, itself a matter of law for the court. Id. "A contract is only ambiguous 'where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Id. (quoting Coll, 50 F.3d at 1122). Where a contract is ambiguous, ambiguities are typically resolved against the drafter of the document. Fenoglio v. Augat, Inc., 50 F. Supp. 2d 46, 57 (D. Mass. 1999).

### B. Construction of "Retire"

The locus of the **[*9]** parties' dispute is the meaning of the term "retire" or "retirement," as used in Paragraph 7 of the Agreement, and whether the parties intended for Bigham to receive SCPs upon leaving employment at InterPay to take a new job. Plaintiff contends that "retire" means to terminate entirely one's employment and to permanently withdraw from the paid workforce. n3 Bigham argues that "retire" means to leave voluntarily employment at InterPay, or alternatively to withdraw from employment in a particular industry or occupation, and does not preclude one from immediately undertaking employment elsewhere, as he did with Donlen. The term "retire" is not defined by nor does it appear elsewhere in the Agreement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 At the hearing, counsel for the plaintiff represented that under InterPay's interpretation of "retire," Bigham is precluded from engaging in any future employment. Under its interpretation, even had Bigham retired, he would lose his SCPs if he were to undertake paid employment at any point after retirement from InterPay.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*10]**

1. Plain Meaning and Structural Analysis - I begin with the plain meaning and structure of the Agreement. Both parties can find support for their interpretation of "retire" in dictionaries and other sources of plain meaning. As one court noted,

> *HN5* The word 'retire' is susceptible to varying meanings depending on the reference to which it is made. In one sense, it connotes a permanent withdrawal from gainful employment altogether, namely, 'to give up business or public life and live on one's income, savings, or pension.' However, 'retire' may also refer simply to withdrawal from a particular occupation or even from a particular position within an occupation.

Neuman v. Akman, 715 A.2d 127, 131-32 (D.C. 1998)(citations omitted). Thus, the scope of retirement-- whether it means withdrawal from a particular job or occupation, or complete withdrawal from the workforce--depends on the word's context. Paragraph 7, however, does not expressly qualify the term retire nor otherwise make clear which meaning of retire is intended. Therefore, I must consult the other provisions to determine whether the Agreement clearly establishes a single definition of retire. **[*11]**

Paragraph 11 governs voluntary termination of employment. In construing the terms retirement and voluntary termination, I seek to give each independent meaning. See Federal Deposit Ins. Corp. v. Singh, 977 F.2d 18, 22 (1st Cir. 1992). The plain meaning of voluntary termination is that the employee has freely chosen to cease employment with the company; this naturally encompasses both quitting to take other employment and permanently withdrawing from the workforce. Under both parties' interpretations, retirement constitutes a subset of voluntary termination. However, Bigham's construction of retire-- withdrawal from one's position or occupation--renders retirement and voluntary termination virtually identical, thus violating the maxim that *HN6* different terms should be construed to give each independent meaning. In contrast, InterPay's definition gives both words distinctive significance.

The need to distinguish retire and voluntary termination is driven by more than the mandate to give words independent meaning. Paragraph 11 provides that "upon voluntary termination all compensation and benefits under this contract shall cease." Agreement P 11 (emphasis added). On **[*12]** its face, Paragraph 7, which grants SCPs on retirement, does not allow for a construction of retire that is a subset of voluntary termination. There are several ways suggested to reconcile the apparent conflict between Paragraphs 7 and 11.

First, it may be argued the bar on compensation and benefits does not apply to SCPs, since as Bigham argues, SCPs are elsewhere referred to by name. However, the adjective "all" in Paragraph 11 combined with the specific characterization of SCPs as "compensation" in Paragraph 7 wholly undermines this argument. In fact, where the Agreement intends to discuss all compensation other than SCPs, it makes this exception expressly. See Agreement P 7(iv)("Except as set forth in this subparagraph (iv) [referring to SCPs paid on death], all other compensation shall end upon Bigham's death.")(emphasis added). Thus, under Paragraph 11, no SCPs can be awarded to one who has voluntarily terminated employment.

Bigham also argues that the "cessation" of all compensation and benefits upon voluntary termination does not include SCPs because the SCPs have not yet begun at the time of termination, and therefore logically cannot cease. Thus, Bigham maintains **[*13]** that SCPs can be initiated following the cessation of all compensation and benefits. This argument too closely parses the language and timing of Paragraph 11; the cessation of benefits upon voluntary termination is not a temporary terminus clearing all past compensation

but allowing new forms of compensation to commence. Rather, the provision anticipates that all forms of compensation under the contract permanently end on the date of voluntary termination. Moreover, the Agreement uses the same language in Paragraph 10, termination for cause, where the Agreement clearly intends to bar all compensation including SCPs. Additionally, in Paragraphs 9 and 12, covering complete disability and termination without cause, respectively, when payment of SCPs is intended the Agreement explicitly provides that InterPay "shall be obligated to provide" SCPs "in accordance with the provisions of Paragraph 7." Agreement PP 9, 12. The maxim *expresio unius est exclusio alterius* counsels treating the absence of such language in Paragraph 11 as evidence against reading the Agreement to provide for SCPs in the case of voluntary termination. Singh, 977 F.2d at 22-23.

Bigham also argues **[*14]** that any conflict between Paragraph 7 and Paragraph 11 must be resolved in favor of providing SCPs in the event of retirement based on the canon of construction favoring specific terms over general language. In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1357 (1st Cir. 1992). HN7 "Separately negotiated or added terms are given greater weight than standardized terms or other terms not specifically negotiated." Id. at 1357-58. cBigham argues that "retire" and "SCPs" are more specific terms than "voluntary termination" and "compensation and benefits," and that they were separately negotiated. Therefore, he contends, Paragraph 7 should be read as an exception to the general cessation of compensation and benefits in the event of voluntary termination under Paragraph 11.

In Bigham's favor, it appears that retire may have been added separately to the otherwise boilerplate language of Paragraph 7 since retire doesn't appear elsewhere in the Agreement. Paragraph 2 lists the possible ways of ending the Agreement before the end of the term, including termination of retirement, death, and permanent disability, but does not include retirement as a separate ground. **[*15]** n4 Moreover, Paragraphs 10-12 establish only three forms of termination of employment (termination for cause, voluntary termination, and termination without cause), suggesting that the boilerplate contract did not conceive of retirement as a separate category distinct from voluntary termination.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Paragraph 2 provides: "The term of this Agreement shall commence on September 2, 1989 and shall continue through April 30, 2011 subject only to prior termination of such employment upon Bigham's death, complete disability, termination of employment, or the occurrence of a successful public offering or sale of the common stock of APS as described in paragraph 13, below."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

However, Bigham's argument assumes that his definition of retire is independently established. In attempting to choose between competing definitions of retire, the maxim favoring specific terms does not lend any greater support to Bigham's interpretation than InterPay's. Rather, it is preferable to construe "retire" in such a way as to avoid creating **[*16]** a direct conflict between Paragraphs 7 and 11 in the first instance. Moreover, because Bigham's definition of retire overlaps so closely with that of voluntary termination, it can hardly be characterized as a more specific term than voluntary termination. Thus, while retire may have been added separately to the contract, that fact does not by itself establish which definition the parties intended. In fact, had the parties intended Bigham's interpretation, they could have expressed this by altering the language of Paragraph 11 to award SCPs in the event of voluntary termination, rather than adding the undefined term "retire" in Paragraph 7 and leaving the existing language of Paragraph 11.

Alternatively, Paragraphs 7 and 11 can be reconciled by construing "retire" to be completely distinct from "voluntary termination." Since the plain meaning of voluntary termination encompasses both parties' construction of "retire," this entails interpreting both terms so as to have distinct yet sensible meanings. The broadest interpretation of retire--withdrawing from one's position at InterPay--is wholly coextensive with voluntary termination and therefore flatly inconsistent with Paragraph 11. **[*17]** A slightly narrower version of Bigham's definition under which retire covers withdrawing from one's employment in the payroll cashing industry requires narrowly defining voluntary termination as leaving InterPay to seek alternate employment elsewhere in the payroll check industry. This is an extremely narrow definition of voluntary termination that is not consistent with common usage.

By contrast, under InterPay's definition of retire as permanently withdrawing from the workforce, voluntary

termination consists of ending employment with InterPay without permanently leaving the workforce. In other words, voluntary termination constitutes quitting employment to take another job whereas retirement means permanently withdrawing from the workforce. This definition, while perhaps more limited than the scope of the word's plain meaning, is a logical construction of voluntary termination. Moreover the distinction it draws between voluntary termination (quitting current employment with the intention of seeking or taking another job) and retirement (permanently withdrawing from employment) is consistent with common understanding. **HN8** A person who in the middle of his career quits his job to take **[*18]** another is ordinarily described as having voluntarily terminated employment rather than having retired. Bigham testified that in describing past changes of employment he did not use the term "retire" to convey his decision to quit one job and take another. Thus, construing retire to mean permanently withdrawing from the workforce avoids conflict with Paragraph 12 and gives both words logical constructions.

Bigham argues that InterPay's construction of "retire" is inconsistent with the inclusion of a non-competition clause in paragraph 7. n5 In other words, if retire means to withdraw permanently from the workforce, there is no reason to include a non-competition clause because Bigham cannot work at all while receiving SCP benefits. Bigham's argument overlooks the fact that Paragraph 12 entitles him to SCPs if he is terminated without cause. In such an event, Bigham could--and likely would--seek alternate employment, and therefore Paragraph 7(iii) has independent vitality under InterPay's construction of retire because it bars Bigham from receiving SCPs if he works for a competitor of InterPay following his termination without cause.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n5 Paragraph 7(iii) provides that:

> All Salary Continuation Payments will end if Bigham directly or indirectly engages in any business that competes with the business of the Company.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*19]**

Were I to consider only the plain meaning and structure of the Agreement, I would be inclined to find that Bigham's interpretation of "retire" is barred by Paragraph 12, and therefore adopt InterPay's constructions as the only possible constructions of "retire" and Paragraph 7. Since it is undisputed that Bigham did not permanently withdraw from the workforce when he left InterPay, this interpretation would lead to the conclusion that Bigham is not entitled to receive SCPs under Paragraph 7 of the Agreement.

But my analysis cannot end with consideration of the plain meaning and structure of the Agreement because **HN9** "Massachusetts law also may permit, in limited circumstances, the use of extrinsic evidence 'for the very purpose of deciding whether the documentary expression of the contract is ambiguous.'" Bank, 145 F.3d at 424 n.2 (quoting Donoghue v. IBC USA (Publications), Inc., 70 F.3d 206, 215 (1st Cir. 1995)). Accordingly, I must address the question whether the term "retire" is shown by parol evidence to have a meaning for the parties different from that suggested by the plain meaning and structure of the Agreement.

2. Parol Evidence Analysis **[*20]** - I consult the various parol evidence offered by both parties to attempt to divine the shared intent of the parties. **HN10** "Where the terms of a written contract are ambiguous, both parties may testify as to what they understood by the terms of the contract when they executed it." Trafton v. Custeau, 338 Mass. 305, 307-08, 155 N.E.2d 159 (1959). "Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; ... (3) trade usage in the relevant industry" and (4) prior course of dealing. Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 4 & n.3 (1st Cir. 1999); see Den Norske Bank AS v. First National Bank of Boston, 75 F.3d 49, 52-53 (1st Cir. 1996).

The parol evidence with respect to the negotiations and the course of performance substantially favor Bigham's interpretations of "retire" and Paragraph 7. All of the available parties who were involved in the

original negotiation and contract drafting agree with Bigham's interpretation of retire. Moreover,
InterPay even began paying SCPs under the Agreement before new management took over and ceased
payments.

Two former InterPay executives, n6 both of whom were involved in hiring Bigham, report that the
Agreement was written so that Bigham would be entitled to receive SCPs if he left the company voluntarily
at any time. Siebel, InterPay's former Senior Vice President and Chief Operating Officer, participated in the
initial employment negotiations with Bigham and was responsible for dealing with outside counsel in
preparing the employment agreement. He testified that Bigham sought income protection if he died,
became disabled, or chose "to leave InterPay at some point." According to Siebel, most of the Agreement
used boilerplate language, but several provisions were added to address these concerns for income
security. Specifically, he testified that the word "retire" was used to mean "retirement from InterPay" and
that his understanding of the definition of retirement today is "leaving your current employer. It doesn't
mean you'll never work again."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Both Siebel and Scott are no longer associated with InterPay because their ownership interests were
fully purchased by Fleet in September, 2000.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*22]**

William Scott, InterPay's former CEO, testified similarly in his deposition regarding the meaning of retire
and the availability of SCPs on voluntary departure from InterPay. Although Scott was not directly involved
in generating the Agreement, he did take part in internal discussions regarding the terms of the
Agreement. He testified that "David [Haynes] felt that if George [Bigham] should decide to retire or leave
the company prior to the full contract date, the contract went to its maturity, that there should be some
way for George to leave and get money from the company instead of walking away from everything."
Specifically with respect to the SCPs, Scott testified that they were to be paid "if he were to become
disabled" or "if he were to retire from the company." According to Scott, the word "retire" was used to
mean to resign his position at the company, and SCPs would be available as long as he did not work for a
competitor company.

InterPay challenges the testimony of Scott and Siebel as unreliable, alleging that they were not involved in
the negotiations, did not record their understanding in contemporaneous writings, and did not at any point
discuss with Bigham the **[*23]** meaning of "retire." These critiques which go to the weight of the evidence
fall short of completely undermining their testimony. Scott and Siebel, both InterPay executives at the time
of Bigham's hiring, were involved in the hiring negotiations and possess knowledge of the discussions and
intentions of the parties to the Agreement. Siebel worked directly with outside counsel in drafting the
employment agreement. Their lack of contemporaneous writings and recollection as to discussions about
the term "retire," while the appropriate subject of cross-examination, does not justify dismissing as
unreliable or non-probative their testimony regarding the intended meaning and scope of the Agreement.

Bigham also testifies that the Agreement was written so that he would receive SCPs if he chose to leave
InterPay. He describes the SCPs as a form of sweat equity in the company that he demanded as part of the
initial employment negotiations. Although Bigham cannot recall specific conversations in which the meaning
of "retire" was discussed, he states that the intent of the Agreement was to provide him SCPs on his
departure from InterPay, whether due to disability or voluntary departure, that **[*24]** would compensate
him for his commitment to the company and the value that he created through his hard work.

InterPay attempts to cast doubt on Bigham's recollection by arguing that Bigham's concern for sweat equity
was addressed solely by the Bigham factor contained in Paragraph 13. This provision, offered instead of
shares of stock, granted Bigham a payout according to a formula in the event that InterPay made a public
offering of its stock or was bought by a third party. InterPay contends that Bigham's testimony about SCPs
as a form of sweat equity was concocted after the fact. The value of the Bigham factor, which was based on
the volume of business in the Chicago office, appears to have been a central concern of Bigham's
throughout his tenure at InterPay. Moreover, because the Bigham factor grew based on the value of
Bigham's contribution to the Chicago office relative to the rest of the company, it is appropriately deemed
"sweat equity." Yet, neither fact is inconsistent with Bigham's testimony regarding SCPs and the parties'

shared understanding of the meaning of retire.

Finally, the actions of InterPay after Bigham gave notice of his intent to leave, including Scott's October **[*25]** 5 letter, strongly support Bigham's interpretation of the contract. After resigning and requesting SCPs, Scott and Siebel, both of whom were closely involved in the negotiation of the contract more than ten years prior, discussed the issue and determined that Bigham was entitled under the Agreement to receive SCPs. Scott's April 5, 2000 letter states that Bigham will be paid SCPs according to the "retirement" schedule described in Paragraph 7(ii). Bigham countersigned this letter to express his agreement with its interpretation of the Agreement. Although the letter does not amount to either an account stated n7 or a basis for promissory estoppel, n8 it is a party admission by individuals with personal knowledge of what the parties intended the Agreement to provide.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 An account stated can only exist where there is a valid underlying basis of indebtedness. See Bucklin v. National Shawmut Bank of Boston, 355 Mass. 338, 244 N.E.2d 726 (1969). Thus, if under the contract itself Bigham is not entitled to receive SCPs, the March 5 letter cannot create an independent basis for entitlement. Rizkalla v. Abusamra, 284 Mass. 303, 306, 187 N.E. 602 (1933)("An action to recover upon an account stated ... must be founded on previous transactions ... creating the relation of debtor and creditor.") **[*26]**

n8 Bigham argues that InterPay is estopped from changing its interpretation of the Agreement. However, his estoppel argument fails because there was no representation on the part of InterPay that was intended to induce a course of conduct. See Corion Corp. v. Gih-Horing Chen, 1991 U.S. Dist. LEXIS 18395, 1991 WL 280288 (D. Mass. 1991). Since InterPay's first representation to Bigham that he would be eligible for SCPs when he left InterPay to work at Donlen did not occur until April 5, more than three weeks after Bigham accepted the employment offer from Donlen, it cannot be said that Bigham relied on InterPay's assurances.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

InterPay attempts to discredit the Scott letter as the generous act of individuals whose departure from InterPay was imminent and whose financial interest in the company would not be negatively affected. InterPay suggests that both Scott and Siebel's interest in InterPay had already been bought by Fleet, and that the value of the buyout would not be affected by the additional liability created by Bigham's SCPs. Yet, InterPay's theory is no more than speculation; it offers no evidence that Scott **[*27]** and Siebel would perjure themselves to benefit Bigham financially.

Aside from its efforts to impeach Bigham's parol evidence, InterPay does not offer any extrinsic evidence of its own to support its construction of the Agreement. Instead, it relies solely on the structural and linguistic arguments pressed in favor of its construction of the Agreement. The question then is whether InterPay's textual arguments lend sufficient support to the parties' intent to overcome Bigham's motion for summary judgment.

3. Genuine Issue of Material Fact About Meaning of "Retire"- *HN11* "An argument between parties about the meaning of an ambiguous contract is typically an argument about a material fact and summary judgment is normally unwarranted unless the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Den Norske Bank, 75 F.3d at 53 (internal quotations and alterations omitted). The ultimate factual dispute is over the parties' intentions as to the meaning of the Agreement. Smart v. Gillette Co. Long Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1996). *HN12* "Exploring the intent **[*28]** of contracting parties often (but not always) involves marshalling facts extrinsic to the language of the contract documents. When this need arises, these facts, together with the reasonable inferences extractable therefrom, are together superimposed on the ambiguous words to reveal the parties' discerned intent." Id. The language used in the contract is strong evidence of the parties' intentions. Thus, a jury is entitled to draw inferences about the parties' intent based on the wording of the Agreement.

I find that the reasonable inferences that can be drawn about the parties' intentions from the contract language itself is sufficient to raise a material issue of genuine fact as to the meaning of the Agreement. My legal finding for purposes of summary judgment that the text of the Agreement is ambiguous and therefore capable of supporting two alternate meanings does not mean that a reasonable jury is foreclosed from finding either of those meanings based on its interpretation of the language and structure and its assessment of the witnesses brought before them. Cf. Hughes v. Boston Mutual Life Ins. Co., 26 F.3d 264, 270 n.6 (1st Cir. 1994). Although InterPay **[*29]** does not present extrinsic evidence of its own, a reasonable jury could find, based on the provision governing "voluntary termination" in. Paragraph 12 and the normal meaning of "retire" in combination with the impeachment of defendant's witnesses, that the parties intended "retire" to mean permanently withdraw from the workforce, and therefore that Bigham was not entitled to receive SCPs on his departure from InterPay. Thus, there exists a genuine issue of material fact as to the meaning of "retire" in Paragraph 7 of the Agreement making summary judgment inappropriate.

CONCLUSION

For the reasons set forth more fully above, I hereby DENY both defendant's and plaintiff's motions for summary judgment.

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT

Service:   **Get by LEXSEE®**
Citation:  **2002 us dist lexis 16202**
View:      Full
Date/Time: Tuesday, January 17, 2006 - 5:52 PM EST

 **LexisNexis®**   About LexisNexis   |   Terms & Conditions
Copyright ©  2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.